## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**JULIA E. WRIGHT**                              )
**5190 Linnean Terrace, N.W.**              )
**Washington, D.C.  20008**                  )
)
      **Plaintiff,**                              )
)
      **v.**                                           )     **Civil Action No. _____**
)
**WILLIAM N. HERMAN,**                    )
**ERIC T. MAY and URBAN**               )
**REALTY ADVISORS, LLC**                )
)
      **Defendants.**                           )
_____)

## COMPLAINT

Plaintiff Julia E. Wright ("Wright" or "Plaintiff"), through undersigned counsel, hereby brings this action against Defendants William N. Herman ("Herman"), Eric T. May ("May"), and Urban Realty Advisors, LLC ("URA") (collectively "Defendants"), pursuant to 28 U.S.C. §§ 2201 and 2202, for declaratory relief, breach of contractual and other duties, civil conspiracy and for damages, indemnification and other relief, and states as follows:

## THE PARTIES

1. Wright is an individual residing at 5190 Linnean Terrace, N.W., Washington, D.C.

2. Herman is an individual residing in Montgomery County, Maryland.

3. May is an individual residing in Montgomery County, Maryland.

4.   URA is a limited liability company formed under the laws of the State of Maryland. On information and belief, Herman and May are the only owners of, and members in, URA.

## JURISDICTION AND VENUE

5.   Jurisdiction of this action is proper pursuant to 28 U.S.C. Section 1332(a) in that the action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

6.   Venue is proper pursuant to 28 U.S.C. 1391(a)(2) in that a substantial part of the acts, events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## ALLEGATIONS OF FACT
## COMMON TO ALL COUNTS

7.   Plaintiff repeats each and every allegation contained in Paragraphs 1 through 6 and realleges the same as though set out here in full.

### CRA Urban.

8.   In or about January 2004, Wright and Herman, having previously known one another for many years, agreed to establish an enterprise to engage in the management and development of commercial real estate projects.

9.   In or about January 2004, Wright and Herman, at Herman's suggestion, decided to utilize an existing limited liability company ("LLC") previously formed by Herman under the laws of the Commonwealth of Virginia as the vehicle through which to conduct their enterprise. Notwithstanding the agreement of Wright and Herman to operate externally in the form of an LLC, they also agreed that, as between themselves, they would be partners and would operate internally as a partnership. At all times material

hereto with respect to CRA Urban, Wright and Herman have operated, as between themselves (and later as between themselves and May) as partners in a partnership operating primarily, if not exclusively, within the District of Columbia.

10. Shortly after establishing their enterprise, Wright and Herman changed the name of the pre-existing LLC first to Concord Realty Advisors, LLC, then to CRA Real Estate Services, LLC, and then to CRA Urban, LLC ("CRA Urban"). After causing their enterprise to occupy several temporary quarters in the District of Columbia, Wright and Herman moved their enterprise (by then named CRA Urban) to 1640 Rhode Island Avenue, N.W., Washington, D.C. pursuant to a five-year lease. The latter location became, and remains, CRA Urban's headquarters and only executive office.

11. At the outset, Wright and Herman each had a 50% ownership interest in their enterprise carried on under the name (eventually) of CRA Urban. In or about May 2004, at Herman's suggestion, CRA Urban hired May as an employee because, according to Herman, May would bring financial management expertise to the enterprise. At or about the same time, Wright and Herman agreed that May should receive a 10% ownership interest in CRA Urban, with Herman and Wright to be equally diluted in connection with the issuance of the interest to May. Accordingly, on or about May 1, 2004, May became an executive employee (a Vice President) of CRA Urban and received a 10% ownership interest in CRA Urban. As a result, following May's employment, Wright held, and still holds, a 45% ownership interest in CRA Urban and Herman and May each held, and, on information and belief, still hold, respectively, a 45% and a 10% ownership interest in CRA Urban. Moreover, notwithstanding his employment by CRA Urban, May agreed that Wright, Herman and May would continue to operate, as between and among

themselves, as partners, and, at all times material hereto as to CRA Urban, the parties did

so operate as between themselves.

The Gage School Project.

12.  When Wright and Herman first began the enterprise that became known as CRA

Urban, the enterprise had an opportunity to compete for the development rights to a

property then owned by The Howard University (the "University"). The latter property

consisted of a parcel of realty and a former D.C. public school building known as "The

Gage School," located at 2035 Second Street, N.W., Washington, D.C. If Wright's and

Herman's enterprise succeeded in winning the competition for this property, it was

Wright's and Herman's intention to convert the former school building into

condominium units and to build additional condominium units on the unimproved portion

of the former school property. The finished redevelopment, containing approximately

ninety-three units, was to be called "Parker Flats at Gage School," and the units in the

project were then to be marketed and sold, subject to certain prior reservation rights in

favor of the University's students, faculty, staff members and other affiliated employees,

to the general public. (The acquisition of the Gage School and its conversion into

condominium units for sale either to members of the University community or to the

public is referred to herein as the "Gage School Project" or the "Project".)

13. In or about June 2004, Wright's and Herman's enterprise, which by then

included May and was known as CRA Urban, was designated as the successful developer

for the Gage School Project. From about June 2004 and until or about November 2004,

CRA Urban undertook the necessary due diligence steps and otherwise prepared to close

on the Gage School Project. During this same period, CRA Urban sought to find a

financing partner to provide equity capital for the Gage School Project. By or about November 2004, after extensive negotiations with representatives of an investment entity (hereinafter described), Wright, Herman and May, as the principals in CRA Urban, reached an agreement with the representatives of the investment entity jointly to pursue the Gage School Project. In order to implement this agreement, in or about November 2004, Wright, Herman, May and the representatives of the investment entity took, contemporaneously and as part of an integrated transaction, the following interrelated steps (among others):

A. Wright, Herman and May caused the formation of an LLC named "CRA Urban Venture I LLC" (the "Venture") under the laws of the District of Columbia. Upon the formation of the Venture, Wright, Herman and May executed an Operating Agreement for the Venture (the "Venture's OA").  Exhibit "A" hereto. Upon the Venture's formation, Wright, Herman and May each held a 1% ownership interest in the Venture as a Class A Member and a 32 1/3% ownership interest as a Class B Member. (The attributes of the ownership interests of the Class A and Class B Members in the Venture are the same in all respects, except that Class B Members are not entitled "to vote on or otherwise participate in the management or affairs of the Company" that are within the scope of "Major Decisions" (as defined in the Venture's OA and as discussed below).)  Plaintiff alleges that this provision, at a minimum, entitles all Class A Members, including Plaintiff, to vote on the Venture matters and to participate in the management or affairs of Venture, except to the extent of those limited activities that are solely within the discretion of the Managing Member (referred in the OA as "Major Decisions" and discussed below).

B. The principals in the investment entity caused the formation of an LLC named "HUI, LLC" (the "Investor") under the laws of the Commonwealth of Virginia. Upon the formation of the Investor, the foregoing principals, on information and belief, became (and still are) the only owners of, and members in, the Investor.

C. The Venture or the Investor caused the formation of an LLC named "Gage School Holdings, LLC" (the "Owner") under the laws of the State of Delaware. Upon, or shortly after, the formation of the Owner, the Venture and the Investor executed an Operating Agreement for the Owner (the "Owner's OA"). Exhibit "B" hereto. Upon the formation of the Owner and the execution of the Owner's OA, the Venture and the Investor became (and, on information and belief, still are) the only owners of, and members in, the Owner. The ownership interests in the Owner are not expressed in fixed percentages. Instead, the governance rights of the Owner are allocated pursuant to a series of detailed contractual provisions which, in effect, give strictly limited powers to the Venture, as the designated Manager and Operator of the Owner, to oversee the development of the Gage School Project, and give broad supervisory, consent, approval and veto rights to the Investor to assure that the Venture is properly performing its duties with respect to the Project in accordance with the Owner's OA and the other applicable agreements and legal and other requirements. Under the terms of the Owner's OA, the Investor's broad supervisory and other powers continue in effect until the Project is converted into condominium units and the Investor receives aggregate proceeds from sales of the units in an amount equal to the total equity capital that the Investor has contributed to the Owner plus a 25% annual Internal Rate of Return thereon (computed in accordance with the provisions of the Owner's OA) (the Investor's foregoing financial

interest shall hereinafter be referred to as the "Investor's Senior Participation"). At such time, if ever, as the Investor's Senior Participation is satisfied, all of the Investor's supervisory and other powers of governance lapse, the Venture, if still the designated Manager and Operator of the Owner, acquires sole control over the management of the Owner's business and the conduct of its affairs, and the Venture is then entitled to receive any remaining proceeds from the sale of condominium units by the Owner after the satisfaction of the Investor's Senior Participation (the Venture's foregoing financial interest shall hereinafter be referred to as the "Venture's Residual Participation").

D. Wright, Herman and May or the Investor caused the formation of an LLC named "Gage School, LLC" (the "Title Holder") under the laws of the District of Columbia. The Owner is the only owner of, and member in, the Title Holder and, as a result, the terms and conditions of the Owner's OA govern all actions of the Owner as the only member of the Title Holder. The sole purpose of the Title Holder is to take title of record to the Gage School Project for the benefit of the Owner and to act as the borrower of record for any acquisition, construction or other financing obtained for the Gage School Project by the Owner which is secured, or to be secured, by a deed of trust or other lien against the Gage School Project.

E. Shortly after the formation of the Venture, the Investor, the Owner and the Title Holder, and the execution of the Venture's OA and the Owner's OA, the Owner caused the Title Holder to acquire the Gage School Project from the University. The funds for the purchase of the Project were provided, in major part, by the proceeds of a short-term acquisition loan in the principal amount of $2,250,000 (the "Loan") made by The Columbia Bank (the "Bank") to the Title Holder with the consent of the Investor.

The Loan is secured by a deferred purchase money deed of trust against the Project.

Repayment of the Loan to the Bank is personally guaranteed, jointly and severally, by

Wright, Herman and May. (Although Wright, Herman and May are each fully liable to

the Bank for the repayment of the entire Loan, under the terms of the Venture's OA, they

are, as between themselves, each only liable for one-third of the amounts due under the

Loan.)

      F. Prior to, but in anticipation of, the purchase of the Gage School Project, the

Venture made a net deemed capital contribution of $225,000, and the Investor made a

cash capital contribution of $1.3 million, to the Owner. Wright, Herman and May each

contributed one-third (or $75,000) of the funds for which the Venture was credited with

its net deemed capital contribution of $225,000 to the Owner. After the payment of the

purchase price for the Gage School Project (primarily from the proceeds of the Loan) and

the other costs and expenses of closing, the Owner had equity funds of approximately $1

million available to pay the Project's predevelopment costs (that is, the costs of preparing

plans and condominium documents for the Project and otherwise getting the Project to

the point of the issuance of a full building permit and a closing on a construction loan).

This sum of equity was expected to be sufficient, and, with proper management of the

Project in accordance with the terms of the Owner's OA and other applicable documents

and requirements, should be sufficient, to pay the Project's predevelopment costs and to

place the Project in an appropriate state of readiness for the issuance of a full building

permit and the closing of an acceptable construction loan.

14. As a result of the contemporaneous execution of the various documents, and the acquisition of the Gage School Project, as described in Paragraph 13 above, following the acquisition of the Gage School Project:

A. The Title Holder holds record title to the Project, subject to the lien of a deferred purchase money deed of trust securing the Bank's Loan, for the benefit of the Owner, the sole owner of the Title Holder;

B. The Venture and the Investor are the sole members of the Owner. The Venture is designated the Manager and the Operator of the Owner subject to, among other things, the terms of the Owner's OA, including the broad supervisory, consent, approval and veto rights of the Investor under the Owner's OA;

C. Under the terms of the Owner's OA, the Venture is subject to, among others, the following duties and obligations in favor of the Investor (unless and until the Investor's Senior Participation is satisfied in full -- an event that has not as yet occurred):

(i) To act as a fiduciary in performing its duties and obligations under the Owner's OA (including its duties and obligations as hereinafter described) and to exercise and meet a standard of Due Care (as defined in the Owner's OA) while so performing as a fiduciary under the Owner's OA. The standard of Due Care is defined in the Owner's OA as requiring the Venture to "act in a manner consistent with [the Venture's] reasonable, good faith determination as to the best interests of the [Owner], in a manner generally consistent with the manner in which a prudent real estate professional experienced in such matters would reasonably be expected to act in the conduct of an enterprise of like character with like aims;"

(ii) Not to take any action requiring a Major Decision (that is, any matter requiring the prior approval or consent of the Investor which, in numerous instances, can be granted, withheld or conditioned in the Investor's sole and absolute discretion) without obtaining the Investor's prior approval or consent;

(iii) To cause, and not to prevent, the "Key Persons" (defined in the Owner's OA to be Wright, Herman and May) to devote, as full-time employees of either the Venture or CRA Urban, "the amount of time and resources necessary for the effective and efficient performance of all of the Venture's duties and obligations of the Operator hereunder, including without limitation the duties and obligations of the Operator as Manager;"

(iv) To act in accordance with, and not to violate, the terms of the Venture's OA (which had been approved, after extensive negotiations, by the Investor) either in connection with the performance of any of the duties or obligations of the Venture under the Owner's OA or otherwise.

D. Under the terms of the Venture's OA, Herman is designated as the Managing Member of the Venture. The authority of the Managing Member to act on behalf of the Venture is, however, subject to, among other things, the need to obtain the "consent or approval" of a Class A Majority for all "Major Decisions." A Class A Majority, in turn, requires the consent of a "Class A Majority" of the Venture's Class A Members (who at all times material hereto have been and continue to be Wright, Herman and May). Major Decisions involve substantially all, if not all, material decisions respecting the management of the business of the Venture and the conduct of its affairs. Without in any way limiting the generality of the foregoing, Herman, when acting as the

Venture's Managing Member, and Herman and May, when acting as a Class A Majority, have the following duties and obligations to Wright under the Venture's OA, the Owner's OA (which is an exhibit to, and is incorporated in and made a part of, the Venture's OA), and otherwise:

(i) Not to engage in willful misconduct against, involving, or with respect to, Wright;

(ii) Not to direct, suffer or permit the Venture, as a member in, and designated Manager and Operator of, the Owner to breach any duty or obligation owed by the Venture, in any capacity, to the Investor (including, without limitation, any of the duties and obligations of the Venture to the Investor described in Paragraph 14.C above);

(iii) Not to prevent or exclude Wright from participating in the Venture's business or the conduct of its affairs, either by denying Wright access to the Venture's books and records (so that Wright could not be and remain fully informed regarding the Venture's business and affairs, including the Project), or by denying Wright a meaningful opportunity to participate in the making of Major Decisions for the Venture by a Class A Majority, or otherwise;

(iv) Not to act, or purport to act, as Managing Member or as a Class A Majority with respect to any Major Decision, as the case may be, with the intent, purpose or effect of advancing his (Herman's), or their (Herman's and May's), personal interest or interests at the expense of Wright or damaging, or attempting to damage, Wright without proper, good faith regard for the best interests of, among others, Wright.

15. Following the contemporaneous execution of the various documents, and the acquisition of the Gage School Project, as described in Paragraph 13 above (which

interrelated transactions had, among others, the legal consequences described in Paragraph 14 above), Wright made (and still has) a capital contribution of $75,000, which represented (and still represents) one-third of the Venture's net deemed capital contribution to the Owner. Moreover, Wright then was (and still is) liable to the Bank for the full amount of the Loan (in the principal sum of $2,250,000, plus interest) pursuant to the terms of her personal guaranty of the Loan (subject to her rights to seek indemnification from Herman and May for any payments in excess of one-third of the amounts due under the Loan). Finally, as a one-third owner of all Class A and Class B Membership interests in the Venture, Wright is entitled to a one-third share of the Venture's Residual Participation in the Gage School Project. Immediately following the acquisition of the Gage School Project, the total amount of the Venture's Residual Participation was reasonably estimated to be, and, with proper management of the Gage School Project in accordance with the terms of the Owner's OA and other applicable agreements and requirements, the total amount of the Venture's Residual Participation should be, no less than $5-$6 million. Wright's one-third share of the latter amount originally was, and ultimately should be, no less than $1.67-$2 million.

16. Following the acquisition of the Gage School Project, Herman, on information and belief, transferred one-quarter of his interest as a Class B Member in the Venture (or approximately an 8% Class B Membership interest in the Venture) to his father in exchange for $200,000, thereby cashing out his (Herman's) entire cash investment (of $75,000) in the Venture and the Project at a substantial profit (garnered at the expense of his father). At or about the same time, May, on information and belief, transferred one-quarter of his interest as a Class B Member in the Venture (or, again, approximately an

8% Class B Membership interest in the Venture) to his brother in exchange for a payment (or other consideration) in an unknown amount (or having an unknown value). On information and belief, neither Herman's father nor May's brother have acted (insofar as the Venture and the Project are concerned) as other than passive Class B Members in the Venture and, specifically, neither of them has participated in, or aided or abetted, any of the wrongful acts of Herman and May as hereinafter described. As a result of the foregoing transfers of Class B Membership interests in the Venture to Herman's father and May's brother, Wright has, as contrasted with Herman and May, the largest cash investment in the capital of the Venture.

The Development Services Agreement<br>
<u>Between the Owner and CRA Urban.</u>

17. Upon, or in anticipation of, the acquisition of record title to the Gage School Project by the Title Holder for the benefit of the Owner, the Owner, with the consent of the Investor, entered into a Development Services Agreement ("DSA") with CRA Urban. The DSA is one of the documents that, like the Venture's OA, is the product of extensive negotiations with the Investor, and is one of the documents that were executed contemporaneously as part of the integrated transaction described in Paragraph 13 above. The DSA is Exhibit J to the Owner's OA, which, in turn, is Exhibit A to the Venture OA

18. Pursuant to the DSA, the Owner retained CRA Urban to provide all development management services for the Gage School Project subject to the terms of the DSA and the Owner's OA (which is incorporated in, and made a part of, the DSA). Subject to the limitations in the DSA and the Owner's OA, the scope of CRA Urban's retention was all encompassing and included the following services and responsibilities:

"[CRA Urban] shall . . . plan, oversee and coordinate, the design and implementation of the Project and provide the day-to-day coordination, administration, and management and supervision of the Project, including all aspects of (A) acquisition of the [Gage School Project], (B) approval of the Project and all aspects thereof for development and construction, (C) the development of the [Project] and construction of units on the Project, (D) the oversight of the marketing of the Units in the Project, (E) the sale of the units and receipt and management of sales proceeds in connection therewith, (F) all customer service and warranty work related to the units, (G) contracting for all services required in the acquisition, development, construction, management and sale of the units, (H) budgeting and accounting for costs of and revenues from the Project and related finance and loan administration, (I) formation of a condominium regime and homeowners' association for the Project (with related documentation and regulatory filings necessary thereto), (J) interacting with federal, state and local governmental authorities with respect to gaining the approvals for, implementation of the conditions requisite to, and complying with the permits for the construction of the Project and (K) the management and oversight of construction of the Project and all Project-related activities relating thereto." DSA, Para. 4(a)(vii).

19. The intent, purpose and effect of the DSA is to delegate to CRA Urban, subject to the terms of the DSA and the Owner's OA, all duties, responsibilities and obligations to act as the Owner's representative with respect to the construction, development, conversion and completion of the Gage School Project, the marketing and sale of the condominium units in the converted Project and "all [other] Project-related activities" as described in the DSA. As a result of this delegation to CRA Urban pursuant to the DSA, the Venture, as a member in, and as the Manager and Operator of, the Owner has been left with no role or authority with respect to the activities and services to be performed by CRA Urban pursuant to the DSA (except as might be otherwise expressly provided in the DSA or the Owner's OA).

20. Under the terms of the Owner's OA and the DSA, any uncured default either by CRA Urban under the DSA, or by the Venture under the Owner's OA, gives the Investor the right (A) to terminate the DSA and all of CRA Urban's rights to continue to provide

development management services for the Project (a "Termination Right"), and (B) to remove the Venture as the Manager and Operator of the Owner in accordance with the terms of the Owner's OA (a "Removal Right").

21. Under the terms of the Owner's OA and the DSA, the following acts or omissions, among others, by CRA Urban and/or the Venture are events of default which if not timely cured (to the extent they can be cured), give the Investor the right to exercise its Termination Right and its Removal Right:

A. The progress of the Gage School Project must achieve specified "Milestones" by designated dates, unless such failure is due to lack of funds, force majeure, reasonably unforeseen circumstances or any action or inaction of the Investor. The Project's failure timely to achieve a Milestone is an event of default that cannot be cured and gives the Investor the right, among others, to exercise its Termination Right and its Removal Right;

B. The DSA may not be assigned, voluntarily or otherwise, by CRA Urban without the prior written consent of the Owner (which may be granted or denied in the Owner's sole discretion). The Owner's written consent to any assignment of the DSA cannot be given without the prior approval of the Investor (which may be granted or withheld in the Investor's sole and absolute discretion). Any purported assignment of the DSA without the Investor's prior approval is an event of default that cannot be cured and gives the Investor the right, among others, to exercise its Termination Right and its Removal Right;

C. The uncured (if curable) breach by the Venture of any duty or obligation owed the Investor that is described in Paragraph 14.C above gives the Investor the right, among others, to exercise its Termination Right and its Removal Right.

22. Under the terms of the Venture's OA and the Owner's OA, any act, omission, or breach by Herman acting, or purporting to act, as the Managing Member of the Venture, or by Herman and May acting, or purporting to act, as a Class A Majority of the Venture, which directs, suffers or permits the Venture to commit a breach that gives the Investor the right to exercise its Termination Right or its Removal Right, is a violation of one or more of the duties and obligations owed by Herman, or by Herman and May, as the case may be, to Wright as described in Paragraph 14.D above.

Herman's and/or Herman's and
May's Wrongful Acts as to Wright.

23. On information and belief, at some time on or about November 5, 2004 (on or around the date of the formation of the Venture), and continuing to date, Herman enlisted May in an improper and unlawful scheme and conspiracy wrongfully to prevent Wright from participating in the business of the Venture; wrongfully to prevent Wright from exercising her  right to inspect and copy the Venture's books and records;  wrongfully to exclude Wright, as a Class A Member in the Venture, from any meaningful participation in the making of Majority Decisions for the Venture in the manner required by the Venture's OA and the Owner's OA; wrongfully to preclude Wright, as a designated Key Person for the Gage School Project, from acting as an employee, much less a full-time employee, of either the Venture or CRA Urban in order that the Venture could devote the time and resources necessary for the efficient and effective performance of the Venture's duties and obligations under the Owner's OA; and wrongfully to utilize, in a pretextual

manner, their positions as (in the case of Herman) the Managing Member of the Venture, and (in the case of Herman and May) as a Class A Majority of the Venture, to advance their own personal interests vis-à-vis Wright (and, particularly, to advantage themselves financially at Wright's expense) without regard to their contractual and other duties and obligations to, among others, Wright.

24. In furtherance and implementation of their unlawful scheme and conspiracy as set out in Paragraph 23 above, Herman and May have, jointly and severally, taken the following wrongful actions directed at Wright:

A. Herman and May have consistently refused to allow Wright to exercise her rights to inspect and copy all of the books and records of the Venture, thereby effectively and willfully preventing Wright from being fully informed regarding the Venture and the Project. When Wright has rightfully persisted in her efforts to exercise her informational rights, Herman and May have wrongfully sought to coerce Wright into surrendering most of her informational rights in exchange for an inspection of only the limited records the Venture is obligated to maintain pursuant to D.C. Code § 29-1022 (a small subset of the entirety of the books and records that Wright is entitled, and needs, to inspect). Moreover, on at least one occasion, in response to a specific inquiry from Wright regarding the existence of certain books and records of the Venture relating to a proposed increase in the amount of the Loan, Herman and May falsely stated to Wright that there were no such books and records (when in fact there were), thus adding misrepresentation to wrongful stonewalling and attempted coercion as means utilized by them to prevent Wright from exercising her rights to inspect the Venture's books and records;

B. Herman and May have consistently, in violation of the Owner's OA and the Venture's OA, wrongfully excluded Wright from any participation in the Venture's business and the conduct of its affairs, and, specifically, from any participation in the making of Major Decisions on behalf of the Venture. Indeed, as a result of Herman's and May's wrongful actions in this regard, Wright has learned of at least one purported Major Decision (a proposed increase in the principal amount of the Loan by $600,000 and a proposed corresponding increase in the amount of her personal guaranty of the Loan) only after it was purportedly made without any participation on her part;

C. Having wrongfully prevented Wright from acting as an employee of, or in an equivalent capacity for, the Venture, Herman and May have also wrongfully prevented Wright from performing any management or other services with respect to the Project for CRA Urban in violation of the terms of the Venture's OA and the Owner's OA. Specifically, on or about November 29, 2004, that is, on or about the same day that the Gage School Project was scheduled to be acquired by the Title Holder for the benefit of the Owner, Herman, acting without any legal justification, told Wright that he had unilaterally "determined" to terminate their partnership being conducted as CRA Urban. Herman and May thereafter *de facto*, but not *de jure*, wrongfully expelled Wright from CRA Urban.

D. Following her wrongful expulsion from CRA Urban, on February 14, 2005, Wright filed Civil Action No. 050324 (RMU) in the United States District Court for the District of Columbia (the "Pending Litigation") against Herman and May to obtain appropriate relief on account of, among other things, her wrongful expulsion from CRA Urban. Thereafter, in an effort to end run the Pending Litigation, and without Wright's

knowledge or consent, Herman and May formed URA, an entity in which Herman and May are purportedly the only owners and members. Herman and May, again without Wright's knowledge or consent, then purportedly caused CRA Urban to transfer and assign all of its commercial real estate management and development agreements, including the DSA, to URA. The transfer and assignment of all of these agreements, including the DSA, was, on information and belief, without consideration to CRA Urban and resulted in the wrongful *de facto* dissolution of CRA Urban. The transfer and assignment of the DSA was, on information and belief, made without the necessary prior (or, alternatively, properly obtained) consent or approval of either the Owner or the Investor in violation of Herman's and May's duties and obligations to Wright under the Venture's OA, the Owner's OA and the DSA;

E. Herman and May have engaged in willful misconduct as to Wright and have purported to act, either as the Managing Member of the Venture, or as a Class A Majority of the Venture, or both, with the intent, purpose and effect of advancing his, or their, personal interests (with respect to the Pending Litigation and otherwise) at the expense of Wright or damaging, or attempting to damage, Wright in violation of their contractual and other duties to Wright.

F. Herman and May have, while acting, or purporting to act, as the Managing Member of the Venture, or as a Class A Majority of the Venture, or both, wrongfully caused, suffered or permitted the Venture and CRA (or URA as the supposed successor to CRA Urban under the DSA) to commit events of default under the Owner's OA, the Venture's OA and the DSA, that have given the Investor a present right to exercise its Termination Right and its Removal Right. Without in any way limiting the foregoing,

Herman and May have, on information and belief, caused the Project to miss one or more

of the Milestones by its or their designated date(s). These wrongful actions and omissions

by Herman and May are violations of their contractual and other duties to, among others,

Wright under the Owner's OA, the Venture's OA, the District of Columbia Code and

otherwise.

25. As a result of Herman's and May's unlawful scheme and conspiracy directed at

Wright, as set out in Paragraph 23 above, and the wrongful actions taken, jointly and

severally, by Herman and May in furtherance and implementation thereof, as set out in

Paragraph 24 above, Wright has suffered, and shall continue to suffer, substantial

financial and other injuries. These injuries include the loss, or diminution and

impairment, of the value of her cash contribution to the Venture's net deemed capital

contribution to the Owner, the loss, or diminution and impairment of her share of the

Venture's Residual Participation, and a call, or threatened call, by the Bank under her

guaranty of the Loan.

## COUNT ONE
## Declaration of Information, Decision-making and Participation Rights

26.    Wright repeats each and every allegation contained in all preceding

paragraphs and incorporates the same herein.

27.    Wright seeks a declaration of her rights as a member of the Venture

pursuant to 28 U.S.C. §§ 2201 and 2202.  Specifically, Wright seeks a declaration that:

(i)    she is entitled to inspect and copy all of the books and

records of the Venture;

(ii)    she is entitled to participate in the making of all the

Venture's "Major Decisions" as defined by the Venture's OA; and

(iii)    she is entitled to participate as a "Key Person" in the Gage

School Project.

## COUNT TWO
### Breaches of Contract and Other Duties

Wright brings this Count Two against Herman and May, jointly and severally, and, in support thereof, states as follows:

28. Wright repeats each and every allegation contained in all preceding paragraphs and incorporates the same herein.

29. Herman and May have, jointly and severally, wrongfully breached their contractual and other duties to Wright under the Venture's OA, and by incorporation therein, the Owner's OA, the DSA, and under the District of Columbia's Uniform Limited Liability Company Ac, D.C. Code § 29-1001 et seq., and otherwise. These breaches include those specified in Paragraphs 23 and 24 above.

30. Wright has suffered, and is continuing to suffer, substantial monetary and other damages and injuries as a direct result of Herman's and May's numerous breaches of their contractual and other duties owed to Wright in connection with the Project.

31. Wherefore, Wright demands judgment against Herman and May, jointly and severally, for such amount of actual damages as may be proved at trial, plus attorneys' fees, interest and costs, plus an indemnification of Wright by Herman and May, jointly and severally, against any loss, claim or demand by the Bank against Wright for or on account of the Loan, and such other relief as the Court deems just and proper.

## COUNT THREE
## <u>Civil Conspiracy</u>

Wright brings this Count Three against Herman and May, jointly and severally, and in support thereof, states as follows:

32. Wright repeats each and every allegation contained in all preceding paragraphs and incorporates the same herein.

33. Herman and May have engaged, and are engaging, in an unlawful civil conspiracy directed at Wright in connection with the Project as described in Paragraph 23 above. Herman and May have taken, and are taking, jointly and severally, numerous wrongful acts directed at Wright in furtherance and implementation of their wrongful civil conspiracy, including those wrongful acts described in Paragraph 24 above.

34. Wright has suffered, and is continuing to suffer, substantial monetary damages and other injuries as a direct result of Herman's and May's wrongful civil conspiracy, and the numerous wrongful acts committed by them, jointly and severally, in furtherance thereof.

35.  Wherefore, Wright demands judgment against Herman and May, jointly and severally, in such amount of actual damages as may be proved at trial, plus attorneys' fees, interest and costs, plus an indemnification of Wright by Herman and May, jointly and severally, against any loss, claim, or demand by the Bank against Wright for or on account of the Loan, and such other relief as the Court deems just and proper.

## COUNT FOUR
## <u>Claims Against URA</u>

Wright brings this Count Four against URA and, in support thereof, states as follows:

36. Wright repeats each and every allegation contained in all preceding paragraphs and incorporates the same herein.

37. URA is an entity under the dominion and control of Herman and May. Herman and May formed URA pursuant to, and in furtherance of, the unlawful scheme and conspiracy between them directed at Wright (as described in Count Three).

38. URA had and has, or is chargeable with, actual knowledge of the illegal conspiracy between Herman and May to injure Wright and of each and every wrongful act willfully or otherwise taken by or for them in furtherance of that illegal conspiracy (including, without limitation, the wrongful assignment by or for them of the DSA to URA with the unlawful intent to utilize URA as an unlawful vehicle to misappropriate, or attempt to misappropriate, the DSA for their sole economic gain and benefit).

39. Acting with actual or imputed knowledge that any transfer of the DSA to itself by or for Herman and May was wrongful and in furtherance of their unlawful conspiracy directed at Wright in connection with the Project, URA nevertheless accepted such a wrongful transfer. As a result of URA's wrongful actions in this respect, URA joined, and aided and abetted, the unlawful conspiracy between Herman and May, and became liable to Wright, jointly and severally with Herman and May, for all wrongful acts committed by or for them in furtherance and implementation thereof. Alternatively, by virtue of its acceptance of the transfer of the DSA to itself, knowing such transfer and acceptance to be wrongful and in furtherance and implementation of an unlawful conspiracy between Herman and May, URA assumed successor liability, jointly and severally, with Herman and May, to Wright for all damages and other relief to which Wright is entitled.

40. Wright has suffered, and shall continue to suffer, substantial monetary damages and other injuries as a direct result of URA's wrongful acts.

41. Wherefore, Wright demands judgment against URA, jointly and severally with Herman and May, in such amount of actual damages as may be proved at trial, plus attorneys' fees, interest and costs, plus an indemnification of Wright by URA, jointly and severally with Herman and May, against any loss, claim or demand by the Bank against Wright for or on account of the Loan, and such other relief as the Court deems to be just and proper.

## PRAYER FOR RELIEF

42. WHEREFORE, Wright respectfully requests the following:

(i)      a declaration of her rights in CRA Urban Venture I LLC pursuant to 28 U.S.C. §§ 2201 and 2202;

(ii)      damages against Herman, May and URA;

(iii)      pre-judgment and post-judgment interest;

(iv)      attorneys' fees and costs;

(v)      such other relief as the Court deems just and proper.

## JURY DEMAND

Wright respectfully requests a jury trial as to each of the above counts.

Respectfully submitted,


_____/s/_____
Stephen H. Marcus, Esq.
Bar No. 394419
Law Office of Stephen H. Marcus
1050 17th Street, N.W.
Suite 600
Washington, D.C.  20036

Tele:    202-776-0651
Fax:     202-331-7272
E-mail: shmarcus@att.net


<u>Counsel for Plaintiff Julia E. Wright</u>

June 13, 2005

## **EXHIBIT "A"**

CRA Urban Venture I LLC Operating Agreement

**<u>EXHIBIT "B"</u>**

Gage School Holdings LLC Operating Agreement