EXHIBIT "A

# OPERATING AGREEMENT

## OF

## CRA URBAN VENTURE I LLC

THIS OPERATING AGREEMENT (this "*Agreement*") of CRA URBAN VENTURE I LLC (the "*Company*"), dated November 5, 2004, is by and among the persons whose names appear on *Schedule A* attached hereto and incorporated by reference herein (the "*Members*").

### *PRELIMINARY STATEMENTS:*

WHEREAS, the Members have formed the Company as a limited liability company under the laws of the District of Columbia for the purposes set forth herein and, accordingly, desire to enter into this Agreement (i) to reflect the admission of the persons identified on Schedule A hereto as Class A Members and Class B Members, as applicable (as such terms are defined in Section 3.1.(a) hereof) of the Company; (ii) to establish the manner in which the business and affairs of the Company shall be managed; and (iii) to determine the respective rights, duties and obligations of the Members with respect to the Company.

NOW THEREFORE, the parties hereto agree that the Operating Agreement of Company shall be as follows:

## ARTICLE I
## DEFINED TERMS; RULES OF CONSTRUCTION

**Section 1.1    Defined Terms.**    Terms used with initial capital letters, which are not otherwise defined in the body of this Agreement, shall have the meanings given to them in *Schedule 1.1* attached hereto and incorporated by reference herein.

**Section 1.2    Rules of Construction.**    Unless the context clearly indicates to the contrary, the following rules apply to the construction of this Agreement:

(i)    Words using the singular number include the plural number and words using the plural number include the singular number.

(ii)    Words of the masculine gender include correlative words of the feminine and neuter genders.

(iii)    The table of contents and the headings or captions used in this Agreement are for convenience of reference and do not constitute a part of this Agreement, nor affect its meaning, construction, or effect.

(iv)    Words referring to persons include any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization or government or agency or political subdivision thereof.

(v)    Any reference in this Agreement to a particular "Article," "Section" or other subdivision shall be to such Article, Section or subdivision of this Agreement unless the context shall otherwise require.

(vi)    When any reference is made in this document or any of the schedules or exhibits attached hereto to the Agreement, it shall mean this Agreement, together with all other schedules and exhibits attached hereto, as though one document.

## ARTICLE II
## FORMATION; NAME; PRINCIPAL OFFICE;
## PURPOSE; TERM

**Section 2.1.    Formation; Name.**    The Members formed the Company as a limited liability company pursuant to Title 29, Chapter 10 of the District of Columbia Official Code (the "*DC Act*") by the filing of Articles of Organization on November 5, 2004 with the Department of Consumer and Regulatory Affairs of the District of Columbia.    The name of the Company is "*CRA Urban Venture I LLC*."

**Section 2.2.    Principal Office and Registered Agent:**    The present address of the principal office of the Company in the District of Columbia is 1640 Rhode Island Avenue, NW, Suite 825, Washington, DC 20036 (the "*Principal Office*") and the name and address of the registered agent of the Company in the District of Columbia is National Registered Agents, CorpAssist, 1090 Vermont Avenue, NW, Washington, DC 20005.    The Managing Member (as such term is defined in Section 5.1. hereof) may at any time and from time to time change the identity of the Company's registered agent, its location, or the location of the Principal Office. The Managing Member shall give due notice of any such change to the Members.

**Section 2.3.    Purposes.**

(a)    The purposes for which the Company is formed are to, in accordance with this Agreement:

(i)    acquire, own, hold, lease, operate and otherwise deal with, sell, transfer, exchange or otherwise dispose of real and/or personal property and

- 2 -

     (ii)    hold a portion of the issued and outstanding interests in Gage School Holdings, LLC, a Delaware limited liability company ("*Gage*"), and to act as the managing member of Gage;

     (iii)    borrow, directly or indirectly, money for any of the purposes of the Company and to draw, make, accept, endorse, discount, execute, issue, sell, pledge, or otherwise dispose of promissory notes, drafts, bills of exchange, warrants, bonds, debentures of negotiable or non-negotiable instruments and evidences of indebtedness and to secure the payment thereof and the interest thereon by mortgage or pledge, conveyance or assignment in trust of the whole or part of the property of the Company at this time owned or hereafter secured;

     (iv)    conduct its business in any of the states, territories, colonies or dependencies of the United States, in any and all foreign countries, and have one or more offices therein, and to hold, purchase, mortgage and convey real and personal property without limit as to amount; and

     (v)    exercise and enjoy all of the powers, rights and privileges granted to, or conferred upon, limited liability companies of a similar character by the DC Act.

     (b)    The purposes enumerated in Section 2.3.(a) shall be in addition to and not in limitation of the general powers of limited liability companies under the DC Act.

**Section 2.4.**   **Perpetual Existence:**   The Company shall have a perpetual existence *provided that* the Company shall be dissolved upon the election to dissolve and terminate the Company in accordance with Article V and Section 7.2. hereof.

**Section 2.5.**   **Maintenance of Good Standing.**   The Managing Member (as such term is defined in Section 5.1. hereof) shall take all necessary action to maintain the Company in good standing as a limited liability company under the DC Act, including (without limitation) the filing of any certificates of correction, articles of amendment and such other applications and certificates as may be necessary to protect the limited liability of the Members and to cause the Company to comply with the applicable laws of any jurisdiction in which the Company owns property or does business.

**Section 2.6.**   **Classification of the Company for Tax Purposes:**   The Members hereby acknowledge their intention that the Company be classified, for federal and state income tax purposes, as a partnership and not as an association taxable as a corporation pursuant to Section 7701(a)(2) of the Internal Revenue Code of 1986, or any successor statute (the "*Code*") and the Income Tax Regulations promulgated thereunder (the "*Regulations*") and hereby agree that the provisions of this Agreement shall be applied and construed in a manner to give full effect to such intent.

**Section 2.7.    Limited Liability of the Members.**  Except as expressly provided under the Act or as may be expressly provided by this Agreement (or by such other agreement as may expressly be entered into by one or more Members), including, but not limited to Section 3.5. hereof, no Member shall be responsible or liable for any indebtedness or obligation of the Company to any other Person.

**ARTICLE III**
**MEMBERS; CAPITAL CONTRIBUTIONS;**
**AND PERCENTAGE INTERESTS**

**Section 3.1.    Members and Initial Capital Contributions:**

(a)    Each Member shall have a Percentage Interest in the Company, which shall consist of (i) a "*Class A Percentage Interest*," and/or (ii) a "*Class B Percentage Interest*," as applicable.  As of the date of this Agreement, the Company has issued, respectively, Class A Percentage Interests representing three percent (3%) of the issued and outstanding ownership interests in the Company, and Class B Percentage Interests representing ninety-seven percent (97%) of the issued and outstanding ownership interests in the Company, which together constitute one hundred percent (100%) of the issued and outstanding ownership interests in the Company.  A holder of a Class A Percentage Interest is hereinafter referred to as a "*Class A Member*," and a holder of a Class B Percentage Interest is hereinafter referred to as a "*Class B Member*."

(b)    Except as otherwise set forth in Section 3.3 and Article IV hereof, each Member's share of the Net Income and Net Loss of the Company and right to receive distributions from the Company (prior to its termination and dissolution) shall be determined by and shall be in proportion to the Percentage Interest held by that Member, regardless of whether such Percentage Interest represents a Class A Percentage Interest or a Class B Percentage Interest.  Class A Percentage Interests and Class B Percentage Interests shall be identical in all respects; *provided, however, that* notwithstanding any other provision of this Agreement to the contrary, a Class B Percentage Interest shall not entitle a holder thereof to vote on or otherwise participate in the management or affairs of the Company.

(c)    The respective names, addresses for notice, Class A Percentage Interests, Class B Percentage Interests and initial Capital Contributions of the Members are as set forth on Schedule A attached hereto.  Upon execution of this Agreement, each Person identified as the holder of a Class A Percentage Interest on Schedule A hereto shall be admitted to the Company as a Class A Member with a Class A Percentage Interest equal to the percentage identified therein, and each Person identified as the holder of a Class B Percentage Interest on Schedule A shall be admitted to the Company as a Class B Member with a Class B Percentage Interest equal to the percentage identified therein.  The Managing Member (subject to any approval requirements set forth in Article V hereof) shall amend Schedule A from time to time to reflect any changes of address, the admission of additional or substitute Members or any change to the information set forth thereon.

- 4 -

(d)    Additional Members may be admitted to the Company from time to time only upon the written consent of the holders of at least two-thirds (2/3) of the Class A Percentage Interests (a "*Class A Majority*").

Section 3.2.    **Capital Contributions**:

(a)    As of the date of this agreement, each Member has contributed as its initial Capital Contribution to the Company cash in the amount appearing next to its name on *Schedule A* under the column entitled "Capital Contributions," which amount shall constitute the initial Capital Account balance of such Member.  At such time as the Company enters into and adopts the Operating Agreement of Gage School Holdings, LLC, it is anticipated that $25,000 of each Member's initial Capital Contribution shall be reimbursed to each such Member.

(b)    Except for the Capital Contributions of the Members identified under Section 3.2.(a) and as set forth in Section 3.3. below, no Member shall have any obligation to make any further Capital Contributions to the Company, nor to lend any funds to the Company. Notwithstanding the foregoing, any Member may, with the written consent of a Class A Majority, agree and become obligated to do so, upon such terms and conditions as may be approved by the prior written consent of such Class A Majority.  No Member shall have any obligation to contribute additional capital to the Company to restore a deficit balance in such Member's Capital Account.

Section 3.3.    **Capital Calls**.

(a)    If, at any time or from time to time, a Class A Majority determines that the Company requires additional funds to pay expenses, costs or obligations associated with the operations of the Company, the Class A Majority may call upon all of the Members (a "*Capital Call*") to make additional Capital Contributions of cash to fund such expenses, costs or obligations by delivering to each Member a written Notice (a "*Capital Shortfall Notice*") describing:  (i) the total amount of additional Capital Contributions then required (the "*Total Additional Capital*"); (ii) a brief description of the expenditures giving rise to the requirement for the Total Additional Capital; (iii) each Member's proportionate share of the Total Additional Capital; and (iv) the date each Member's additional Capital Contribution is required, which date shall not be less than ten (10) days after the Capital Shortfall Notice has been given.  A Member's proportionate share of the Total Additional Capital shall be equal to the product of (x) the Total Additional Capital needed, multiplied by (y) a fraction the numerator of which shall be the Percentage Interest (regardless of Class) held by such Member and the denominator of which shall be one hundred percent (100%), all as in effect on the date the Capital Shortfall Notice is delivered.

(b)    If a Member (the "*Defaulting Member*") fails to contribute the additional Capital Contribution that such Defaulting Member is required to make pursuant to a Capital Call hereunder (the "*Defaulted Amount*") by the time required in the Capital Shortfall Notice (a "*Default*"), then one or more of the other Members (other than a Defaulting Member), upon funding all of its proportionate share of the Total Additional Capital (the "*Non-Defaulting*

*Member(s)*") shall have the right, but not the obligation, in proportion to their relative Percentage Interests, to make one or more loans to the Company in an amount equal, in the aggregate, to the Defaulted Amount (the "*Member Loan*"), which Member Loan shall be deemed to be a loan by the Non-Defaulting Member(s) to the Defaulting Member(s), followed by a Capital Contribution of such amount by the Defaulting Member(s) to the Company. Member Loans shall constitute fully recourse demand loans, which shall bear interest from the date of advance at the annual rate of the prime rate, as published from time to time in the Wall Street Journal, plus five percent (5%) per annum, compounded monthly, until all principal and accrued interest thereon is repaid in full.

       (i)     For the period during which any Member Loan remains outstanding, any amounts otherwise distributable to the Defaulting Member from the Company under this Agreement shall instead be distributed to the Non-Defaulting Member(s) in proportion to the outstanding balance on all Member Loan(s) made by them to such Defaulting Member(s), which shall be deemed for all purposes hereunder to constitute a distribution of such amount by the Company to such Defaulting Member, followed by the deemed payment of such amount by the Defaulting Member to the Non-Defaulting Member(s), in proportion to the outstanding balance on all Member Loans made by the Non-Defaulting Member(s) to the Defaulting Member, (i) first, to be applied against accrued but unpaid interest on the Member Loan(s) made to the Defaulting Member and (ii) second, to be applied to principal repayment on such Member Loan(s).

       (c)     If the Non-Defaulting Members determine *not* to make a Member Loan(s) under the circumstances described in Section 3.3.(b) above, then the Percentage Interests of the Defaulting Members and Non-Defaulting Members, respectively, shall be adjusted as follows:

       (i)     The Class A Percentage Interest owned by a Defaulting Member(s) shall be adjusted so that, after the date of the Default, the Class A Percentage Interest of the Defaulting Member is equal to the total issued and outstanding Class A Percentage Interests of the Company prior to the Default multiplied by a fraction, the numerator of which equals the aggregate amount of all Capital Contributions made, or previously deemed made, by such Defaulting Member to the Company as of the date of the Default (the "*Defaulting Member Capital Contributions*"), and the denominator of which is the aggregate amount of all Capital Contributions made by all Members as of the date of the Default (the "*Aggregate Capital Contributions*").

       (ii)     The Class B Percentage Interest owned by the Defaulting Member(s) shall be adjusted so that, after the date of the Default, the Class B Percentage Interest of the Defaulting Member is equal to the total issued and outstanding Class B Percentage Interests in the Company prior to the Default multiplied by a fraction, the numerator of which equals the Defaulting Member Capital Contributions, and the denominator of which is the Aggregate Capital Contributions.

       (iii)     The Class A Percentage Interest owned by each Non-Defaulting Member shall be adjusted so that, after the date of the Default, the Class A Percentage Interest of

- 6 -

such Non-Defaulting Member(s) is equal to the total issued and outstanding Class A Percentage Interests in the Company as of the date of the Default multiplied by a fraction, the numerator of which equals the aggregate Capital Contributions of such Non-Defaulting Member (the "*Non-Defaulting Member Capital Contributions*"), and the denominator of which equals the Aggregate Capital Contributions.

(iv)    The Class B Percentage Interest owned by each Non-Defaulting Member shall be adjusted so that, after the date of the Default, the Class B Percentage Interest of the Non-Defaulting Member(s) is equal to the total issued and outstanding Class B Percentage Interests in the Company as of the date of the Default multiplied by a fraction, the numerator of which equals the Non-Defaulting Member Capital Contributions, and the denominator of which equals the Aggregate Capital Contributions.

(d)    For purposes of applying the provisions of Article IV hereof, in the event the Percentage Interests are revised pursuant to Section 3.3.(c) hereof, the Company's books shall be closed as of the close of business on the day prior to the date on which the Non-Defaulting Members (or Non-Defaulting Member, as the case may be) fund their share of the Total Additional Capital. All Available Cash, Net Income, Net Loss and items thereof attributable to the period prior to the date on which the Capital Contribution occurs, as reasonably determined by the Managing Member (unless the Managing Member is the Defaulting Member, in which case a Class A Majority shall possess the exclusive authority to make such determination), shall be distributed and/or allocated, as applicable, in proportion to the Percentage Interests held by the Members *prior to* any adjustment pursuant to Section 3.3.(c). All Available Cash, Net Income and Net Loss and items thereof attributable to the period beginning on the date on which the Non-Defaulting Members fund their share of the Total Additional Capital, as reasonably determined by the Managing Member (unless the Managing Member is the Defaulting Member, in which case a Class A Majority shall possess the exclusive authority to make such determination), shall be distributed and/or allocated, as applicable, with reference to the Percentage Interests held by the Members *subsequent to* any adjustments pursuant to Section 3.3.(c).

**Section 3.4.    Additional Capital.**

(a)    If, at any time or from time to time, a Class A Majority determines that the Company requires additional funds that have not been raised through additional Capital Contributions and/or Member Loans pursuant to a Capital Call, as set forth in Section 3.3. hereof, the Class A Majority, in the exercise of its sole discretion, may cause the Company to borrow the required additional funds from any third-party lender, *provided* that no Member or Affiliate shall, without its prior written consent, have any *personal liability whatsoever* in connection therewith (subject to Section 3.5. below); or cause the Company to borrow the required additional funds from one or more Members (or any of their respective Affiliates) willing to make such loans as "Cash Shortfall Loans" in accordance with Section 3.4.(b).

(b)    Cash Shortfall Loans, if any, made pursuant to this Section 3.4. shall: (i) be evidenced by a written promissory note containing customary terms and conditions; (ii) bear

- 7 -

interest at a fixed annual rate equal to the prime rate as published in the Wall Street Journal as of
the date of each advance, plus five percent (1%), compounded monthly, (iii) be required by the
lending Member, be secured by a lien on and a security interest in all of the property and assets of
the Company and (iv) be repaid in full prior to the distribution of any Available Cash to the
Members.

(c)     Any Member who makes or proposes to make a Cash Shortfall Loan shall have
the right at any time and from time to time to cause the Company to replace the Cash Shortfall
Loan with a loan from a third party, provided the terms of any third-party loan are more favorable
to the Company than the Cash Shortfall Loan.  The Company, acting through the Managing
Member, shall have the right at any time and from time to time to repay any Cash Shortfall Loan
and replace it with a loan from a third party.  Any Cash Shortfall Loan may be repaid at any time
without prepayment premium or penalty.

### Section 3.5.   Guaranties.

(a)     If a Class A Majority causes or has caused the Company, or an entity in which the
Company (directly or indirectly) is a member, general or limited partner, shareholder or owner (a
"*Lower Tier Entity*"), to borrow funds from any third-party lender, then the Class A Majority
may require each of the Members to guaranty its proportionate share (based on the Percentage
Interest held by such Member) of such loan(s) obtained by the Company or a Lower Tier Entity,
as the case may be.  In connection with the foregoing, each Member hereby covenants and agrees
to provide such guaranties and satisfy its Proportionate Guaranty Obligation with respect to any
and all of the foregoing guaranties (whether or not such Member actually guaranteed the subject
loan and regardless of the amount of the subject loan guaranteed by such Member) and, to the
extent such Member has failed to fully satisfy its Proportionate Guaranty Obligation, to be
subject to the terms of Section 3.5.(c) below with respect to Excess Payments made by any of the
other Members or their respective Affiliates.

(b)     If any Member or Affiliate thereof makes a payment to the Company, to a third-
party lender or otherwise pursuant to any personal guaranty contemplated by Section 3.5.(a)
above, to the extent such payment is *not* an Excess Payment, such payment shall be treated as a
Capital Contribution to the Company by the Member.

(c)     If any Member (because of joint and several liability or otherwise) makes an
Excess Payment:

(i)     each other Member who failed to fully satisfy its Proportionate Guaranty
Obligation shall indemnify and hold harmless from and against any and all loss, cost and
expense those Members making Excess Payments, *provided that* such indemnity shall be
solely in proportion to and to the extent of such Member's respective deficiency in its
Proportionate Guaranty Obligation; and

(ii)    such Excess Payment shall be treated as a demand loan made by such
Member to each of the other Members (except a Member who fully satisfied its

- 8 -

Proportionate Guaranty Obligation) in proportion to such Members' respective demand loans and shall bear interest from the date of payment at the annual rate equal to the prime rate, as published from time to time in the Wall Street Journal, plus five percent (5%), compounded monthly from the date of payment by the Member making the Excess Payment, until such loans and all accrued interest are repaid. If any Member fails to repay such deemed demand loan within ten (10) days following notification from the Member making the Excess Payment, such Member shall be deemed a Defaulting Member hereunder and shall be subject to all the provisions of Sections 3.3.(b), 3.3.(c) and 3.3.(d) hereof.

**Section 3.6. Capital Accounts**.

(a) An individual capital account (the "*Capital Account*") shall be maintained on the books of the Company for each Member. The Capital Account of a Member shall consist of its initial Capital Contribution and shall be *increased by*

(i) the amount of any additional Capital Contributions (including, but not limited to those described in Section 3.3.(b) and 3.5. above), and

(ii) allocations to it of Net Income (or items thereof),

and shall be *decreased by*

(iii) the amount of money and the fair market value of property (net of liabilities secured by the distributed property that it assumes or to which such property is subject) distributed by the Company to such Member (including, but not limited to deemed distributions to a Defaulting Member pursuant to Section 3.3.(b) above, but excepting those distributions paid to Non-Defaulting Members in accordance with Section 3.3.(b)(1)), and

(iv) the amount of Net Loss allocated to such Member.

(b) The Capital Accounts shall be determined, maintained and adjusted in accordance with the Code and the Regulations, including the capital account maintenance rules in Regulations §1.704-(1)(b)(2)(iv).

(c) Upon (i) a Permitted Transfer and (ii) the acceptance of a transferee of the transferred Percentage Interest as a Member pursuant to the terms of this Agreement, the transferring Member's Capital Account attributable to such transferred Percentage Interest (or portion thereof) shall become the initial Capital Account of the transferee, unless the Transfer of the transferring Member's Percentage Interest (or portion thereof) causes a termination of the Company for federal income tax purposes under Section 708 of the Code. If a Member transfers less than all of its Percentage Interest in the Company, the portion of the transferring Member's Capital Account that shall become the initial Capital Account of the transferee shall be equal to the transferring Member's Capital Account prior to such Transfer multiplied by the percentage of

- 9 -

the transferring Member's Percentage Interest being transferred, as set forth in the pertinent transfer documents. The transferring Member's remaining Capital Account shall be reduced by the amount of the transferee's initial Capital Account.

Case 1:05-cv-01179-RMU    Document 1-2    Filed 06/13/2005    Page 11 of 25

**(d)**     If any Member shall advance or lend any monies to the Company, the amount of any such loan shall not increase the Member's Capital Account or affect in any way his or its share in the profits, losses or distributions of the Company (except to the extent specifically provided to the contrary elsewhere in this Agreement, including but not limited to Article II hereof).

### Section 3.7.     General Rules Relating to Capital of the Company:

**(a)**     No Member shall be personally liable for the return of the Capital Contributions of the Members, or any portion thereof (except as specifically provided otherwise in this Agreement), it being expressly understood that any such return of contributions shall be made solely from the Company assets.

**(b)**     Except as specifically provided otherwise in this Agreement, (i) no Member shall have the right to withdraw or receive any return of his Capital Contributions; and (ii) no Member shall have any right to demand or receive property (other than cash) in return of his Capital Contributions.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

### Section 4.1.     Allocation of Net Income and Net Loss:

**(a)**     Net Income and Net Loss for any taxable year of the Company shall be allocated among the Members in proportion to the Percentage Interests held by the Members.

**(b)**     Except as may be otherwise required under the Code or the Regulations, all allocations of income, gain, and loss (and items thereof) for income tax purposes shall be allocated among the Members in proportion to their Percentage Interests.

**Section 4.2.     Distributions of Available Cash:**     Except as otherwise provided in Article III hereof, all Available Cash for each calendar year (or portion thereof) shall be distributed to the Members in proportion to the Percentage Interests held by the Members. Available Cash shall be distributed at least annually, or at such more frequent intervals as may be determined by the Managing Member.

**Section 4.3.    Liquidation or Dissolution**:

(a)    Upon the liquidation or dissolution of the Company, the assets remaining after satisfaction (whether by payment or by establishment of reserves therefor) of creditors, including Members who are creditors, shall be distributed to the Members in proportion to their Percentage Interests.    If assets are to be distributed in kind, the Members' Capital Accounts shall be appropriately adjusted, in accordance with Section 4.1. hereof, before any such distribution to reflect any Net Income or Net Loss which would have been allocated if the property distributed in kind had been sold for its fair market value (net of liabilities) by the Company prior to dissolution.

(b)    Notwithstanding anything else in this Agreement to the contrary, no Member shall have an obligation to contribute additional capital to the Company in order to restore a deficit balance in his Capital Account.

# ARTICLE V
## MANAGEMENT AND CONTROL OF BUSINESS AND AFFAIRS

### Section 5.1.    Authority of Managing Member and Members.

(a)    **Management and Control.**  Subject to the provisions of Section 5.1(b) hereof, the business and affairs of the Company shall be managed exclusively by the Managing Member identified in *Schedule B*, as such schedule may be amended from time to time (the "*Managing Member*").  Except as otherwise specifically provided in this Agreement, including but not limited to the provisions of Section 5.1.(b) hereof, the Managing Member shall have the exclusive right to manage and control the day-to-day business and operations of the Company and, without any requirement to obtain the consent or approval of any other Member, is hereby authorized to take any action of any kind, and to do anything and everything, in furtherance of the purposes of the Company, in accordance with this Agreement, the DC Act and otherwise applicable law.

(b)    **Major Decisions Requiring Majority Approval.**  Notwithstanding Section 5.1.(a), decisions with regard to each of the matters identified in this Section 5.1.(b) (each such decision a "*Major Decision*" or, collectively, "*Major Decisions*") shall require the consent of a Class A Majority.  Those decisions on behalf of the Company constituting Major Decisions are the following:

(i)    (a) to borrow money for Company purposes, whether secured or unsecured (including refinancing, consolidating, extending or modifying any indebtedness of the Company, whether now existing or hereafter acquired); (b) to execute promissory notes and other evidences of indebtedness (including promissory notes and other documents containing confessed judgment provisions) on behalf of the Company; (c) to mortgage or subject to any security device all or any portion of the Company's assets or properties; (d)

- 11 -

or to guaranty the obligations of any other Person; or (e) to raise additional capital under the circumstances described in Section 3.4. hereof);

     (ii)     to make a distribution of Available Cash other than in strict conformity with Article IV and to determine the amount of any such Available Cash to be distributed to the Members pursuant to Article IV hereof;

     (iii)     to distribute property of Company other than cash;

     (iv)     to sell, convey, dispose of or exchange all or substantially all of the Company's assets or properties;

     (v)     to issue a Capital Call in accordance with Section 3.3. hereof;

     (vi)     to bring or defend, pay, collect, compromise, arbitrate, resort to legal action or otherwise adjust claims or demands of or against the Company;

     (vii)     to pay any fee or other compensation of any kind to any Member or any Affiliate of a Member other than in accordance with this Agreement;

     (viii)     to enter into any sale, lease or loan transaction with a Member or Affiliate thereof;

     (ix)     to admit a new member to the Company in accordance with Section 3.1.(d);

     (x)     to consent to the Transfer of the interest of any Member from the Company except as otherwise specifically permitted by this Agreement;

     (xi)     to consent to the withdrawal of any Member from the Company except as otherwise specifically permitted by this Agreement;

     (xii)     to require the personal guaranty of any indebtedness of the Company or Affiliate thereof by the Members in accordance with Section 3.5. hereof;

     (xiii)     to amend or modify this Agreement or the Articles of Organization;

     (xiv)     to significantly modify the lines of business in which the Company is engaged and/or change the purpose of the Company;

     (xv)     to enter into any contract or lease, or other form of agreement, directly or indirectly, whether written or oral, with any Person, calling for payments in excess of $10,000 in any one year;

     (xvi)     to elect or remove a Managing Member in accordance with Sections 5.2. hereof;

- 12 -

(xviii) to determine the period to which Available Cash, Net Income and Net Loss, and items thereof, are attributable under the circumstances described in Section 3.3.(d);

(xix)  to elect to liquidate, dissolve, reorganize or recapitalize the Company, or appoint a Liquidating Trustee in accordance with Section 7.2. hereof;

(xx)  to elect to merge the Company into another entity or enter into any joint venture with any person or entity; and

(xxi)  to make any and all tax elections required or permitted to be made by the Company;

(xxii)  to adopt and modify the annual operating/capital budget of the Company; and

(xxiii) to enter into any transaction with, or make any payment to, a Member or any Affiliate of a Member.

(c)  **Authority of Members.**  Except as otherwise specifically provided in this Agreement, no Member, other than the Managing Member in its capacity as such, shall have any authority or right to act for or bind the Company or to participate in or have any control over Company business.

(d)  **Approval by Members of Certain Actions.**  The Members hereby authorize and approve of the execution and delivery by the Managing Member, on behalf of the Company, of that certain Operating Agreement of Gage School Holdings, LLC, in the form attached hereto as Exhibit A.  In addition, the Members hereby authorize and approve of the Managing Member (i) causing the Company, in its capacity as Operator of Gage School Holdings, LLC, to cause Gage School Holdings, LLC to enter into and adopt that certain Operating Agreement of Gage School LLC in the form attached hereto as Exhibit B, and (ii) causing the Company, in its capacity as Operator of Gage School Holdings, LLC, in its capacity as Sole Managing Member of Gage School LLC, causing Gage School LLC to enter into, execute and deliver the purchase agreement and related documents, and the loan agreement and related documents, attached hereto as Exhibit C and D, respectively.

### Section 5.2.  Appointment and Removal of Managing Member.

(a)  The Managing Member shall be appointed by a Class A Majority, and a Class A Majority shall have the exclusive authority to fill any vacancy occurring in accordance with this Section 5.2.  A Managing Member shall hold office until his successor is elected and qualified pursuant to this Agreement or, if earlier, his death, resignation (in accordance with Section

~BALT2:4109826.v4  |11/29/04

5.2.(c) hereof) or removal (in accordance with Section 5.2.(b) hereof), declaration of bankruptc[y] under the laws of any jurisdiction, mental incompetence adjudged by a court of competen[t] jurisdiction in any state or country, or conviction by any court in any state or country of an[y] felony or any misdemeanor involving moral turpitude of a Managing Member.

(b)     A Managing Member may be removed, at any time, with or without cause, by [a] Class A Majority.

(c)     A Managing Member may resign effective upon giving written notice to eac[h] Member of the Company, unless the notice specifies a later time for the effectiveness of suc[h] resignation. The Members authorized to appoint or remove the Managing Member shall hav[e] power to elect a successor to take office when the resignation is to become effective.

### Section 5.3.    Other Businesses of Members.

(a)     Subject to the application of Section 5.3(b) hereof, any Member and any affiliat[e] of a Member may engage in or possess an interest in other business ventures of any nature o[r] description independently or with others, and neither the Company nor any Member shall hav[e] any rights in or to such independent ventures or the income or profits derived therefrom, an[d] such activities shall not be construed as a breach of any duty of loyalty or other fiduciary duty t[o] the other Members or the Company.

(b)     Each Member agrees that, during the time such Member is a member of th[e] Company and until the earlier of (i) **[three (3)]** years thereafter, or (ii) such time as the Compan[y] has been liquidated and dissolved, neither such Member nor such Member's affiliates will inves[t] in, finance and/or otherwise participate in, in any manner, any residential condominium project[s] within a five (5) square block radius of the location of any residential condominium project i[n] which the Company is involved, other than (i) with respect to projects comprising, in total[,] fifteen (15) or fewer units, taking all such projects into account as a single project, or (ii) throug[h] the Company or another joint venture involving all of the Members.

### Section 5.4.    Compensation of Members and Managing Member:

(a)     Except for the rights to receive allocations and distributions provided unde[r] Article IV, no Member or Managing Member, in his capacity as such, shall receive any fee[,] salary, reimbursement or other compensation or remuneration for serving as a Member o[r] Managing Member.

(b)     Each Member shall be fully and entirely reimbursed by the Company for any and all actual, reasonable and necessary out-of-pocket expenses incurred by such Member on behalf of the Company.

- 14 -

# ARTICLE VI

**Section 6.1     Restrictions on Transfer and Withdrawal:**  No Member may, withou the written consent of a Class A Majority, (i) Transfer his Interest by any means whatsoeve directly or indirectly, whether by operation of law or otherwise, or (ii) voluntarily withdraw fro the Company as a Member, provided, however, that a Member may Transfer Class B Interests t such Member's spouse, descendants, or any trust or other entity exclusively owned and/o benefiting any one or more of the following without the consent of the other Members. An attempted Transfer or withdrawal in contravention of any of the provisions of this Agreemen shall be void *ab initio* and shall not bind or be recognized by the Company or the remainin Members.

*[Note:  Parties to agree upon and add a buy/sell provision that applies in the event of Class A Member's death, disability, termination of employment, etc.]*

# ARTICLE VII
## CONTINUATION OF THE COMPANY UPON PERSON
## CEASING TO BE A MEMBER; DISSOLUTION OF THE COMPANY

### Section 7.1.    Continuation of the Company Upon Person Ceasing to be a Member:

(a)     A person shall cease to be a Member of the Company upon the occurrence of an of the following events (each, a "*Dissolution Event*"):

(i)     in the case of a Member who is an individual, the individual's death or adjudication by a court of competent jurisdiction as incompetent to manage the individual's person or property;

(ii)     in the case of a Member who is acting as a member by virtue of being a trustee of a trust, the termination of the trust;

(iii)     in the case of a Member that is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(iv)     in the case of a Member that is a corporation, the dissolution of the corporation or the revocation of its charter; and

(v)     in the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

(b)     The Company shall not be dissolved, but shall continue, upon the occurrence of a Dissolution Event with respect to any Member.

- 15 -

## Section 7.2.    Liquidation and Termination:

(a)    Upon liquidation and/or dissolution of the Company, the remaining Members, b unanimous consent at the time of such dissolution, shall appoint one of their Members or an other person of their choice to act as Liquidating Trustee to arrange for the liquidation of th Company.  The Liquidating Trustee shall convert the assets of the Company to cash or it equivalent and arrange for the affairs of the Company to be wound up with reasonable speed bu with a view towards obtaining fair value for Company assets, and, after satisfaction (whether b payment or by establishment of reserves therefor) of creditors, including Members who ar creditors, shall distribute the remaining assets to and among the Members in accordance with th provisions of Section 4.3.

(b)    Each Member shall look solely to the assets of the Company for all distribution with respect to the Company and his Capital Contribution thereto and share of profits, gains and losses thereof and shall have no recourse therefor (upon dissolution or otherwise) against any other Member.  No Member shall have any right to demand or receive property other than cash upon dissolution and liquidation of the Company.

## ARTICLE VIII
## BOOKS AND RECORDS; ACCOUNTING, TAX ELECTIONS, ETC.

### Section 8.1.    Books, Records and Reports:

(a)    The books and records of the Company shall be maintained by the Managing Member on behalf of the Company and shall be available for examination by any Member, or his duly-authorized representatives, during regular business hours.

(b)    The Managing Member shall cause to be furnished to the Members within ninety (90) days of the end of each fiscal year (i) a complete accounting of the affairs of the Company, and (ii) appropriate information to be used by the Members for reporting their respective shares of the profits and losses of the Company for income tax purposes.  The cost of such financial and tax reports shall be an expense of the Company.

### Section 8.2.    Bank Accounts:    One or more Company bank accounts shall be established and checks up to $1,000 on the accounts may be signed by any Class A Member, and by any two Class A Members and/or the Managing Member (provided that such check is within the authority of the Managing Member as set forth in Article V hereof) for checks in excess of $1,000.

### Section 8.3.    Fiscal Year; Methods of Accounting:    The fiscal year of the Company and the method of accounting to be used in keeping the books of the Company shall be determined by the Managing Member in accordance with applicable law.

~BALT2:4109826.v4  |11/29/04

**Section 8.4.    Tax Matters Member.**  Eric T. May is hereby designated to act as the "Tax Matters Member" under Code Section 6231(a)(7) of the Code. As provided in Code Sections 6221 through 6231 and subject to the provisions hereof, the Tax Matters Member shall represent the Company and the Members in their capacities as Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and subject to the provisions hereof, shall file any tax returns and execute any agreements or other documents on behalf of the Company.

**ARTICLE VIII**
**ENFORCEMENT OF CERTAIN**
**RIGHTS AND OBLIGATIONS OF MEMBERS**

**Section 9.1.    Waiver of Right to Judicial Dissolution:**    The Members agree that irreparable damage would be done to the good will and reputation of the Company if any Member should bring an action in court to dissolve the Company.  Care has been taken in this Agreement to provide what the Members believe are fair and just payments to be made to a Member whose relation with the firm is terminated for any reason.  Accordingly, each of the Members accepts the provision under this Agreement as its sole entitlement on termination of its Company relation.  Each Member hereby waives and renounces its individual right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company.

**Section 9.2.    Waiver of Partition, Valuation and Accounting:**    Each Member, on behalf of itself and its successors, representatives, heirs and assigns hereby waives and releases each and all of the following rights that he have or may have, if any, by virtue of holding a Percentage Interest in the Company: (i) any right of partition or any right to take any other action which otherwise might be available to such Member for the purpose of severing its relationship with the Company or such Member's interest in the assets held by the Company from the interest of the other Members; (ii) except as expressly provided herein, any right to valuation and payment of the Percentage Interest of any Member; and (iii) any right to an accounting of the Percentage Interest of any Member.

**ARTICLE X**
**GENERAL PROVISIONS**

**Section 10.1.  Notices:**    All notices, offers, requests and demands herein required or permitted to be given or made shall be made in writing and deemed to be effectively served and delivered when received by the party to whom it is addressed if delivered by hand or by overnight delivery service or three (3) days after the date of postmark if sent by registered or certified mail, postage prepaid, return receipt requested.  If the notice, offer, request or demand is intended for the Company, it shall be addressed to the Company at the principal office of the Company, or if intended for a Member, shall be addressed to the Member at his or its address appearing on *Schedule A* or addressed to such other person or at such other address designated by written notice given to the Company and all Members.

- 17 -

**Section 10.2.  Binding Provisions**:  The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, personal representatives, successors and assigns of the respective parties hereto.

**Section 10.3.  Separability of Provisions**:  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect any other provisions of this Agreement.

**Section 10.4.  No Third Party Beneficiaries**:  No provision of this Agreement, including but not limited to Section 3.5. hereof, is intended to be for the benefit of any unrelated creditor to whom any debts, liabilities or obligations are owed by, or who otherwise has any claim against, the Company or any of the Members, and no such creditor shall obtain any right under any such provisions or shall by reason of such provisions make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any of the Members.

**Section 10.5.  Section Titles; Word Meanings**:  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text. In this Agreement, the singular shall include the plural and the neuter gender shall include the masculine and feminine genders, and vice versa, unless the context otherwise requires.

**Section 10.6.  Entire Agreement; Amendments**:  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof.  This Agreement may be modified or amended only by a written amendment or other instrument signed by all of the Members.

**Section 10.7.  Applicable Law**:  This Agreement shall be construed and enforced in accordance with the laws of the District of Columbia, without regard to conflict of law principles.

**Section 10.8.  Counterparts**:  This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.  Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents hereof.

*[signatures appear on following page]*

- 18 -

IN WITNESS WHEREOF, the Members have executed this Agreement under seal on the year and date first above written.

**WITNESS:**

**CLASS A MEMBERS:**

_____(SEAL)
William N. Herman

_____(SEAL)
Eric T. May

_____(SEAL)
Julia H. Wright

**CLASS B MEMBERS:**

_____(SEAL)
William N. Herman

_____(SEAL)
Eric T. May

_____(SEAL)
Julia E. Wright

- 19 -

-BALT2:4109826.v3  |

# OPERATING AGREEMENT

## OF

## CRA URBAN VENTURE I LLC

Names, Addresses, Capital Contributions and Percentage Interests of Members

### *Schedule A*

| Name and Address of Member | Capital Contributions | Percentage Interests |
|---|---|---|
| William N. Herman<br>10516 Tulip Lane<br>Potomac, Maryland 20854 | $100,000.00 | (a) 1% Class A Percentage Interest<br><br>(b) 32 1/3% Class B Percentage Interest |
| Eric T. May<br>10300 Summit Avenue<br>Kensington, Maryland 20985 | $100,000.00 | (a) 1% Class A Percentage Interest<br><br>(b) 32 1/3% Class B Percentage Interest |
| Julie E. Wright<br>_____<br>_____ | $100,000.00 | (a) 1% Class A Percentage Interest<br><br>(b) 32 1/3% Class B Percentage Interest |
| **TOTALS** | **$300,000.00** | **3% Class A Percentage Interests**<br><br>**97% Class B Percentage Interests** |

- I -

## OPERATING AGREEMENT

### OF

## CRA URBAN VENTURE I LLC

Name and Address of Managing Member

*Schedule B*

---

*Name and Address of Managing Member*

William N. Herman
10516 Tulip Lane
Potomac, Maryland 20854

- 1 -

OPERATING AGREEMENT

OF

## CRA URBAN VENTURE I LLC

Additional Defined Terms

*Schedule 1.1*

---

The following additional defined terms used in this Agreement shall, unless otherwise noted or unless the context otherwise requires, have the following meanings:

*Affiliates*:  when used with reference to a specified person (i) any person who, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with the specified person, (ii) any person who is an officer, partner, or trustee of, or serves in a similar capacity with respect to, the specified person, or any person of which the specified person is an officer, partner or trustee, or with respect to which the specified person serves in a similar capacity, (iii) any person who, directly or indirectly, is a partner, or the beneficial owner of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified person, or any person of which the specified person is directly or indirectly the owner of any partnership interest or class of equity securities or in which the specified person has a substantial beneficial interest, (iv) any family member of the specified person (i.e., any spouse, sibling, ancestor, or descendant), and (v) an Affiliate of any affiliated person.

*Available Cash*:  with respect to any fiscal period, all cash receipts of the Company, including (without limitation) amounts previously set aside as reserves which the Members determine no longer to be necessary for such purpose, if any, *less* cash payments disbursed for operating expenses and additions to reserves, if any, as determined by unanimous consent of the Members.

*Capital Contributions*:  with respect to each Member, the total amount of cash or the agreed fair market value of any property contributed by such Member (net of any liabilities assumed by the Company and any liabilities to which such property is subject) in accordance with this Agreement, including, but not limited to, the amounts deemed contributed by Members pursuant to Section 3.3.

*Class A Member*:  a Member holding a Class A Percentage Interest.

*Class B Member*:  a Member holding a Class B Percentage Interest.

"*Excess Payment*" means the amount paid by any Member (or its Affiliate) under a guaranty of any loan, which one or more of the Members (or their respective Affiliates) are required to guaranty pursuant to Section 3.5 hereof, to the extent such amount paid exceeds such Member's Proportionate Guaranty Obligation.

*Interest*:  the entire ownership interest of a Member in a Percentage Interest of the Company at any particular time, including the Member's share of the profits and losses of the Company, the right to receive distributions from the Company and the right to any and all other benefits to which

- 2 -

such Member may be entitled as provided in this Agreement and in the DC Act, together with the obligations of such event to comply with the terms and provisions of this Agreement and of the DC Act.

Case 1:05-cv-01179-RMU   Document 1-2   Filed 06/13/2005   Page 24 of 25

***Member***:  at any time, any Person admitted and remaining as a member of the Company pursuant to the terms of this Agreement.  As of the date of this Agreement, the members of the Company are the Members identified on Schedule A.

***Net Income*** and ***Net Loss***:  for any fiscal year means the net income or net loss of the Company for federal income tax purposes for such year as determined by the accountants for the Company without regard to any adjustments to basis pursuant to Sections 734 or 743 of the Code, but subject to the following adjustments:

(i)  Any income of the Company that is exempt from federal income tax shall be added to such taxable income or loss.

(ii)  Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(i), shall be subtracted from such taxable income or loss.

(iii)  If the fair market value on the date that an asset is contributed to the Company (or if the basis of such asset for book purposes is adjusted under the Treasury Regulations, such adjusted "book" basis) differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, in lieu of the depreciation, amortization and other cost recovery deductions taken into account for computing such taxable income or loss, the amount for depreciation, amortization and other cost recovery deductions shall be equal to an amount which bears the same ratio to such beginning fair market value (or adjusted "book" basis) as the federal income tax deduction for such year or other period bears to such beginning adjusted tax basis.

(iv)  If the value at which an asset is carried on the books of the Company differs from its adjusted tax basis and gain or loss is recognized from a disposition of such asset, the gain or loss shall be computed by reference to the asset's "book" basis rather than its adjusted tax basis.

***Percentage Interest***:  with respect to each Member, such Member's percentage of certain specified rights, benefits, duties and obligations by virtue of being a Member of the Company and holding an LLC Interest in the Company, as specified on *Schedule A*, as the same may be amended or modified from time to time.

***Permitted Transfer***:  a Transfer of a Member's, *provided that* such Transfer is in accordance with the terms and conditions of this Agreement.

***Person***:  any individual, corporation, partnership, limited liability company, association, trust or other entity or organization.

"***Proportionate Guaranty Obligation***"  With respect to any loan which one or more of the Members (or their Affiliates) are required to guaranty pursuant to Section 3.5 hereof, the obligation

- 3 -

of each Member to make payments to a third party lender, the Company or to any other Member in an amount equal to the proportionate amount (x) the amount required to be paid under any and all such guaranties multiplied by (y) a fraction, the numerator of which is the total Percentage Interest held by such Member and the denominator of which is one hundred (100) (determined as of the time the guaranty obligation, or the underlying obligation, as applicable was incurred).

   *Transfer* means (i) as a noun, any voluntary or involuntary sale, assignment, transfer, pledge, hypothecation, exchange or other disposition of a Member's Percentage Interest (or portion thereof) direct or indirect, by any means whatsoever, whether by operation of law or otherwise; and (ii) as a verb, any action or actions taken by or on behalf of a Member which results in such sale, assignment, transfer, pledge, hypothecation, exchange or other disposition of a Member's Percentage Interest (or portion thereof).

- 4 -