OPERATING AGREEMENT

OF

GAGE SCHOOL HOLDINGS, LLC

TABLE OF CONTENTS

Page

**ARTICLE I.        FORMATION** ...................................................................... 1

   **1.01**    **Formation** ................................................................................. 1
   **1.02**    **Names and Addresses** ............................................................... 1
   **1.03**    **Nature of Business.** .................................................................. 1
   **1.04**    **Title Holding Subsidiaries** ....................................................... 2
   **1.05**    **Term of Company** .................................................................... 2
   **1.06**    **Limited Liability** ..................................................................... 2
   **1.07**    **Broker's Indemnity** ................................................................. 3

**ARTICLE II.        MANAGEMENT** ................................................................. 3

   **2.01**    **Management** ............................................................................ 3
   **2.02**    **Member Approvals** .................................................................. 3
   **2.03**    **Manager** ................................................................................. 6
   **2.04**    **Removal of the Manager** .......................................................... 7
   **2.05**    **Reimbursement and Compensation** ............................................ 9
   **2.06**    **Employees and Consultants** ...................................................... 9
   **2.07**    **Contracts with Affiliates.** ........................................................ 10
   **2.08**    **Insurance** .............................................................................. 11
   **2.09**    **Liability and Indemnity** ........................................................... 11

**ARTICLE III.        BUSINESS PLAN AND BUDGET** ....................................... 12

   **3.01**    **Project Plans** ......................................................................... 12
   **3.02**    **Competing Project and Investments.** ......................................... 12

**ARTICLE IV.        CAPITAL CONTRIBUTIONS** ............................................. 13

   **4.01**    **Initial Capital Contributions** .................................................... 13
   **4.02**    **Second Capital Contribution** .................................................... 13
   **4.03**    **Additional Capital Contributions.** ............................................. 14
   **4.04**    **Construction** .......................................................................... 14
   **4.05**    **Project Schedule** .................................................................... 15
   **4.06**    **Remedies For Failure to Contribute Additional Capital** ............... 15
   **4.07**    **Capital Contributions in General** .............................................. 15

**ARTICLE V.        PROFITS AND LOSSES** ..................................................... 16

   **5.01**    **Tax Allocations** ...................................................................... 16
   **5.02**    **Regulatory and Curative Allocations** ......................................... 17

**ARTICLE VI.        DISTRIBUTIONS** ............................................................. 17

   **6.01**    **Net Cash Flow** ....................................................................... 17
   **6.02**    **Intent and Examples** ............................................................... 18
   **6.03**    **No Reinvestment** .................................................................... 18
   **6.04**    **Tax Distributions** ................................................................... 18

TABLE OF CONTENTS
(cont'd)

Page

**ARTICLE VII.    BOOKS, RECORDS AND ACCOUNTING** ........................................ 19

7.01    Company Books ........................................................ 19
7.02    Reports .................................................................. 19
7.03    Company Tax Elections, Tax Controversies ......................... 19
7.04    Accounting Method and Fiscal Year ................................. 19
7.05    Accountants and Other Professionals ............................... 20
7.06    Banking ................................................................. 20
7.07    Tax Returns ............................................................ 20
7.08    Confidentiality of Information ....................................... 20

**ARTICLE VIII.    RESTRICTIONS ON TRANSFER** ................................ 20

8.01    Limitations on Transfer .............................................. 20
8.02    Admission of Substitute Members ................................... 21
8.03    Additional Restrictions on Transfer ................................ 21
8.04    Regulatory Prohibition ............................................... 22
8.05    Election; Allocations Between Transferor and Transferee ....... 22
8.06    Partition ................................................................ 22
8.07    Waiver of Withdrawal and Purchase Rights ........................ 23

**ARTICLE IX.    DISSOLUTION** ......................................................... 23

9.01    Events Causing Dissolution of the Company ...................... 23
9.02    Winding Up of the Company ........................................ 23

**ARTICLE X.    DEFAULT** ................................................................. 24

10.01    Event of Default ..................................................... 24
10.02    Rights Arising From an Event of Default ......................... 26
10.03    Defaults under Company Loans .................................... 26

**ARTICLE XI.    DISPUTE RESOLUTION** ........................................... 27

**ARTICLE XII.    REPRESENTATIONS AND WARRANTIES** ................ 27

12.01    Operator Representations and Warranties ........................ 27
12.02    Investor Representations and Warranties ......................... 28
12.03    Mutual Representations and Warranties ........................... 28
12.04    Survival of Representations and Warranties ...................... 29

**ARTICLE XIII.    [INTENTIONALLY OMITTED]** ................................ 29

**ARTICLE XIV.    MISCELLANEOUS** ................................................. 29

14.01    Notices and Approvals ............................................. 29
14.02    Statutes ............................................................... 30
14.03    Cross References .................................................... 30
14.04    Remedies ............................................................. 31
14.05    Litigation Without Termination ................................... 31
14.06    Successors and Assigns ............................................ 31
14.07    Amendments ......................................................... 31

~BALT2:4113320.v8  |11/29/04
1-6

TABLE OF CONTENTS
(cont'd)

Page

**14.08    Governing Law** ......................................................................**31**
**14.09    Interpretation** ........................................................................**31**
**14.10    No Obligation to Third Parties** ...........................................**31**
**14.11    Further Assurances** ..............................................................**31**
**14.12    Merger of Prior Agreements** ...............................................**31**
**14.13    Enforcement** ..........................................................................**32**
**14.14    Time** ........................................................................................**32**
**14.15    Severability** ...........................................................................**32**
**14.16    No Waiver** ..............................................................................**32**
**14.17    Legal Representation** ............................................................**32**
**14.18    Appendices, Schedules and Exhibits** ...................................**32**
**14.19    Intentionally Omitted** ..........................................................**33**
**14.20    Indemnity** ..............................................................................**33**
**14.21    Signer's Warranty** ................................................................**33**
**14.22    No Offer or Binding Contract** .............................................**33**

**ARTICLE XV.       DEFINITIONS**.................................................**34**


EXHIBIT A      PARTNERS
EXHIBIT B      INTERNAL RATE OF RETURN
EXHIBIT C      [INTENTIONALLY OMITTED]
EXHIBIT D      REPORTS AND PLANS
EXHIBIT E      TARGET AREA
EXHIBIT F      PROJECT BUSINESS PLAN
EXHIBIT G      PROJECT BUDGET
EXHIBIT H      MILESTONES
EXHIBIT I       SALES GUIDELINES
EXHIBIT J      DEVELOPMENT SERVICES AGREEMENT
EXHIBIT K-1   LOAN DOCUMENTS
EXHIBIT K-2   ACQUISITION DOCUMENTS

~BALT2:4113320.v8  |11/29/04
1-6

OPERATING AGREEMENT
OF
GAGE SCHOOL HOLDINGS, LLC

THIS OPERATING AGREEMENT (this "Agreement") is entered into effective as of November __ 2004, by and between HUI, LLC, a Virginia limited liability company ("Investor"), and CRA URBAN VENTURE I LLC, a District of Columbia limited liability company ("Operator").  The capitalized terms used in this Agreement, including without limitation any schedules, appendices and exhibits to this Agreement, and not otherwise defined shall have the meanings given to such terms in Section 16, Definitions.

## ARTICLE I.
## FORMATION

**1.01** **Formation**.  The Company has been formed as a Delaware limited liability company pursuant to the provisions of the Delaware Act.  The Company shall be operated in accordance with, and the Members shall be governed by, the terms and conditions of this Agreement.  If any term of this Agreement is inconsistent with any term of the Delaware Act that is not mandatory, then this Agreement shall control.  In connection with the formation of the Company, the Manager shall cause to be filed with the office of the Delaware Secretary of State a duly executed Certificate of Formation for the Company in accordance with the Delaware Act.  The Manager shall also cause to be executed, acknowledged and/or verified such other documents and/or instruments as may be necessary and/or appropriate in order to form the Company under the Delaware Act and/or to continue its existence in accordance with the provisions of the Delaware Act and/or to register, qualify to do business and/or operate its business as a foreign limited liability company in any other state in which the Company conducts business.

**1.02** **Names and Addresses.**  The name of the Company is "Gage School Holdings, LLC".  The registered office of the Company in the State of Delaware shall be at 1209 Orange Street, Wilmington, DE 19801.  The name of the registered agent for the Company in the State of Delaware at such address shall be CT Corporation System.  For so long as Operator is the Manager, the principal office for the Company shall be maintained at c/o CRA Urban LLC, 1640 Rhode Island Avenue, NW, Suite 825, Washington, DC  20036, or such other location at which Operator maintains an office and thereafter at such other place(s) as the Manager may designate from time to time.  Copies of any material notices or other matters received by the Company shall be promptly delivered by the Manager to the Members.

**1.03** **Nature of Business.**  The principal purposes for which the Company is to exist are (a) the acquisition (directly or indirectly) of, and the development, renovation, redevelopment, repositioning, imposition of a condominium regime upon, management, financing, operation and maintenance, in compliance with this Agreement, of Gage School, 2035 Second Street, NW, Washington, DC real estate Project (the "Project"); (b) to sell or otherwise dispose of the condominium units to be created as part of the Project; and (c) to conduct such other activities with respect to, and otherwise realize and optimize the economic return from, the Project and any related assets the Company may hereinafter acquire as are appropriate to carrying out the foregoing purposes.  The Project will be owned entirely by the Company.

**1.04    Title Holding Subsidiaries**. Title to the Project may be held by a separate, single purpose, limited liability company or partnership that is wholly owned by, and whose only members, partners and/or managers are, the Company and other limited liability companies wholly owned (directly or indirectly) by the Company (each a "Title Holding Subsidiary"). It shall be the Manager's duty and responsibility to duly form and maintain each Title Holding Subsidiary and cause each Title Holding Subsidiary to be and remain in good standing in its state of organization and qualified to do business in each jurisdiction in which it owns property or otherwise conducts business, to obtain appropriate employer and/or tax identification numbers (to the extent required) for the Title Holding Subsidiary, and the like. The rights, duties, responsibilities and authority of the Members and the Manager with respect to the Project, if owned through a Title Holding Subsidiary shall be identical to their respective rights, duties, responsibilities and authority with respect to the Project owned directly by the Company. Any provision of this Agreement giving the Members, or the Manager the right or authority to take any action or refrain from taking any action, or cause the Company to take any action or refrain from taking any action, shall be interpreted to give them the identical right or authority with respect to the appropriate Title Holding Subsidiary. Any provision of this Agreement imposing any duty or responsibility on the Members or the Manager, or limiting their respective rights or authority, with respect to the Project if owned directly by the Company shall be interpreted to impose the identical duty, responsibility or limitation on them with respect to the Project owned through a Title Holding Subsidiary. Each Title Holding Subsidiary shall be deemed to be an extension of the Company for purposes of determining the rights, duties and obligations of the Members and the Manager, including without limitation the contribution of capital and the receipt of distributions and allocations under this Agreement. The provisions of this Section apply only to the rights, duties, responsibilities and authority of the Members and Manager to and among themselves. Nothing in this Section shall result in any liability being imposed on any of the Members or Manager to any other Person or in any way defeat or limit the application of Section 1.06. The operating agreement for each Title Holding Subsidiary shall be in a form approved by the Members.

**1.05    Term of Company**. The term of the Company shall commence on the date the Certificate of Formation for the Company is filed with the Delaware Secretary of State and shall continue until December 31, 2044 (the "Termination Date"), unless otherwise dissolved pursuant to Article IX. The existence of the Company as a separate legal entity shall continue until the cancellation of the Company's Certificate of Formation.

**1.06    Limited Liability**. Except as otherwise required hereunder or pursuant to any non-waivable provision of the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members and Manager shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager of the Company. Notwithstanding anything to the contrary in this Agreement, no third party or any creditor of the Company, shall have any right to require the Manager to make a capital call or to enforce the obligations of the Members to make any Capital Contribution, loan or other advance.

**1.07    Broker's Indemnity**.  Neither Member has had any contact or dealings regarding this Agreement or the formation of the Company through any investment banker, broker, finder or similar person who can claim a right to any commission or similar compensation in connection with this transaction, except for Cushman and Wakefield (the "Broker").  All compensation payable to the Broker in connection with the acquisition of the property upon which the Project is to be developed (the "Property"), with this Agreement or the formation of the Company shall be borne by the Company as a Project expense.  In the event that any other investment banker, broker, finder or similar person claims any commission or similar compensation in connection with this Agreement or the formation of the Company, the Member through whom the investment banker, broker, finder or similar person makes its claim shall indemnify, defend and hold harmless the other Member, its Constituents and the Company from and against any and all liability, loss (including without limitation Costs of Litigation) which any of them may suffer or incur by reason of any such claim.  The provisions of this Section shall survive the dissolution or other termination of the Company.

## ARTICLE II.
## MANAGEMENT

**2.01    Management**.  Except as otherwise expressly provided in this Agreement, (a) all aspects of the business and affairs of the Company shall be managed, and all decisions affecting the business and affairs of the Company shall be made, by the Manager, with, as necessary, the unanimous consent of the Members; and (b) no Member , in its capacity as such (as distinct from its capacity as Manager, as applicable) shall have any right, power or authority to act (as agent or otherwise) for, or to bind, the Company in any manner.

**2.02    Member Approvals**.  Anything contained in this Agreement to the contrary notwithstanding, the Manager shall have the exclusive right, power and authority to approve and/or cause the Company to undertake any of the actions listed below (each a "Major Decision") only with the unanimous consent of the Members.  However, in all other situations and with respect to all other matters, the Manager shall have the sole and exclusive right, power and authority to approve and/or cause the Company to undertake any other action without the requirement of the consent of any Member, in its capacity as such.  In addition, during any period that the Priority Return of the Investor is equal to zero (i.e. – that the Investor has achieved as of such date, taking into account all contributions and distributions through such date, a 25% IRR on its Capital Contributions), notwithstanding any provision of this Agreement to the contrary, the Investor shall have no consent or approval rights over Major Decisions, and shall have no right to take any action and/or enforce any rights in any capacity hereunder whatsoever, including but not limited to the right to declare an Event of Default and or enforce any remedies with respect thereto.  The Major Decisions shall be as follows:

(a)    Cause the Company to engage in any business not described in Section 1.03;

(b)    Except as otherwise provided in Section 2.04, issue any additional interest or interests in the Company or admit any additional Person or Persons as members of the Company;

- 3 -

(c)    Call for any additional Capital Contributions not otherwise authorized by this Agreement;

(d)    Dissolve the Company prior to the Termination Date;

(e)    Any merger, consolidation, joint venture, partnership, limited liability company, other similar business combination or entity involving the Company;

(f)    Enter into any contract or agreement (i) with the general contractor, and (ii) with any other party (including but not limited to the Project architect and Project sales agent), provided, however, that Member consent will not be required with respect to contracts or agreements described in clause (ii), above, to the extent that they are consistent with the then-approved Project Budget, are with unrelated third parties, and are on commercially reasonable, market rate terms, provided, however, that the Investor shall have approval rights over any change in the identity of the architect (currently Bonstra) or the sales agent (currently McWilliams Ballard);

(g)    To borrow money in the name of the Company, or to make, execute or deliver for the Company any bond, mortgage, deed of trust, security document, forward commitment, hedge, loan commitment, cap or collar, guaranty, indemnity bond, indemnity, surety bond, security, accommodation, or any of the foregoing, or to amend any of the foregoing;

(h)    Use the Property for other than a Company purpose or use the Property as collateral for an obligation other than a  Company obligation, provided, however, that the Members acknowledge that the Operator may cause the Company to allow community members and/or the community association to host events on the Property without requiring the consent of the Members;

(i)    Confess a judgment against the Company,  the Property or any of the Members (other than against the Manager itself);

(j)    Admit a Person as a Member to the Company;

(k)    Enter into or amend a lease or other occupancy agreement for the Property or any part thereof;

(l)    Agree upon, and thereafter modify, the sales guidelines that shall apply to the sale of condominium units in the Project (the "Sales Guidelines"), or thereafter sell any one or more of the condominium units in a manner inconsistent with the approved Sales Guidelines which, upon approval, shall be attached hereto as Exhibit I;

(m)    Adopt or modify any Pre-Development Budget or Project Budget, or incur any operating expense (or related series of expenses) or incur any capital expense (or related series of expenses) that is not consistent with the then-current, approved Pre-Development Budget or Project Budget, as applicable, other than as permitted pursuant to the provisions of Section 2.03(c) hereof;

- 4 -

(n)     Enter into an employment agreement with or otherwise hire any employee of the Company;

(o)     File a voluntary petition in bankruptcy or otherwise initiate proceedings to have the Company declared bankrupt or insolvent, or filing for or consenting to the institution of bankruptcy, insolvency proceedings, or reorganization or relief as a debtor under federal or state law, or seeking or consenting to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or similar official) of the Company or any material part of either of their assets, make any general assignment for the benefit of creditors, or admit in writing the inability of the Company to pay its debts generally as they become due;

(p)     Enter into any agreement with or transfer any material Company asset to any Affiliate of any Member, other than the Development Services Agreement attached hereto as Exhibit J, which is hereby approved by the Members;

(q)     Permit the Company to retain any accountant other than Aronson & Company, Member approval being limited to the identity of the accountant, not to be unreasonably withheld, and such approval being deemed granted if not denied in writing within five (5) days after submission of the identity of the accountant;

(r)     Initiate, defend or settle any real estate tax appeals, or other actions or proceedings consistent with the normal operation of the Property where the amount in dispute is greater than $50,000;

(s)     Make a loan;

(t)     Approve any material change to any item approved by Investor, such as auditors, banks, legal, design drawings, general contractor or construction contract, check signing, property manager, condo warranty changes;

(u)     Take any action or refrain from taking any action that causes a material default under any material agreement, including without limitation any loan agreement or general contractor agreement;

(v)     Initiate, defend, settle or compromise any litigation, arbitration, alternate dispute resolution or dispute with any third party; and

(w)     Acquire stock or other business property.

All requests by the Manager for consent of the Members shall be submitted to the Members in writing.  Failure by any Member to submit a written objection (or a reasonable, written request for additional information) to the requested action within five (5) business days of the submission of such written request (or the provision of such requested additional information, as applicable), shall be deemed to constitute such Member's approval with respect to the item at issue.  The Investor shall not have the right to unreasonably withhold, condition or delay the granting of its consent with respect to the items set forth in Subsections 2.02(f),(g),(l)

- 5 -

or (m) hereof.  As to item 2.02(t), (i) the Investor shall not have the right to unreasonably withhold, condition or delay the granting of its consent to the identity of a successor or replacement accountant, auditor, legal counsel, general contractor, architect, property manager or sales agent, and (ii) to the extent that the Investor's original approval of an item was required pursuant to Sections 2.02(f),(g), (l) or (m), as to any change or modification to such item that requires the Investor's approval, such approval shall not be unreasonably withheld, conditioned or delayed by the Investor.  As to all other items, the Investor shall have the right to withhold its consent in the exercise of its sole and absolute discretion.  In addition, any dispute of the Members as to the item described in Section 2.02(l) hereto shall be submitted to David Mayhood for binding resolution.

**2.03    Manager.**

      (a)    Appointment of Manager.  Operator is hereby designated as the "Manager" of the Company.  Operator shall serve in such capacity unless and until Operator is removed in accordance with the provisions of Section 2.04.  Following any removal of Operator as the Manager, the Person (who may be, but need not be, a Member of the Company) selected in accordance with the provisions of Section 2.04 shall serve as the replacement "Manager" of the Company.

      (b)    Duty and Authority.  The Manager shall have the duty and responsibility (subject in all respects to the availability of funds), and shall have the sole and exclusive power and authority (subject only to the provisions of Section 2.02 hereof) to manage and administer the day-to-day business and affairs of the Company and the Project.  Operator acknowledges that it is a fiduciary under this Agreement, and as a fiduciary Operator agrees to utilize Due Care in carrying out its obligations hereunder.

      (c)    Authorized Actions and Expenditures.  Subject in all events to the maximum funding limits provided in Section 4.03, Manager may cause the Company to expend funds in excess of the then-applicable approved Pre-Development Budget or Project Budget (as proposed and approved in the manner set forth in Section 3.01 hereof) if each of the following conditions are satisfied:  (i) such payments will only be made to third parties that are not Affiliates of the Operator; and (ii) the expenditure does not result in the then applicable, approved Pre-Development Budget or Project Budget, as applicable, being exceeded, in the aggregate with all other excess expenditures, by (a) the greater of $50,000.00 or ten percent (10%) with respect to any particular line item,  or (b) ten percent (10%) in the aggregate, with respect to the Pre-Development Budget, or by (a) the greater of $50,000 or five percent (5%) with respect to any particular line item, or (b) five percent (5%) in the aggregate, with respect to the Project Budget.  Notwithstanding the foregoing, reallocation of items of expense from one line item to another (including contingency) shall be ignored for purposes of the foregoing calculation, to the extent that such reallocation does not result in any increase to the overall budget, and any such reallocation that is consistent with the foregoing shall not require the consent of the Members.  In addition to the foregoing, consent of the Members shall not be required with respect to expenses incurred in excess of budgeted amounts to the extent that such expenses constitute interest, utilities, insurance or real estate taxes.  The use of more than the

- 6 -

greater of (i) 25% of the contingency funds, or (ii) $100,000 of such contingency funds, for a single or related series of items, shall be a Major Decision, but otherwise the use of contingency funds shall not be aggregated in determining whether it constitutes a Major Decision.

(d)     <u>Indemnification by Manager</u>.  The Manager shall indemnify, defend and hold harmless the Company, the Member(s) and their Constituents to the full extent permitted by Law from and against any and all liabilities, losses, claims, costs, damages and expenses (including without limitation Costs of Litigation) directly arising from and directly attributable to any act or failure to act by the Manager that constitutes an Event of Default hereunder.

(e)     <u>No Substitute Performance</u>.  The Members agree that (i) Operator's role as Manager of the Company and the performance of such role in accordance with this Agreement is personal in nature; (ii) Investor is relying on the reputation of Operator and its personnel for knowledge, expertise, capabilities, reliability and integrity; and (iii) Investor is excused from accepting the performance as Manager of any Person other than Operator or a Permitted Transferee.  The Members agree that the provisions of this Agreement relating to Operator's responsibility as Manager and Operator's compensation for such activities constitute a nonassignable contract under Section 365(c) of the United States Bankruptcy Code or any similar Law.  Any purported assignment in violation of this Section shall be null and void.  Further, in the event Operator is a debtor under the United States Bankruptcy Code or any similar Law and this Agreement has not been terminated, the Members agree that (iv) adequate protection of Investor's interest in this Agreement requires that Operator timely comply with all of the terms of this Agreement; (v) the occurrence of a Buyout Default by the Operator cannot be cured under Section 365(b) of the United States Bankruptcy Code or any similar Law; and (vi) upon the occurrence of a Buyout Default by the Operator, Investor shall be entitled to exercise its rights under Article X of this Agreement and, if required, the Operator consents to relief from the automatic stay of Section 362 of the United States Bankruptcy Code or any similar Law to permit such exercise.

**2.04    <u>Removal of the Manager</u>.**

(a)     <u>Removal</u>.

(i)     The Investor shall have the right to remove Operator as the Manager of the Company in the event that the Investor reasonably determines, in good faith, that a Removal Default has occurred, by delivering notice ("Removal Notice") thereof to Operator within thirty (30) days after the occurrence of a Removal Default.

(ii)     Subsequent to the provision of a validly and timely delivered Removal Notice, (1) Operator and Operator's Affiliates shall no longer be entitled to receive any Manager Fees, except for such Manager Fees that have become payable (whether or not yet paid) under the provisions of the Development Services Agreement prior to the time that Operator is removed as Manager, which the Operator or its Affiliate, as approved, shall be entitled to receive without set-off; (2) the Investor may, in its sole and absolute discretion, designate as a replacement Manager any person or entity that may (but need not) be a Member of the Company (including, without limitation, Investor or any Affiliate thereof); and (3) all bank accounts,

- 7 -

contracts, deposits, accounts or other evidences of any rights of the Company shall be transferred to the name or control of such party as the Investor shall direct and Operator shall promptly execute such instruments and take such actions as the Investor may request to effect such transfer. Any replacement Manager shall be a fiduciary and shall be bound to act in the best interests of the Company, utilizing Due Care. In the event that the Operator disputes whether in fact a Removal Default has occurred, the Removal Notice shall nevertheless be effective, so long as it was delivered by the Investor in good faith, but the Operator shall have the right to challenge whether a Removal Default has occurred pursuant to the provisions of Section 2.04(a)(iii) hereof.

(iii)    The Operator may challenge a Removal Notice by submitting written notice of such challenge, stating in detail its reasons therefor, to the Investor. Within there (3) business days after such written challenge is submitted to the Investor, the Investor shall designate which of the persons set forth below shall resolve such dispute. If the Investor fails to do so within such three (3) business day period, or if the person so designated by the Investor is not available, then the Operator shall designate which of such persons set forth below shall be selected to resolve the dispute. Once the resolving person has been selected in accordance with the foregoing, the Investor and the Operator shall each submit a written statement of its position to such resolving person within ten (10) business days, and the resolving person shall render its determination as to whether or not a Removal Default has occurred within ten (10) business days after the end of the above-described ten (10) business day period. If the resolving person determines that no Removal Default has occurred, the Manager shall immediately be reinstated as Manager and all rights relating thereto (including but not limited to the right to receive Manager Fees) shall immediately be reinstated as well. Institution of the above procedure shall constitute the Operator's only remedy with respect to a Removal Notice that the Operator believes has been improperly submitted. Set forth below is the list of persons to whom a dispute as to whether a Removal Default has occurred may be submitted:

Richard Carr
Neil Rauenhorst
Ray Ritchey
Michael Darby

(iv)    From and after any removal of the Manager pursuant to this Section: (1) the replacement Manager (and not Operator) shall be entitled to exercise all the rights, duties and obligations, and to receive any and all Manager Fees (to the extent such Manager fees have not yet been earned, as set forth in Section 2.04 (a)(ii)(1) hereof), of the Manager under this Agreement; (2) Operator shall have no further rights or obligations under this Agreement, including without limitation under Section 2.03; (3) Operator shall have no further obligation to make Capital Contributions hereunder; and (4) any decision, consent or approval which requires the concurrence of both Members shall not require the approval of the Operator, provided, however, that unless the Removal Default giving rise to the removal of Operator as Manager is described in clause (b) of the definition thereof, the Operator shall retain its approval rights over the following items contained in Section 2.02 hereof: (a); (b); (c); (d); (e); (h); (j); (l); (p); (u); and (w). Notwithstanding the foregoing, so long as the Operator has the right to

- 8 -

make its pro-rata share of additional Capital Contributions and/or loans to the Company upon the same terms applicable to the Investor or any Person admitted as an additional Member, after ten (10) business days notice to the Operator of such terms, the consent of the Operator to the items described in Subsections 2.02(b), (c) or (j) shall not be required pursuant to the provisions of this Section 2.04(a)(iv).

(b)    Generally.  Subject to the provisions of Section 2.04(a)(iii), any removal of Operator as Manager shall be effective upon the date that a Removal Notice delivered in good faith by the Investor is actually received by the Operator (or such later time as may be provided in the Removal Notice).  The costs of implementing a change of management pursuant to this Section (including without limitation the attorneys' fees and costs incurred by Investor and any replacement Manager) shall in all events be borne by the Company.  Any such removal shall not constitute a release or waiver of any other right or remedy the Company or the Investor may have hereunder on account of any Event of Default giving rise to such removal event.

**2.05    Reimbursement and Compensation.**

(a)    Generally.  Except as otherwise expressly provided in this Agreement (including but not limited to the provision(s) of Section 2.07(d) hereof or the then - applicable Project Budget), no Member, Manager or any Constituent thereof shall receive any compensation for services rendered to or in connection with the Company or any Project or be reimbursed for general administrative or overhead expenses.  However, as an expense of the Company, each Member shall be reimbursed by the Company for any reasonable out-of-pocket costs and expenses actually incurred in connection with the business and affairs of the Company to the extent provided for in the applicable Project Budget or then applicable Annual Budget.

(b)    Organization Costs.  The Company shall pay all reasonable costs and expenses (including without limitation legal fees) incurred by each Member in connection with the formation of the Company and the negotiation and documentation of this Agreement and the related Agreements and included in the initial, approved Project Budget attached hereto.  The reasonable costs of preparing and making the filings described in Section 1.01, as well as any filing fees and organization expenses payable in connection therewith, shall be paid or reimbursed by the Company.

**2.06    Employees and Consultants.**

(a)    No Employees.  The Company shall not have employees.  The Manager (and/or its Affiliate, if applicable) shall be solely responsible for all wages, benefits, insurance, payroll taxes and compliance with all applicable Laws with respect to any of its employees.  The Manager shall, at any time and from time to time during the term of the Company, provide such information as the Investor shall reasonably request regarding the employees of the Manager who work on Company matters.

(b)    Consultants.  The Investor may, at its election, engage the services, or cause the Company to engage the services, of the Operations Auditor to assist and advise the Investor and the Company in connection with the Company's business and affairs and the

- 9 -

Investor's rights and duties with respect to the Company, provided, however, that any and all costs associated therewith shall be paid entirely by the Investor, and not by the Company or the Operator.

**2.07    Contracts with Affiliates.**

(a)    Generally.  If the Company uses the personnel or resources of any Member, the Manager or an Affiliate of any Member or the Manager, or otherwise contracts directly or indirectly with any Member, the Manager or an Affiliate of any Member or Manager (including without limitation CRA Urban) for services or materials, such contracting, the making of any payment with respect thereto, and the making of any amendment, modification, waiver, termination, extension, rescission and/or assignment thereof, shall be subject to the unanimous consent of the Members that (i) the payment or compensation therefore is at competitive arm's-length rates; (ii) such personnel are experienced and competent in the provision of the services for which they have been hired by the Company; (iii) such materials are comparable in quality, type, size, and specifications as would be obtained in a competitive arm's-length transaction; (iv) such contract is terminable by the Company without cause at any time Operator, for any reason, ceases to be the "Manager"; and (v) the terms of the contract are comparable to those that would be obtained in a competitive arm's-length transaction.  Whether or not such action is permitted under this Agreement, the Member other than the member (or its Affiliate) with which the Company has so contracted, acting alone, shall have the right on behalf of the Company to send any notice of default or termination, to institute or settle legal proceedings and/or to take such other action as may be necessary or appropriate to enforce the rights and protect the interests of the Company pursuant to any agreement now or hereafter entered into between the Company and any Member, the Manager or an Affiliate of any Member or the Manager, including without limitation CRA Urban, provided that any action so taken must be taken in the Investor's reasonable, good faith belief that the taking of such action is in the best interests of the Company.

(b)    Manager Affiliates.  Subject to approval of the Investor, the Manager may subcontract with or delegate to one or more Affiliates of the Manager to perform some or all of the activities and services that are the Manager's duty and responsibility under this Agreement or under any agreement between the Manager and the Company, and the Manager may assign all or any portion of any Manager Fees payable to the Manager to any Affiliate of the Manager.  To the extent any Affiliate of the Manager performs any activities or services for the Company stated in this Agreement (or in any agreement between the Manager and the Company) to be the duty or responsibility of, or as activities or services being provided by, the Manager, such shall be at no cost or expense to the Company (other than the Manager Fees) and no such contracting, subcontracting, delegation or assignment by the Manager shall relieve the Manager of the ultimate duty, responsibility and liability for the performance of the Manager's duties and responsibilities under this Agreement.

(c)    Limitation on Authority.  Notwithstanding anything to the contrary contained in this Agreement or in any contract between the Company and any third party, including without limitation any contract between the Company and any Affiliate of the

- 10 -

Manager, the Manager may exercise any right or authority reserved to the Company under such contracts, subject only to the limitations on the Manager's authority as may be set forth herein.

(d)    Development Services Agreement.  Notwithstanding any provision hereof to the contrary, the Members hereby authorize and approve of the Company entering into the Development Services Agreement with CRA Urban LLC in the form attached hereto as Exhibit J, which shall be executed coincident with the execution hereof, and the Members further approve of the payment by the Company of the pre-development fee and the development fee to CRA Urban LLC pursuant to the provisions thereof.

**2.08    Insurance**.  Manager shall purchase and maintain, or cause to be purchased and maintained, on behalf and at the expense of the Company, policies of insurance (1) for the Company's operations, (2) for the protection of the Company's assets, and (3) as may be reasonably required to comply with third-party requirements in such amounts and of such type as may be required by any third party lender to the Company.

**2.09    Liability and Indemnity.**

(a)    Limitation on Liability.  Except as expressly provided to the contrary in this Agreement, none of the Members or the Constituents thereof shall be liable, responsible, or accountable, in damages or otherwise, to the Company or any Member for any good faith business judgment if such Member or Constituent did not cause or engage in an Event of Default, and, in the case of Operator (including Operator in its capacity as Manager) and its Constituents, exercised Due Care.

(b)    Indemnity.  The Company shall indemnify, defend and hold harmless each Member and Constituent thereof to the greatest extent permitted by law against any and all liabilities, losses, claims, costs, damages and expenses (including without limitation Costs of Litigation) as a result of any claim or legal proceeding by any Person (including by or through the Company and/or any Member) relating to any good faith business judgment if such indemnitee did not cause or engage in an Event of Default, and, in the case of Operator (including Operator in its capacity as Manager) and its and Constituents, exercised Due Care.

(c)    Costs of Defense.  From time to time, as requested by an indemnitee, Costs of Litigation will be paid by the Company, as invoiced, prior to the final disposition of such claims, actions or proceedings upon receipt by the Company of an undertaking by or on behalf of such indemnitee to repay such amounts if it shall be determined that such indemnitee is not entitled to be indemnified hereunder.

(d)    Funding of Indemnity.  Any indemnification provided hereunder shall be satisfied first out of assets of the Company as an expense of the Company.  In the event the assets of the Company are insufficient to satisfy the Company's indemnification obligations, the Members need not make additional Capital Contributions to satisfy all or any portion of the indemnification obligations of the Company pursuant to this Section.

- 11 -

**2.10    Approval of Acquisition of Property and Acquisition/Pre-Development Loan**.

The Members hereby authorize and approve of the Operator, in its capacity as Operator of and on behalf of the Company, in its own capacity and/or in its capacity as sole Managing Member of Gage School LLC, a Title Holding Subsidiary, as applicable in each case, executing and delivering (i) the loan documents specified on Exhibit K-1 in the form attached thereto, in connection with that certain $2,250,000 acquisition/predevelopment loan from The Columbia Bank, and (ii) the purchase agreement and related documents specified on Exhibit K-2, in the form attached thereto, relating to the acquisition of the Property.

## ARTICLE III.
## BUSINESS PLAN AND BUDGET

**3.01    Project Plans**.  Attached hereto as Exhibit F and Exhibit G, respectively, is the initial Project Business Plan, Pre-Development Budget, and Project Budget, each of which is hereby approved by the Members.  The Manager shall propose updates to the Project Business Plan, Pre-Development Budget and Project Budget from and after the date hereof, from time to time, as circumstances warrant, all of which shall be subject to the approval of the Investor, with such approval not to be unreasonably withheld, conditioned or delayed.  Prior to commencement of construction and closing on the construction loan, the Manager shall propose an updated Project Budget, which shall be subject to the approval of the Investor, which approval shall not be unreasonably withheld, conditioned or delayed, and to the approval of the construction lender. It is the intent of the parties that the Project Business Plan and the Project Budget that are approved in accordance with the foregoing prior to commencement of construction shall be updated at least annually, with all such updates to occur in accordance with the procedures set forth above.  Anything contained in this Agreement, any Project Business Plan or any amendment to the Project Business Plan to the contrary notwithstanding, in the event of any inconsistency or conflict between the Project Business Plan and this Agreement, the provisions of this Agreement shall control.

**3.02    Competing Project and Investments.**

(a)    Investor.  Operator acknowledges that Investor and Affiliates of Investor are engaged in the investment business and have in the past and intend in the future to invest in, finance and/or otherwise participate in real estate development, real estate investment, other real estate-related businesses and other businesses and/or ventures for their own account and with others.  Nothing in this Agreement shall be deemed to restrict in any way the present or future business or investment activities in which Investor or any Investor Affiliate may engage, whether or not such other businesses or investments may be in competition with the Company.  Neither the Company nor Operator shall have any right by virtue of this Agreement or the relationship created hereby in or to any activities of Investor or any Investor Affiliate permitted hereunder (or the income or proceeds derived therefrom).

(b)    Operator.  Operator and the Key Persons shall devote the amount of time and resources necessary for the effective and efficient performance of the duties and obligations

- 12 -

of the Operator hereunder, including without limitation the duties and obligations of the Operator as Manager.

(c)    Operator Affiliates.  Operator agrees that its Affiliates will not, and Operator agrees to cause its Affiliates to not, invest in, finance and/or otherwise participate in for their own account, advise or assist another client with respect to, or sponsor or form any other fund to invest in, any residential condominium project, to the extent that such project actually engages in sales and/or marketing activities prior to such time as binding contracts have been executed for sales of condominium units in the Project at prices for units aggregating at least eighty five percent (85%) of the total sales price for all units set forth in the then-current, approved Project Budget, within the area of the shaded portion of the map attached hereto as Exhibit E (the "Target Area"), other than (i) with respect to projects comprising, in total, fifteen (15) or fewer units, taking all such projects into account as a single project, or (ii) through the Company or another joint venture involving the Investor.  In addition, the Operator covenants and agrees that its participation (or the participation of any of its Affiliates) in any such other project shall not diminish or otherwise detract from the level of managerial attention devoted to the Project.

## ARTICLE IV.
## CAPITAL CONTRIBUTIONS

**4.01    Initial Capital Contributions.**  Prior to the date hereof, the Operator has expended $300,000 for the benefit of the Project, which shall be deemed for all purposes to constitute a cash Capital Contribution made by the Operator on the date hereof.  Concurrently with the execution hereof, $75,000 of such deemed Capital Contribution shall be disbursed to Operator as a reimbursement of pre-formation expenditures, such that Operator shall be deemed to have made a net Capital Contribution of $225,000 as of the date hereof.  Concurrently with the execution and delivery of this Agreement, the Investor shall make a cash Capital Contribution to the Company in the amount of $1,300,000.  The initial Capital Contribution by each Member made (or deemed made) pursuant to this Section shall be credited to the Book Capital Account of such Member as of the date hereof.

**4.02    Second Capital Contribution.**  (a) Upon ten (10) days notice from Operator, provided the construction loan has closed (or is to close concurrently with the Investor's satisfaction of its funding obligation) and provided the Operator is as of such time reasonably projecting the Project's internal rate of return to be at least 25% (with a copy of such projection to be included with Operator's Notice to the Investor with respect to such Capital Contribution, Investor shall make a "Second Capital Contribution" in the amount requested by Manager, which request shall not be less than Two Million Dollars ($2,000,000.00) (less the aggregate Capital Contributions made by Investor pursuant to Section 4.01 hereof) nor more than Four Million Dollars ($4,000,000.00) (less the aggregate Capital Contributions made by Investor pursuant to Section 4.01 hereof).  The Investor acknowledges and agrees that the final construction loan amount (and, therefore, the amount of the Investor's required Second Capital Contribution) may take into account a value for the Property that is in excess of the purchase price paid by the Company therefor, to the extent determined by the construction lender.

- 13 -

(b)    The Manager shall have the right to call for a portion of the Investor's Capital Contribution prior to closing on the construction loan in order to enable the Company to commence certain limited aspects of construction prior to such time, subject to the approval of the Investor.

### 4.03    Additional Capital Contributions.

(a)    Generally.  From time to time, once all required Capital Contributions pursuant to Sections 4.01 and 4.02 hereof have been made in full, and all available loan proceeds have been exhausted, the Manager may require the Members, with the unanimous consent of the Members, to make additional Capital Contributions.  The additional Capital Contributions will be provided by the Members in proportion to their respective Percentage Interests.

(b)    Loans.  In the event that any Member makes a loan to the Company, such loan shall not be considered a Capital Contribution and shall not increase the Book Capital Account of the lending Member, and repayment of such loans shall not be deemed withdrawals from the capital of the Company.  No Member or Affiliate shall make any loan to the Company without the unanimous consent of the Members, provided, however, that if the Operator has been removed pursuant to the provisions of Section 2.04 hereof, the Investor may make loans to the Company, to the extent necessary, without the Operator's consent, but such loans must be upon commercially reasonable terms, and the Operator shall be afforded the right to make it pro-rata share (based on relative Percentage Interests) of any such loan on the same terms as any loan made by the Investor.

(c)    Guarantees.  In the event that any Affiliate of Operator makes a payment to any Company lender pursuant to a guaranty agreement given by such Operator Affiliate to such lender, such Operator Affiliate shall be fully subrogated to the rights of the lender with respect to any such payment.  Under no circumstances shall the Investor be required to guaranty any Company obligation.

### 4.04    Construction

(a)    Construction Documents.  Anything contained herein to the contrary notwithstanding, no construction on the Project may be commenced unless and until (i) the plans and specifications for the Project are substantially complete; and (ii) all building permits and other licenses, authorizations and permits have been issued to the Company by all applicable governmental and regulatory agencies as are necessary to legally and validly authorize the complete development and construction of the Project, provided, however, that the Manager may in its discretion cause the Company to commence certain limited aspects of the construction process prior to receipt of all of the permits described in clause (ii), above, so long as all permits and other legal requirements applicable to such limited aspects of construction have in fact been secured.  All construction will be undertaken using guarantied maximum price construction contracts with reputable and capable licensed contractors.  Contractors will be underwritten by the Manager to be financially qualified to assure the guarantied maximum price or will be bonded.

- 14 -

(b)    Right to Use Plans.  In any and all contracts with architects, engineers or others for the preparation of drawings, designs, plans and specifications for the construction or rehabilitation of a the Project, the Manager shall require that all such drawings, designs, plans and specifications for a the Project shall either be and remain the property of the Company, or shall vest in the Company the exclusive right/license to build with respect thereto.

**4.05    Project Schedule**.  If the development of the Project is delayed for any reason and such delay gives rise to a Removal Default, then, anything contained in this Agreement to the contrary notwithstanding, the Investor shall have no duty, obligation or liability to make any further Capital Contribution to the Company unless and until the Members agree upon a revised Project Schedule for that Project.

**4.06    Remedies For Failure to Contribute Additional Capital.**

(a)    Remedies.  If any Member (the "Non-Contributing Member") fails timely to make all or any portion of any Capital Contribution required pursuant to the provisions of Section 4.03 hereof (the "Shortfall Amount") and such failure continues for ten (10) business days following the Effective Date of notice thereof from the other Member, then such other Member (the "Contributing Member"), in addition to any and all other remedies available to the Contributing Member under this Agreement or otherwise at law or in equity (including, without limitation, instituting a legal proceeding to collect the Shortfall Amount), shall have the right, but not the obligation, at any time thereafter (provided such Contributing Member has made the corresponding Capital Contribution required of it), in its sole discretion, to fund the Shortfall Amount to the Company, and treat the aggregate amount of the Shortfall Amount as a loan to the Company from the Contributing Member (collectively, "Excess Company Loan") and not a Capital Contribution.  Each Excess Company Loan shall bear interest at the rate of twenty percent (20%) per annum, compounded monthly.  The Contributing Member shall be considered a third party creditor of the Company and the Excess Company Loan shall be repaid as a Company expense before any distributions to Members pursuant to this Agreement with any such repayment first applied to reduce the interest accrued on such Excess Company Loan and then to reduce the principal amount thereof.  Payments made on Excess Company Loans shall not be Net Cash Flow, and shall not be deemed distributed pursuant to Article VI or IX.  In the event there are more than one (1) outstanding Excess Company Loans, then each such Excess Company Loan shall be repaid by the Company in proportion to the amount it represents of the total amount owing under all such Excess Company Loans.  The Non-Contributing Member shall execute, acknowledge, deliver, file and/or record, as appropriate, any documents, instruments and agreements reasonably necessary to memorialize the Excess Company Loan, including, without limitation, any note evidencing the Excess Company Loan.  If not sooner repaid, all principal and interest on Excess Company Loans shall become immediately due and payable upon the dissolution of the Company from the proceeds, if any, of such dissolution.

**4.07    Capital Contributions in General**.  A Book Capital Account shall be maintained for each Member in accordance with the Regulations under uniform policies approved by the Manager, upon the advice of the Company's accountants.  Except as otherwise expressly provided in this Agreement (a) any and all Capital Contributions shall be made in cash and shall

- 15 -

be credited to the Book Capital Account of the contributing Member as and when such Capital Contribution is made; (b) no part of the Capital Contributions of any Member may be withdrawn by such Member; (c) no Member shall be entitled to receive interest on such Member's Capital Contributions; (d) no Member shall have the right to receive or obligation to accept property other than cash in return for such Member's Capital Contributions; (e) no Member shall be required or be entitled to contribute additional capital, make any loan or advance any credit to the Company; (f) no Member shall have the right to the return of all or any portion of its Capital Contributions before the dissolution and termination of the Company and then only to the extent of the cash and other property, if any, distributable to the Members upon Company liquidation; and (g) no Person who is not a party to this Agreement may enforce or make any claim under any provision of this Agreement for the contribution of capital, making of any loan, payment of any amount or otherwise.

**ARTICLE V.**
**PROFITS AND LOSSES**

**5.01    Tax Allocations.**

(a)    General Allocation Rule.  For each taxable year of the Company, after the application of **Section 5.02**, Profits and/or Losses shall be allocated to the Members in a manner that causes each Member's Adjusted Capital Account Balance to equal the amount that would be distributed to such Member pursuant to **Section 9.02(d)** upon a hypothetical liquidation of the Company in accordance with **Section 5.01(b)**.

(b)    Hypothetical Liquidation Defined.  In determining the amounts distributable to the Members under **Section 9.02(d)** upon a hypothetical liquidation, it shall be presumed that (i) all of the Company's assets are sold at their respective Gross Asset Values, (ii) payments to any holder of a non-recourse debt are limited to the Gross Asset Value of the assets securing repayment of such debt, and (iii) the proceeds of such hypothetical sale are applied and distributed in accordance with **Section 9.02**.

(c)    Special Loss Allocation.  If the Company incurs Losses at any time when the Members' Adjusted Capital Account Balances have been reduced to or below zero, such Losses shall be allocated to the Members in proportion to their Percentage Interests.

(d)    Special Profits Allocation.  If the Company incurs Profits at any time when the Members' Adjusted Capital Account Balances are less than zero and the hypothetical liquidation described in **Section 5.01(b)** would not result in any distributions to the Members, Profits shall be allocated to the Members in proportion to their negative Adjusted Capital Account Balances, until such negative balances have been eliminated.

(e)    Item Allocations.  To the extent the Manager determines that allocations of Profits and/or Losses over the term of the Company are not likely to produce the Adjusted Capital Account Balances intended under this **Section 5.01**, then special allocations of income, gain, loss and/or deduction shall be made as deemed appropriate by the Manager

- 16 -

(including re-allocation in prior years, if necessary, and the amendment of tax returns to reflect the same) to achieve the intended Adjusted Capital Account Balances.

(f)     Capital Accounts.  A separate capital account ("**Capital Account**") will be maintained for each Member.  The Capital Account of each Member will be determined and adjusted as follows:

(i)     Each Member's Capital Account will be credited with the Member's Capital Contributions, the Member's distributive share of Profits, any items in the nature of income or gain that are specially allocated to the Member under Section 5.02, and the amount of any Company liabilities that are assumed by the Member or secured by any Company property distributed to the Member.

(ii)     Each Member's Capital Account will be debited with the amount of cash and the Gross Asset Value of any Company property distributed to the Member under any provision of this Agreement, the Member's distributive share of Losses, any items in the nature of deduction or loss that are specially allocated to the Member under Section 5.02, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by the Member to the Company.

(ii)     If any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

5.02     **Regulatory and Curative Allocations**.  The allocations set forth in **Section 5.01** are intended to comply with the requirements of Regulations Sections 1.704-1(b) and 1.704-2.  If the Company incurs "non-recourse deductions" or "partner non-recourse deductions," or if there is any change in the Company's "minimum gain" or "partner non-recourse debt minimum gain," as defined in such Regulations, or if the Manager determines that the foregoing allocations fail for any reason to comply with the Regulations, the allocation of Profits, Losses and items thereof to the Members shall be modified in a reasonable manner deemed necessary or advisable by the Manager to comply with the Regulations.  In determining allocations to be made pursuant to this **Section 5**, the Manager may take into account any requirements of Code Sections 704(c) and 706 (and any Regulations which require allocations to be made in a manner consistent with such Code Sections),  and shall make such modifications to the allocations under this **Section 5** as are deemed appropriate by the Manager to comply with the requirements of such Code and Regulation Sections.

## ARTICLE VI.
## DISTRIBUTIONS

6.01     **Net Cash Flow**.  Except as provided in Section 6.04 or in Section 9.02 hereof, Net Cash Flow shall be distributed to the Members at such times as determined by the Manager, with the goal of distributing Net Cash Flow as quickly as is possible after repaying any construction lender.  Net Cash Flow shall be distributed in the following order of priority:

- 17 -

(a)     First, subject to the application of Section 10.02(a) hereof, to the Members to the extent of and in proportion to the respective excess, if any, for each Member, of (i) such Member's Priority Return accrued to the date of distribution over (ii) the aggregate amounts previously distributed to such Member pursuant to this Section 6.01(a) and/or Section 10.02(b) hereof, as applicable; and

(b)     Second, if distributions per subsection (a) (or Section 10.02(b), if applicable) have been satisfied, then solely to the Operator.

**6.02    Intent and Examples**.  The intent of **Section 6.01(a)** above is to give each non-delinquent Member an internal rate of return equal to 25% on its Capital Contributions and to share any shortfall ratably among non-delinquent Members in accordance with their relative Priority Returns.  To the extent that any distributions are incorrectly paid, adjustments to correct such incorrect payments shall be made.  To that end, any Member who receives a distribution in excess of the correct amount of such distribution shall promptly repay the amount of any such incorrect distribution, and any such repaid amounts shall be redistributed pursuant to **Section 6.01**, or the Manager may offset the excess payments against future distributions to the Member receiving such excess payments.  Examples demonstrating the functioning of distributions pursuant to **Section 6.01** are set forth on **Exhibit B**, attached hereto and made a part hereof.

**6.03    No Reinvestment**.  Except for any reserve established pursuant to the definition of "Net Cash Flow", all Net Cash Flow shall be distributed on a current basis and shall not be reinvested in any other Project, either new or existing, or used to pay or make any Company expenses or expenditures in connection with the operation of the Company, the development, ownership or operation of the Project or otherwise.

**6.04    Tax Distributions**.  Notwithstanding any provision hereof to the contrary, including but not limited to the provisions of Section 6.01 hereof, to the extent that there is sufficient Net Cash Flow available, and (i) the distribution described in this Section 6.04 is not prohibited by any third party lender to the Company, and (ii) distributions equal to the amounts described below have not otherwise been made pursuant to the provisions of Section 6.01 hereof, the Company shall make a distribution to each Member on or prior to April 15 in each year equal to such Member's "Tax Distribution Amount" with respect to the prior fiscal year of the Company.  A Member's "Tax Distribution Amount" for each fiscal year of the Company shall equal the amount of net taxable income allocated to such Member with respect to such fiscal year, multiplied by forty percent (40%).  All distributions pursuant to this Section 6.04 shall be made to the Members in proportion to their respective Tax Distribution Amounts.  To the extent that distributions equal to a Member's entire Tax Distribution Amount with respect to the prior fiscal year are not able to be made on or prior to April 15 in each year, the unpaid portion of such Member's Tax Distribution Amount shall accrue and shall be added to the next succeeding Tax Distribution Amount to be distributed to such Member pursuant to this Section 6.04.  All distributions made pursuant to this Section 6.04 shall be taken into account when made for purposes of determining the amounts to be distributed to the Members pursuant to the provisions of Section 6.01 hereof, as if such distributions had in fact been made pursuant to the provisions of Section 6.01 hereof.

- 18 -

# ARTICLE VII.
## BOOKS, RECORDS AND ACCOUNTING

**7.01    Company Books**.  The Manager shall cause to be kept, at the principal office of the Company, or at such other location as the Manager shall reasonably designate (a) full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities and the business affairs of the Company; (b) this Agreement and the other organizational documents of the Company and all amendments thereto; (c) all records required to be maintained by the Company pursuant to the Act; (d) all deeds, leases, contracts, title matters, surveys, financing documents and other documentation, records and financial information relating to the Project; and (e) federal, state and local income or information tax returns of the Company.  The Manager shall retain and make available to the Members, or cause the preservation and availability to the Members of, such books and records for a period of at least seven (7) years following the dissolution and liquidation of the Company and provide the Members the opportunity to obtain such documents prior to their disposal.  The Members (personally or through an authorized representative) shall have the right at any time during normal business hours to inspect all such books and records, to make copies thereof and to take extracts therefrom.

**7.02    Reports**.  The Manager shall cause to be prepared and delivered, at such times as are reasonably determined by the Manager (or otherwise in accordance with the terms of this Agreement), the reports, appraisals and other items set forth in Exhibit D.  The Manager shall, as needed, consult with the Operations Auditor to assist the Manager in preparing and formatting such reports, appraisals and other items to accommodate Investor's normal reporting requirements.  All costs and expenses of preparing such reports, appraisals and other items shall be borne by the Company as a venture expense.  All fees of the Operations Auditor shall be borne by the Investor, subject to the last sentence of Section 7.05(b) hereof.

**7.03    Company Tax Elections, Tax Controversies**.  Unless the Manager provides notice to the Manager to the contrary, the Manager shall make elections for the Company provided for in the Code, including, without limitation, the elections provided for in Section 754 of the Code, so long as such elections do not result in any adverse tax consequences to the Investor.  Additionally, until such time as the Members provide notice to the Manager to the contrary, the Manager shall have the right to seek to revoke any such election (including without limitation, any election under Section 754 of the Code) so long as such revocation does not result in any adverse tax consequences to the Investor.

**7.04    Accounting Method and Fiscal Year**.  Subject to Section 448 of the Code, the books of the Company shall be kept on such method of accounting for tax and financial reporting purposes as may be recommended by the Manager and approved by the Manager.  The fiscal year of the Company shall be the twelve (12) month period ending December 31 of each year during the term of the Company, with any period of less than twelve (12) months at the beginning or end of the term of the Company also being deemed a fiscal year of the Company for

purposes of this Agreement.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be recommended by the Manager and shall be subject to the approval of the Manager.

**7.05**   **Accountants and Other Professionals.**

(a)    The Company shall engage as its accountants such certified public accountants as are approved by the Investor.  Aronson & Company is hereby approved as the initial Company accountants.  Annually, such accountants shall conduct a financial audit of the Company and its operations and provide a report of the results of such audit to the Manager.  The cost of such financial audit shall be borne by the Company.

(b)    The Investor may, from time to time (but in no event more than twice in a single twelve (12) month period), engage (at the Investor's expense) the Operations Auditor to conduct an operational audit on the Company and Manager.  The Manager and each of the Members shall cooperate and provide reasonable assistance to any such auditors.  If the Operations Auditor determines that errors in the aggregate (other than errors in favor of the Investor) have occurred that result in a variance of greater than the larger of (i) five percent (5%) of the distributable amount, or (ii) $200,000, then the expenses of the Operations Auditor with respect to such audit shall be borne by the Company.

(c)    The Manager may cause the Company to engage such lawyers and law firms to provide such services and representation to the Company as the Manager may recommend, subject to the approval of the Investor.

**7.06**   **Banking**.  All funds of the Company shall be deposited in such accounts and at such banks or financial institutions as the Manager may recommend, and subject to the Manager's right and authority from time to time to require that Company funds and accounts be maintained at other banks or financial institutions.  Columbia Bank is hereby approved as the initial bank for the maintenance of Company funds and accounts.  Monies and funds of the Company shall be used only for Company purposes.  All funds of the Company shall be deposited only in accounts of the Company in the Company name, shall not be commingled with funds of the Manager, any Member, or any other Person, and shall be withdrawn only upon the signature of at least any two (2) of the Key Persons (or any one (1) of the Key Persons for withdrawals less than $1,000).  The Investor reserves the right to cause the bank accounts of the Company to be audited at the Investor's expense and to cause Company funds not deposited in the proper accounts to be immediately transferred thereto.

**7.07**   **Tax Returns**.  Within seventy-five (75) days after the end of each fiscal year of the Company, the Manager shall cause the Company's accountants to prepare and submit drafts of the Company's federal, state and local tax returns to the Company's auditors for their review and approval.  The costs of such preparation and review, and the costs of any revisions or supplements to such tax returns required as a result of such review, shall be Company expenses.  The Manager shall use diligent efforts to have the Company's accountants prepare and file final federal, state and local tax returns for the Company and its Title Holding Subsidiaries (to the extent applicable) no later than the initial statutory filing date therefore.

- 20 -

**7.08    Confidentiality of Information**.  Each party hereto agrees that the terms of the transactions contemplated by this Agreement, the identities of the Members, and all information made available by one party to the other or in any way relating to the other party's Interest in the Company, shall be maintained in strict confidence and no disclosure of such information will be made, except to such attorneys, accountants, fiduciaries, partners, members, investment advisors, lenders and others as are reasonably required to evaluate and consummate the transactions contemplated by this Agreement.  Each party hereto further agrees and covenants as follows:

(a)    No party hereto shall disclose or authorize the disclosure of the terms of this Agreement or any instruments, documents, or assignments delivered in connection with this Agreement, or the identity of any other party to this Agreement in any public statement, news release, or other announcement or publication.

(b)    Nothing contained herein shall prevent any party hereto from disclosing or accessing any information otherwise deemed confidential under this Section (i) in connection with that party's enforcement of its rights hereunder; (ii) pursuant to any legal requirement, any statutory reporting requirement or any accounting or auditing disclosure requirement applicable to such party; (iii) in connection with performance by either party of its obligations under this Agreement (including, but not limited to, the delivery and recordation of instruments, notices or other documents required hereunder); or (iv) to existing or bona fide potential investors, lenders, participants or assignees in or of the transactions contemplated by this Agreement or such party's rights under this Agreement.

**ARTICLE VIII.**
**RESTRICTIONS ON TRANSFER**

**8.01    Limitations on Transfer.**

(a)    Except for Transfers to one or more Permitted Transferees, no Member, and no Person owning any direct or indirect interest in a Member, may Transfer all or any part of such Member's Interest or such Person's direct or indirect interest in a Member, including without limitation any right to receive distributions or any other economic interest.  A Permitted Transferee shall receive and hold the transferring Member's Interest (or such direct or indirect interest in a Member) subject to the terms of this Agreement (including without limitation the restrictions on Transfers contained in this Article) and to the obligations hereunder of the transferor.  Any attempted Transfer or withdrawal by a Member or a Person owning a direct or indirect interest in a Member in violation of the restrictions set forth in this Article shall be null and void ab initio and of no force or effect and, in addition to the other rights and remedies at law and in equity, the other Member shall be entitled to injunctive relief enjoining the prohibited action.  The Members expressly agree that damages at law would be an inadequate remedy for a breach or threatened breach of the Transfer restrictions set forth in this Agreement.

(b)    "Permitted Transferee" shall mean with respect to a Member, (1) a Transfer directly to an individual having an economic or controlling interest in such Member that does not transfer a "controlling interest in a Member"; (2) a Transfer to a spouse, child, father, mother, daughter, son, grandchild, brother or sister of the transferring party, or (3) a Transfer to a

- 21 -

trust for the benefit of the transferring party or any person who is a permitted recipient under (1) or (2)) above, or (4) any entity controlled by such Member, directly or indirectly, provided, however, that any such transfer shall not release such Member from any of its duties, obligations or liabilities under this Agreement.  In addition, no Transfer shall be a Permitted Transfer if it would cause a Key Person Default.

     **8.02**    **Admission of Substitute Members**.  If any Member Transfers its Interest to a Permitted Transferee in accordance with Section 8.01, then such Permitted Transferee shall be admitted into the Company as a substitute member if, but only if (a) the transferor and Permitted Transferee execute and acknowledge such other instruments as the non-transferring Member may deem reasonably necessary to effectuate such admission; (b) the Permitted Transferee in writing accepts, assumes and agrees to be bound by all of the transferor's duties, obligations and liabilities under and pursuant to this Agreement and all of the terms and conditions of this Agreement, as the same may have been amended; and (c) the transferor pays all reasonable expenses incurred by the non-transferring Member in connection with such admission, including, without limitation, legal fees and costs.  If such Permitted Transferee is admitted into the Company as a substitute member, the Manager shall cause the books and records of the Company to be amended to reflect such admission.  To the fullest extent permitted by law, any Permitted Transferee of an Interest who does not become a substitute member shall have no right to require any information or account of the Company's transactions, to inspect the Company books, or to vote on any of the matters as to which a Member would be entitled to vote under this Agreement, and such Permitted Transferee shall only be entitled, as an assignee, to receive such distributions and allocations of income, gain, loss, deduction or credit or similar items to which the transferor was entitled, to the extent assigned.  A Member that Transfers its Interest shall not cease to be a member of the Company until the admission of the Permitted Transferee as a substituted member of the Company and, until the admission of such Permitted Transferee as a substitute member, such transferring Member shall continue to be entitled to exercise, and shall continue to be bound by, all of the rights, duties and obligations of such Member under this Agreement.

     **8.03**    **Additional Restrictions on Transfer**.  Notwithstanding any other provision contained herein, any Transfer described in this Article shall be null and void ab initio and of no force or effect if (i) such Transfer would cause a termination of the Company for federal or state, if applicable, income tax purposes; (ii) such Transfer would require the registration of such Interest pursuant to, or otherwise directly or indirectly violate, any applicable federal or state securities Laws; (iii) such Transfer would cause the Company to become a "publicly traded partnership" as such term is defined in Section 469(k)(2) or 7704(b) of the Code; (iv) such Transfer would cause the Company to be regulated under the Investment Company Act of 1940, the Investment Advisors Act of 1940 or the Employee Retirement Income Security Act of 1974, each as amended; (v) such Transfer would result in a violation of applicable Laws; (vi) such Transfer would, in the opinion of the Company's counsel, cause the Company to cease to be classified as a partnership for state and federal income tax purposes; (vii) such Transfer would cause an acceleration of any loan or debt instrument to which the Company is a party or result in a breach or violation of any restriction contained in any agreement or order to which the Company is a party or by which the Company is bound; or (viii) the transferring Member fails to

~BALT2:4113320.v8  |11/29/04
1-6

reimburse the Company and the other Member for any costs incurred by the Company or the other Member in connection with such Transfer. Until all of the conditions to an effective Transfer have been satisfied, the Company, the Manager and the other Member may continue to treat the purported transferor of any such interest as its absolute owner and shall incur no liability for any allocation or distribution made in good faith to the transferor.

     **8.04**   **Regulatory Prohibition**. Notwithstanding any other provision contained herein, no Member shall take or permit any action to be taken with respect to itself (including, without limitation, any change in its shareholders, members or partners, as applicable) that would cause the Company to be regulated under the Investment Company Act of 1940, the Investment Advisors Act of 1940 or the Employee Retirement Income Security Act of 1974, each as amended, and any such action shall be null and void ab initio and of no force or effect.

     **8.05**   **Election; Allocations Between Transferor and Transferee**. Upon the Transfer of the Interest of any Member or the distribution of any property of the Company to a Member, the Company may file, in the sole and absolute discretion of the Investor or Manager, an election in accordance with applicable Income Tax Regulations, to cause the basis of the Company property to be adjusted for federal income tax purposes as provided by Sections 734 and 743 of the Code. Upon the Transfer of the Interest of a Member as herein provided, the Profits and Losses attributable to the Interest so transferred shall be allocated between the transferor and Permitted Transferee as of the date set forth on the written assignment. In the reasonable discretion of the Manager, such allocation may be based upon either (a) the result of Company activities during the periods in which each was the holder of the Interest transferred; or (b) each Member's pro rata share of the total Profits and Losses of the Company for the fiscal year in which the Transfer occurred based upon the number of days during the applicable fiscal year of the Company that the Interest so transferred was held by each of them. Distributions shall be made to the holder of record of the Interest on the date of distribution.

     **8.06**   **Partition**. No Member shall have the right to partition any assets of the Company, nor shall a Member make an application or proceeding for a partition of any assets of the Company. Upon any breach of the provisions of this Section by any Member, the other Member (in addition to all rights and remedies afforded by law or equity) shall be entitled to a decree or order restraining or enjoining such application, action or proceeding. The Members expressly agree that damages at law would not be an adequate remedy for a breach or threatened breach of the restrictions set forth in this Section.

     **8.07**   **Waiver of Withdrawal and Purchase Rights**. Except in connection with any Transfer which results in the Permitted Transferee becoming a substitute member of the Company, no Member may voluntarily withdraw, resign or retire from the Company. Each Member hereby waives any and all rights such Member may have to withdraw and/or resign from the Company pursuant to Section 18-603 of the Delaware Act and hereby waives any and all rights such Member may have to receive the fair value of such Member's Interest in the Company upon such withdrawal, resignation and/or retirement pursuant to Section 18-604 of the Delaware Act. No admission or withdrawal of a Member, whether in accordance with this Agreement or otherwise, shall cause the dissolution of the Company. Any purported admission,

- 23 -

withdrawal or removal which is not in accordance with this Agreement shall be null and void and, in addition to other rights and remedies at law and in equity, the other Member(s) shall be entitled to injunctive relief enjoining the prohibited action.  The Members expressly agree that damages at law would not be an adequate remedy for a breach or threatened breach of the restrictions set forth in this Section.

## ARTICLE IX.
## DISSOLUTION

**9.01    Events Causing Dissolution of the Company.**  The Company shall be dissolved upon the first to occur of (a) the expiration of the term of the Company; (b) the sale, transfer or other disposition by the Company of all or substantially all of its assets and the collection by the Company of any and all proceeds (including without limitation the full cash payment of any promissory note or other deferred payment obligation) therefrom; or (c) the approval by unanimous consent of the Members to dissolve the Company.  Neither a Member's bankruptcy, retirement, resignation, expulsion or other cessation to serve, nor a technical termination of the Company under Section 708(b)(1)(B) of the Code, shall cause a dissolution of the Company and, notwithstanding such event, the Company's business shall continue without interruption or break in continuity (subject to Section 708(b)(1)(B) of the Code if applicable).  No Member acting alone shall have the right to, and each Member hereby agrees that it shall not unilaterally, seek to dissolve or cause the dissolution of the Company or seek to cause a partial or whole distribution or sale of Company assets, whether by court action or otherwise, it being agreed that any actual or attempted dissolution, distribution or sale would cause a substantial hardship to the Company and the remaining Member.  Any attempted dissolution or distribution in violation of the restrictions set forth in this Section shall be null and void ab initio and of no force or effect and, in addition to the other rights and remedies at law and in equity, the other Member shall be entitled to injunctive relief enjoining the prohibited action.  The Members expressly agree that damages at law would be an inadequate remedy for a breach or threatened breach of the restrictions set forth in this Section.

**9.02    Winding Up of the Company.**  Upon the dissolution of the Company the Manager shall proceed to wind up the affairs of the Company, subject to the approval rights of the Investor over the actions described in Section 2.02 hereof.  During such winding up process, the profits, losses, refinancing proceeds, project capital proceeds, and Net Cash Flow shall continue to be shared, allocated and distributed in accordance with this Agreement.  The assets shall be liquidated as promptly as is consistent with obtaining a fair value therefor.  The proceeds from all asset sales, to the extent available, shall be applied and distributed by the Company as soon as reasonably practical after such liquidation, in the following order:

(a)     First, to the Company's creditors other than Members and the expenses of liquidation, in the order of priority provided by law;

(b)     Second, to set up any reserves in amounts that are reasonably determined by the Manager to be necessary to provide for contingent, conditional, unmatured, unliquidated or uncertain liabilities or obligations.  If any of such liabilities are being disputed or are reasonably expected by the Manager to be disputed, the Manager may increase the reserve

- 24 -

associated with any such disputed liability or obligation by the reasonable Costs of Litigation expected to be incurred by the Company in resolving the dispute. Such reserves shall be disbursed under the direction of the Manager in payment of such liabilities or obligations. As such liabilities or obligations have been paid or adequately provided for in the reasonable judgment of the Manager, the balance of such reserves shall be distributed, first pursuant to Section 9.02(c) and then Section 9.02(d) below;

(c)    Third, to interest first and then principal on Member loans, and on other debts owing to the Members to the extent incurred in compliance with this Agreement; and

(d)    Thereafter, to the Members as provided in Section 6.01 of Article VI.

**9.03    Clawback**. Upon liquidation of the Company, the Operator shall contribute to the Company an amount (the "Clawback Account") equal to the shortfall, if any, between (i) the aggregate amount of distributions that would have been received by the Investor pursuant to Section 6.01(a) on the assumption that there was sufficient cash available to the Company to make those distributions in full, and (ii) the total amount of distributions actually received by the Investor pursuant to Section 6.01(a), and the Clawback Amount immediately shall be distributed to the Investor. The obligation of the Operator to pay the Clawback Amount shall be limited to the cumulative amounts actually received by the Operator from the Company pursuant to Section 6.04.

## ARTICLE X.
## DEFAULT

**10.01    Event of Default**.

(a)    Events of Default. Each of the following shall constitute an "Event of Default" by the "Defaulting Member":

(i)    Any breach or default by such Member (including without limitation Operator in its capacity as Manager) of any covenant, duty, obligation, representation or warranty under this Agreement and/or any exhibit hereto; provided, however, that in any such instance, prior to such breach or default being deemed an Event of Default, such Member (a) shall have received notice from the other Member of such breach or default; and (b) shall have (i) failed to cure or remedy such breach or default within ten (10) business days following the Effective Date of such notice, in the event of a failure to contribute capital, or thirty (30) days following the Effective Date of such notice in the event of any other breach or default; or (ii) if such breach or default does not consist of the failure to contribute capital or otherwise pay money and is not curable within such thirty (30) days, failed to commence such cure within such thirty (30) days or failed to diligently and continuously pursue such a cure or remedy thereafter, and in any event failed to fully cure or remedy such breach or default within one hundred twenty (120) days of the Effective Date of such notice.

(ii)    The occurrence of any Key Person Default.

- 25 -

(iii)     The rendering, by a court with appropriate jurisdiction, of a decree or order (1) adjudging such Member or any of its Primary Affiliates bankrupt or insolvent; or (2) approving as properly filed a petition seeking reorganization, readjustment, arrangement, composition, or similar relief for such Member or any of its Primary Affiliates under the federal bankruptcy Laws or any other similar applicable Law or practice, and if such decree or order shall have continued undischarged and unstayed for a period of sixty (60) days.

(iv)     The rendering, by a court with appropriate jurisdiction, of a decree or order (1) for the appointment of a receiver, a liquidator, or a trustee or assignee in bankruptcy or insolvency of such Member or any of its Primary Affiliates, or for the winding up and liquidation of such Member's or any of its Primary Affiliate's affairs, provided that such decree or order shall have remained in force undischarged and unstayed for a period of sixty (60) days; or (2) for the sequestration or attachment of any property of such Member or any of its Primary Affiliates without its return to the possession of such Member or its release from such sequestration or attachment within sixty (60) days thereafter.

(v)     Such Member or any of its Primary Affiliates (1) institutes proceedings to be adjudicated a voluntary bankrupt or an insolvent; (2) consents to the filing of a bankruptcy proceeding against such Member or Primary Affiliate; (3) files a petition or answer or consent seeking reorganization, readjustment, arrangement, composition, or similar relief for such Member or Primary Affiliate under the federal bankruptcy Laws or any other similar applicable Law or practice; (4) consents to the filing of any such petition, or to the appointment of a receiver, a liquidator, or a trustee or assignee in bankruptcy or insolvency for such Member or Primary Affiliate or a substantial part of such Member's or Primary Affiliate's property; (5) makes an assignment for the benefit of such Member's or Primary Affiliate's creditors; (6) is unable to or admits in writing such Member's or Primary Affiliate's inability to pay such Member's or Primary Affiliate's debts generally as they become due; or (7) takes any action in furtherance of any of the aforesaid purposes.

(vi)     Any breach or default by CRA Urban or its Primary Affiliates under any of its agreements with the Company which remains uncured after the expiration of any notice and/or cure period applicable thereto under such agreements.

(b)     <u>Defaulting Member</u>.  For the purposes of implementing the provisions contained in this Agreement, the "Defaulting Member" shall be (i) in the case of an Event of Default referenced in Section 10.01(a)(i), the Member whose action or inaction, or whose Primary Affiliate's action or inaction, caused or resulted in such Event of Default; (ii) in the case of an Event of Default referenced in Section 10.01(a)(ii), the Operator; (iii) in the case of an Event of Default referenced in Section 10.01(a)(iii), (iv) or (v), the Member who, or whose Primary Affiliate, is the subject of such court decree or order, has instituted such proceedings or filed such petitions, or is insolvent, etc.; and (iv) in the case of an Event of Default referenced in Section 10.01(a)(vi), the Operator.  The "Non-Defaulting Member" is the Member that is not the Defaulting Member.

**10.02   <u>Rights Arising From an Event of Default</u>.**

~BALT2:4113320.v8  |11/29/04
1-6

(a) Upon the occurrence of an Event of Default, the Non-Defaulting Member shall have only the rights and remedies set forth in this Section 10.02.  If the Operator/Manager is the Defaulting Member, the Non-Defaulting Member's sole remedy shall be to seek to recover indemnification from the Defaulting Member pursuant to the provisions of Section 2.03(d) hereof, provided, however, that (i) if the Event of Default also constitutes a Removal Default, the Non-Defaulting Member shall also have the rights set forth in Section 2.04 hereof ; (ii) if the Event of Default constitutes a breach of the provisions of Section 3.03(c) hereof, the Non-Defaulting Member shall have any and all rights and remedies available at law or in equity, and (iii) if the Event of Default constitutes the failure by the Operator to make a required Capital Contribution pursuant to Section 4.03 hereof, the provisions of Section 4.06 hereof shall apply. If the Investor is the Defaulting Member, all consent or approval rights of the Investor hereunder shall immediately and automatically cease and be of no further force or effect, in the same manner as if the Investor's Priority Return had been reduced to zero, and, if the Investor's default is a failure to make required Capital Contributions pursuant to Section 4.01 or 4.02 hereof, then, in lieu of the provisions of Section 6.01(a) hereof, Net Cash Flow shall, from and after such date, be distributed pursuant to Section 10.02(b) hereof.  If the Investor's default is a failure to make a required Capital Contribution pursuant to Section 4.03, then the provisions of Section 4.06 hereof shall apply.

(b)     If the provisions of this Section 10.02(b) apply, then Net Cash Flow shall be distributed as follows, rather than pursuant to Section 6.01(a) hereof:

> "First, fifty percent (50%) to the Investor and fifty percent (50%) to the Operator, until the excess of the Investor's Priority Return (calculated for this purpose utilizing an internal rate of return of fifteen percent (15%), rather than twenty-five percent (25%) over the aggregate amount previously distributed to the Investor pursuant to this Section 10.02(b) and/or Section 6.01(a) has been reduced to zero; and"

### 10.03    Defaults under Company Loans.

(a)  In the event that the Company has been formally declared in "default" under the provisions of the documents evidencing a loan made to the Company by a third party lender, and notice of such default has been provided to the Company pursuant to the applicable provisions of the loan documents evidencing such loan (a "Lender Default"), the Members shall consult with one another in good faith in an attempt to determine the manner in which to respond to such Lender Default and the actions to take in response thereto.  Notwithstanding the foregoing, other than to the extent set forth in Section 10.01(b) hereof, the Manager shall ultimately have the sole and exclusive right to determine the manner in which to respond to such Lender Default, subject to the provisions of Section 2.02 hereof.

(b)     If no agreement has been reached as to the manner in which to respond to a Lender Default, and such Lender Default has not in fact been cured, on or prior to the date that is ten (10) days prior to the expiration of the cure period applicable to such Lender Default,

~BALT2:4113320.v8  |11/29/04
1-6

taking all available extensions of such cure period into account (or one (1) day prior to the expiration of all applicable cure periods, solely with respect to a monetary Lender Default), then the Investor shall have the unilateral right to determine the manner in which the Company is to respond to such Lender Default, with such authority of the Investor to extend solely to actions taken in an attempt to cure such Lender Default, and with such authority of the Investor to terminate immediately upon the curing of such Lender Default. Any and all actions taken by the Investor pursuant to the provisions of this Section 10.03(b) shall be taken upon the reasonable, good faith determination that such actions are in all respects in the best interests of the Company.

## ARTICLE XI.
## DISPUTE RESOLUTION

(a)    Notwithstanding any provision of this LLC Agreement to the contrary, in the event that the Members have a good faith, material disagreement concerning a Major Decision, and the Members are unable to resolve such disagreement after negotiating in good faith with respect thereto for a period of thirty (30) days, then either Member shall have the right to institute the binding dispute resolution procedure under Section 11.01(b) of this Agreement by giving a notice (hereinafter referred to as the "Dispute Notice") to the other Member.

(b)    If, in accordance with the terms of Section 11.01(a) hereof, either Member delivers a Dispute Notice to the other Member, and the Member receiving the Dispute Notice does not, within five (5) days after receipt thereof, acquiesce with the triggering Member's position with respect to the Major Decision at issue (in which case the Dispute Notice shall be deemed withdrawn), then the party providing the Dispute Notice shall designate a person to resolve such dispute from the list of such persons set forth in Section 2.04(a)(iii) hereof, and the procedural provisions of such Section 2.04(a)(iii) shall apply to the resolution of such dispute (except that the Major Decision(s) in the Dispute Notice shall be the subject matter for resolution, and the Dispute Notice rather than the Removal Notice shall determine the relevant time periods), provided further, that the resolving person shall be bound to follow "baseball" arbitration in resolving such dispute, such that the resolving person must choose between the specific positions of the two parties, and shall not have the authority to craft a compromise resolution that is not the expressed position of one of the two parties.

## ARTICLE XII.
## REPRESENTATIONS AND WARRANTIES

### 12.01  Operator Representations and Warranties.

(a)    Representations and Warranties.  The Operator makes the following representations and warranties as of the date of the execution of this Agreement:

(i)    Authorization.  Operator is a limited liability company, duly organized, validly existing, and in good standing under the laws of the District of Columbia, it has full power and authority to execute and agree to this Agreement and to perform its

- 28 -

obligations hereunder, and all actions necessary for the due authorization, execution, delivery and performance by the Operator of this Agreement have been duly taken.

(ii)    <u>Compliance with other Instruments</u>.  The Operator's authorization, execution, delivery, and performance of this Agreement does not conflict with any other agreement or arrangement to which the Operator is a party or by which the Operator is bound.

(iii)    <u>Reports</u>.  The Operator has delivered to the Investor on or prior to the date hereof all environmental and other reports in its possession or in the possession of its Affiliates relating to the Project.

**12.02  <u>Investor Representations and Warranties</u>**.  Investor makes the following representations and warranties as of the date of this Agreement:

(a)    <u>Authorization</u>.  The Investor has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder, and all actions necessary for the due authorization, execution, delivery and performance by the Investor of this Agreement have been duly taken.

(b)    <u>Compliance with Other Instruments</u>.  The Investor's authorization, execution, delivery, and performance of this Agreement does not conflict with any  other agreement or arrangement to which the Investor is a party or by which the Investor is bound.

**12.03  <u>Mutual Representations and Warranties</u>**.  Each Member hereby represents and warrants to the Company and to each other Member as follows:

(a)    <u>No Litigation</u>.  That there is no litigation pending or, to the Member's knowledge, threatened, against such Member or its Affiliates, which if determined adversely to the Member or its Affiliates would adversely affect the ability of the Member to fulfill its obligations in accordance with the terms of this Agreement or which would have a material adverse effect on the financial condition of the Member or its Affiliates.

(b)    <u>Purchase Entirely for Own Account</u>.  The Member is acquiring its Interest in the Company for the Member's own account for investment purposes only and not with a view to or for the resale, distribution, subdivision or fractionalization thereof and has no contract, understanding, undertaking, agreement or arrangement of any kind with any person to sell, transfer or pledge to any person its interest or any part thereof nor does such Member have any plan to enter into any such agreement.

(c)    <u>Investment Experience</u>.  By reason of its business or financial experience, the Member has the capacity to protect its own interest in connection with the transactions contemplated hereunder, is able to bear the risks of an investment in the Company, and at the present time could afford a complete loss of such investment.

(d)    <u>Disclosure of Information</u>.  The Member is aware of the Company's business affairs and financial condition and has acquired sufficient information about the

~BALT2:4113320.v8  |11/29/04
1-6

Company to reach an informed and knowledgeable decision to acquire an interest in the Company.

        (e)    <u>Federal and State Securities Laws</u>.  The Member acknowledges that the Interests have not been registered under the Securities Act of 1933 or any state securities Laws, inasmuch as they are being acquired in a transaction not involving a public offering, and, under such Laws and subject to the transfer restrictions set forth in Article VIII, may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.  In this connection, the Member represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act of 1933.

    **12.04**  **<u>Survival of Representations and Warranties</u>**.  All representations and warranties contained in this Article shall survive the execution and delivery of this Agreement.

**ARTICLE XIII.**
**[INTENTIONALLY OMITTED]**

**ARTICLE XIV.**
**MISCELLANEOUS**

    **14.01**  **<u>Notices and Approvals</u>**.  Any notice, approval, consent, payment, demand, communication, authorization, delegation, recommendation, agreement, offer, report, statement, certification or disclosure required or permitted to be given or made under this Agreement, whether or not expressly so stated, shall not be effective unless and until given or made in writing and shall deemed to have been duly given or made as of the following date (the "Effective Date"):  (i) if delivered personally by courier or otherwise, then as of the date delivered or if delivery is refused, then as of the date presented; (ii) if sent or mailed by certified U.S. mail, return receipt requested, or by Federal Express, Express Mail or other mail or courier service, then as of the date received; or (iii) if sent by facsimile, then either (A) as of the date on which the appropriate electronic confirmation of receipt is received by the sending party at or before 5:00 p.m. (receiver's time) on any business day, or (B) as of the next business day if the time of the appropriate electronic confirmation of receipt received by the sending party is after 5:00 p.m. (receiver's time) or is not a business day.  All such communications shall be addressed as follows (which address(es) for a party may be changed by that party from time to time by notice to the other parties).  No such communications to a party shall be effective unless and until deemed received at all address(es) for such party.  E-mail addresses, if included, are for convenience only.  No notice, approval, consent, demand or other communication delivered by e-mail shall be of any force or effect unless and until also delivered in a manner otherwise authorized by this Section.

<u>If to the Company</u>:           To its principal offices

- 30 -

<u>If to Operator:</u>                CRA URBAN VENTURE I LLC
1640 Rhode Island Avenue, NW
Suite 825
Washington, DC  20036
Attention:  William Herman
Phone:  (202) 787-3003
Fax:  (202) 787-3010
E-mail:  william.herman@craurban.com

<u>With a copy to:</u>

Fred Klein, Esq.
Piper Rudnick LLP
1200 Nineteenth Street, NW
Washington, DC  20036-2412
Phone:  (202)861-6668
Fax:  (202)689-7455
E-mail:  Frederick.klein@pipperrudnick.com

<u>If to Investor:</u>                HUI, LLC
c/o 1711 N Street, NW
Washington, DC  20036
Attention:  Joseph Rymal, Vice President
Phone:  (202) 419-3110
Fax:  (202) 419-3113
E-mail:  JosephRymal@aol.com

<u>And a copy to:</u>

Hunton & Williams LLP
1900 K Street, NW
Washington, DC  20006
Attention:  Thomas F. Kaufman, Esq.
Phone:  (202) 955-1604
Fax:  (202) 828-3718
E-mail:  tkaufman@hunton.com

     **14.02  <u>Statutes</u>**.  Any reference herein to any Law, or any section or provision thereof, shall be deemed to include any future amendments thereto and any similar provisions of Law that may hereafter replace or be substituted for such provision, whether or not designated by the same title or number.

     **14.03  <u>Cross References</u>**.  All cross references in this Agreement to other articles, sections and paragraphs shall be deemed references to the corresponding articles, sections and paragraphs of this Agreement unless expressly stated otherwise.

- 31 -

**14.04    Remedies**.  Other than to the extent specifically set forth herein, no remedy conferred upon the Company or any Member in this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but rather each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute, including without limitation the right to petition a court to have a receiver appointed to manage the Project.

**14.05    Litigation Without Termination**.  Any Member shall be entitled to maintain, on its own behalf or on behalf of the Company, any action or proceeding against any other Member or the Company (including, without limitation, any action for damages, specific performance or declaratory relief) for or by reason of breach of such party of this Agreement, or any agreement entered into in connection with this Agreement, notwithstanding the fact that any or all of the parties to such proceeding may then be Members in the Company, and without dissolving the Company.

**14.06    Successors and Assigns**.  This Agreement shall not be assigned or otherwise transferred (by operation of law or otherwise) by any Member except as is otherwise permitted hereby.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, administrators and assigns.

**14.07    Amendments**.  Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed by both Members.

**14.08    Governing Law**.  Except as otherwise expressly provided, this Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware without reference to choice of law principles which might indicate that the Law of some other jurisdiction should apply.

**14.09    Interpretation**.  The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation hereof.  Whenever the context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and the neuter, and vice versa.  This Agreement shall not be construed against either Member but shall be construed as a whole, in accordance with its fair meaning, and as if prepared by both Members jointly.

**14.10    No Obligation to Third Parties**.  The execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate either of the parties hereto to, any person or entity not a party to this Agreement.

**14.11    Further Assurances**.  Each of the parties shall execute such other and further documents and do such further acts as may be reasonably required to effectuate the intent of the parties and carry out the terms of this Agreement.

**14.12    Merger of Prior Agreements**.  This Agreement constitutes the entire agreement between the parties, and supersedes all prior agreements and understandings between the parties, relating to the subject matter hereof, including without limitation, any term sheet or letter of

- 32 -

intent, which shall be of no further force or effect upon execution of this Agreement by both Members.

**14.13** **Enforcement**. In the event a dispute arises concerning the performance, meaning or interpretation of any provision of this Agreement or any document executed in connection with this Agreement, the prevailing party in such dispute shall be awarded any and all Costs of Litigation incurred by the prevailing party in enforcing, defending or establishing its rights hereunder or thereunder. In addition to the foregoing award of Costs of Litigation, the prevailing party shall also be entitled to recover its Costs of Litigation incurred in any post judgment proceedings to collect or enforce any judgment. This provision is separate and several and shall survive the merger of this Agreement or any such other document into any judgment on this Agreement or such document.

**14.14** **Time**. For purposes of this Agreement "business day" shall mean any day other than a Saturday, Sunday, Delaware, or national holiday or other day on which commercial banks in Delaware are generally not open for business. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is not a business day, in which event the period shall run to and include the next day which is a business day.

**14.15** **Severability**. If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

**14.16** **No Waiver**. No delay or failure on the part of any party hereto in exercising any right, power or privilege under this Agreement or under any other instrument or document given in connection with or pursuant to this Agreement shall impair any such right, power or privilege or be construed as a waiver of any default or any acquiescence therein. No single or partial exercise of any such right, power or privilege shall preclude the further exercise of such right, power or privilege. No waiver shall be valid against any party hereto unless made in writing and executed by the party against whom enforcement of such waiver is sought and then only to the extent expressly specified therein.

**14.17** **Legal Representation**. Each party has been represented by legal counsel in connection with the negotiation of the transactions herein contemplated and the drafting and negotiation of this Agreement. Each party and its counsel have had an opportunity to review and suggest revisions to the language of this Agreement. Accordingly, no provision of this Agreement shall be construed for or against or interpreted to the benefit or disadvantage of any party by reason of any party having or being deemed to have structured or drafted such provision.

**14.18** **Appendices, Schedules and Exhibits**. All references in this Agreement to appendices, exhibits and schedules shall, unless otherwise expressly provided, be deemed to be references to the appendices, exhibits and schedules attached to this Agreement. All such

- 33 -

appendices, exhibits and schedules attached hereto are incorporated into and made a part of this Agreement as though fully set forth herein.

**14.19   Intentionally Omitted.**

**14.20   Indemnity**. The following provisions govern actions for indemnity under this Agreement or any document or instrument executed pursuant to this Agreement. The indemnitor shall be responsible for any costs, expenses, judgments, damages, liability and losses incurred by the indemnitee with respect to any and all indemnified claims, and the indemnitor, at the indemnitor's sole cost and expense, shall assume the defense of any and all indemnified claims, with counsel reasonably acceptable to the indemnitee; provided, however, that an indemnitee shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnitor, if the indemnitee reasonably believes that representation of such indemnitee by the counsel retained by the indemnitor would be inappropriate due to actual or potential conflicting interests between such indemnitee and any other party represented in such proceeding by counsel retained by the indemnitor. Any delay by the indemnitee in delivering notice to the indemnitor after indemnitee receives notice of an indemnified claim shall not relieve the indemnitor of any liability to the indemnitee unless, and then only to the extent that, such delay is actually prejudicial to the indemnitor's ability to defend such action, and the failure to deliver notice to the indemnitor will not relieve the indemnitor of any other liability that it may have to any indemnitee. The settlement of a claim without the prior consent of the indemnitor shall not release the indemnitor from liability with respect to such claim if the indemnitor has unreasonably withheld consent to such settlement or has failed to provide or pay for a defense thereof as provided herein. All fees, costs and expenses to be paid by indemnitor hereunder shall be made on a "paid as incurred" basis within thirty (30) days of the indemnitor's receipt of a statement or invoice therefor. Should the indemnitor object to any such fees, costs or expenses the indemnitor shall nevertheless pay such fees, costs and expenses within said thirty (30) days which payment, if expressly stated in writing at the time of such payment to be "under protest", shall not prejudice the indemnitor's right to subsequently object to such fee, cost or expense paid under protest.

**14.21   Signer's Warranty**. Each individual executing this Agreement on behalf of an entity hereby represents and warrants to the other party or parties to this Agreement that (i) such individual has been duly and validly authorized to execute and deliver this Agreement and any and all other documents contemplated by this Agreement on behalf of such entity; and (ii) this Agreement and all documents executed by such individual on behalf of such entity pursuant to this Agreement are and will be duly authorized, executed and delivered by such entity and are and will be legal, valid and binding obligations of such entity.

**14.22   No Offer or Binding Contract**. The parties hereto agree that the submission of an unexecuted copy or counterpart of this Agreement by one party to another is not intended by either party to be, or be deemed to be a legally binding contract or an offer to enter into a legally binding contract. The parties shall be legally bound pursuant to the terms of this Agreement only if and when the parties have been able to negotiate all of the terms and provisions of this

- 34 -

Agreement in a manner acceptable to each of the parties in their respective sole discretion, and both Members have fully executed and delivered this Agreement.

# ARTICLE XV.
## DEFINITIONS

"**Adjusted Capital Account**" means, with respect to a Member, such Member's Capital Account balance as of the end of each fiscal year, as the same is specially computed to reflect the adjustments required or permitted to be taken into account in applying Regulations Section 1.704-1(b)(2)(ii)(d) (including adjustments for partnership minimum gain and partner nonrecourse debt minimum gain).

"**Affiliate**" means, with reference to a specified Person (provided, however, that in no event shall the Company be deemed an Affiliate of any Member):

        (a)     a Person that, directly or indirectly, through one or more intermediaries, has control of, is controlled by or is under common control with, the specified Person (as used herein, the terms "control", "controlled by" and "under common control with" mean possession of the power to direct or cause the direction of the management and policies of the Person, whether through ownership of voting securities or by contract);

        (b)     any Person that is an officer, director, controlling shareholder, general partner, managing member or trustee of, or serves in a similar capacity with respect to, the specified Person or any Affiliate (under clause (a) of this definition) of the specified Person, or for which the specified Person is an officer, director, controlling shareholder, general partner, managing member or trustee, or serves in a similar capacity;

        (c)     the specified Person's, or any Affiliate (under clause (a) or (b) of this definition) of the specified Person's, spouse, child, grandchild, sibling, parent, grandparent, aunt, uncle, cousin, niece or nephew, as well as the spouse of any of the foregoing; or

        (d)     in addition, with respect to Operator, any Key Person.

"**Agreement**" means this Operating Agreement (including all its exhibits and schedules), as it may be amended.

"**Broker**" is defined in Section 1.07.

"**Capital Contribution**" means any contribution of capital made or deemed made by a Member or its predecessor-in-interest to the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" means the limited liability company governed by this Agreement.

"**Constituent**" means, with respect to any Person, such Person's board members, officers, directors, shareholders, partners, members, retirants, beneficiaries, trustees, agents, employees,

~BALT2:4113320.v8  |11/29/04
1-6

internal investment contractors, representatives, Affiliates and, with respect to Operator, the Key Persons.

"**Contributing Member**" is defined in Section 4.06(a).

"**Costs of Litigation**" means all fees, costs and expenses incurred in litigation, including without limitation court costs, attorney fees and expert witness fees. Fees, costs and expenses not included within those allowed by statute shall be set forth in the parties' pleadings and shall be proven and awarded in the judgment to the prevailing party after the conclusion of the trial on all other issues. Such award, at the discretion of the court, may be based on proof in a separate trial before the trial judge alone, by declarations or by a noticed motion. The right to trial by jury on such fees, costs and expenses is hereby waived.

"**CRA Urban**" means CRA Urban LLC, a Virginia limited liability company.

"**Defaulting Member**" is defined in Section 10.01(b).

"**Delaware Act**" means the Delaware Limited Liability Company Act (6 De1.C. § 18-101, et seq.), as hereafter amended from time to time.

"**Depreciation**" means, for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the year or other period, Depreciation will be an amount which bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for the year or other period bears to the beginning adjusted tax basis, provided that if the federal income tax depreciation, amortization, or other cost recovery deduction for the year or other period is zero, Depreciation will be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Operator.

"**Due Care**" shall mean to act in a manner consistent with the Operator's reasonable, good faith determination as to the best interests of the Company, in a manner generally consistent with the manner in which a prudent real estate professional experienced in such matters would reasonably be expected to act in the conduct of an enterprise of like character with like aims.

"**Event of Default**" is defined in Section 10.01.

"**Gross Asset Value**", with respect to any asset, is the adjusted basis of that asset for federal income tax purposes, except as follows:

        (a)    The initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Regulations promulgated thereunder) by a Member to the Company will be the fair market value of the asset on the date of the contribution, as unanimously determined by the Members.

- 36 -

(b)     The Gross Asset Values of all Company assets will be adjusted to equal the respective fair market values of the assets, as unanimously determined by the Members, as of (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution, (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company if an adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company, and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided that adjustments pursuant to clauses (i) or (ii) shall be made only if the Operator reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members.

(c)     The Gross Asset Value of any Company asset  distributed to any Member will be the gross fair market value of the asset on the date of distribution.

(d)     The Gross Asset Values of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), provided that Gross Asset Values will not be so adjusted to the extent that the Operator determines that an adjustment under clause (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this clause (d).

(e)     After the Gross Asset Value of any asset has been determined or adjusted under in accordance with the foregoing, Gross Asset Value will be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Profits or Losses.

Any determination of Gross Asset Value as determined with respect to fair market value shall be determined unanimously by the Members.

"**Interest**" means in respect to any Member, all of such Member's right, title and interest in and to the management, information, allocations, distributions and capital of the Company, and any and all other interests in the Company, in accordance with the provisions of this Agreement and the Delaware Act.

"**Investor**" means HUI, LLC, a Virginia limited liability company, and its permitted successors and assigns.

"**Key Person Default**" shall mean (a) the failure of any two (2) out of three (3) of the Key Persons to own in the aggregate at least fifty one percent (51%) of the voting interests of Operator, or (b) the failure of at least any two (2) out of three (3) of the Key Persons to devote, as a full time employee of Operator or an Affiliate of Operator, the amount of his/her time required by Section 3.02(b) of this Agreement.

"**Key Persons**" means each of William Herman, Eric May and Julia Wright (or any replacement for any of them approved by the Investor in the exercise of its sole discretion).

- 37 -

"**Knowledge**" or the phrase "to Manager's knowledge" or words of similar import shall be deemed to refer to the actual knowledge of Manager as well as that knowledge which Manager would reasonably be expected to possess with the exercise of Due Care.

"**Laws**" means all federal, state and local laws, moratoria, initiatives, referenda, ordinances, rules, regulations, standards, orders, judicial decisions, common law and other governmental, quasi-governmental and utility company requirements (including those relating to labor and employment, the environment, health and safety, or handicapped persons).

"**Major Decision**" is defined in Section 2.02.

"**Manager**" is defined in Section 2.03(a).

"**Manager Fees**" means the pre-development fee and development fee payable to the Manager pursuant to the provisions of the Development Services Agreement.

"**Members**" means Investor and Operator, collectively; "Member" means any one (1) of the Members.

"**Milestone**" means the milestones set forth on Exhibit H, attached hereto.

"**Net Cash Flow**" means the amount, if any, by which (a) the sum of (i) all cash receipts of the Company prior to any applicable determination date (including without limitation all cash receipts realized from operations of the Company, including refinancing proceeds and capital proceeds), plus (ii) the amount of any reduction in reserves (which may only occur pursuant to the then current, approved Project Budget); exceeds (b) the sum of (i) all cash disbursements of the Company prior to such determination date (including any refinancing proceeds or capital proceeds), plus (ii) the amount of any increase in reserves (including, without limitation, any reserve for capital expenditures and/or development of the Project, in each case funded to the extent set forth in the then-current, approved Project Budget.)

"**Non-Contributing Member**" is defined in Section 4.06(a).

"**Non-Defaulting Member**" is defined in Section 10.01(b).

"**Operations Auditor**" means such consultant or professional as may be designated by the Investor.

"**Operator**" means CRA Urban Venture I LLC, a District of Columbia limited liability company.

"**Percentage Interests**" means the Members' interests in the Company expressed as a percentage, which at any given time shall equal the relative Capital Contributions made by the Members to the Company.

"**Permitted Transferee**" is defined in Section 8.01(b).

- 38 -

"**Person**" means and includes an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated organization and a government or any department or agency thereof, or any entity similar to any of the foregoing.

"**Primary Affiliates**" means, as to Operator, the Key Persons, any person or entity controlling, controlled by or under common control with the Operator, or the Key Persons, and CRA Urban.

"**Priority Return**" means the amount of money required for a Member to receive a twenty five percent (25%) per year internal rate of return with respect to its Capital Contributions. In computing the Priority Return, the return shall be calculated utilizing the assumptions set forth in Exhibit B.

"**Profits**" and "**Losses**" mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

> (1)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses will be added to taxable income or loss;

> (2)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704-1(b)(2)(iv)*(i)*, and not otherwise taken into account in computing Profits or Losses, will be subtracted from taxable income or loss;

> (3)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the property, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

> (4)    In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for the taxable year or other period;

> (5)    If the Gross Asset Value of any Company asset is adjusted, the adjustment will be taken into account as gain or loss from disposition of the asset for purposes of computing Profits or Losses.

"**Project**" is defined in Section 1.03.

"**Project Agreements**" means all leases, rental agreements, service contracts, vending machine, telecommunications and other facilities leases, utility contracts, maintenance contracts, management contracts, leasing contracts, equipment leases, brokerage and leasing commission agreements and other agreements or rights related to the construction, ownership, use, operation, occupancy, maintenance or development of the Project.

- 39 -

"**Project Budget**" is defined in Section 3.01.

"**Project Business Plan**" is defined in Section 3.01.

"**Project Schedule**" means a development schedule identifying the proposed development and construction of the Project, and the projected dates for the achievement of major milestones in the development process and the commencement and completion of such construction at various stages of the Project.

"**Refund Amount**" is defined in Section 4.06(a)(i).

"**Regulations**" means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Removal Default**" means (a) failure to achieve a Milestone within the relevant time frame for satisfaction thereof, as such Milestones and time frames are set forth on Exhibit H, attached hereto, and/or the occurrence of a Lender Default that has not been cured prior to the expiration of all applicable cure periods, unless such failure or Lender Default, as applicable, has occurred due to (i) lack of funds, (ii) force majeure, (iii) reasonably unforeseen circumstances, or (iv) any action or inaction of the Investor, including but not limited to Investor's failure to grant its consent with respect to a Major Decision; (b) any Event of Default resulting from gross negligence, willful misconduct, bad faith, fraud, misappropriation of funds or criminal acts; (c) a Key Person Default; or (d) an Event of Default under Sections 10.01(a)(iii), (iv) or (v).

"**Removal Notice**" is defined in Section 2.04(a)(i).

"**Shortfall Amount**" is defined in Section 4.06(a).

"**Termination Date**" is defined in Section 1.03.

"**Title Holding Subsidiary**" is defined in Section 1.04.

"**Transfer**" means any sale, exchange, assignment, disposition, pledge, hypothecation, encumbrance, other grant of a security interest, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer, including transfer to a receiver, levying creditor, trustee or receiver in bankruptcy or a general assignment for the benefit of creditors, whether direct or indirect, for value or no value, or voluntary or involuntary (including by operation of law or other legal or equitable proceedings). The following shall also be deemed a "Transfer" with respect to Operator: (a) any change in ownership of Operator that results in ten percent (10%) or more of the direct or indirect ownership interests in Operator having been Transferred since the time Operator became a Member or which results in a change in the Person or Persons having effective control of Operator; (b) any dissolution of Operator, or any acquisition, merger or consolidation of Operator by or with another Person; or (c) any change in the ownership or control of Operator that would result in the requirements of this Agreement, or the requirements to avoid a Key Person Default, no longer being satisfied.

- 40 -

[SIGNATURES APPEAR ON NEXT PAGE]

~BALT2:4113320.v8  |11/29/04
1-6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

WITNESS/ATTEST:

**INVESTOR**

HUI, LLC, a Virginia limited liability company

By:  Ka Po'e Hana, LLC, its manager

By:_____(SEAL)
    John H. Agee
    President & CEO

**OPERATOR**

CRA URBAN VENTURE I LLC, a District of Columbia limited liability company

By:  _____(SEAL)
    William Herman, Managing Member

- 42 -

**EXHIBIT A**

**MEMBERS**

<u>Names and Addresses of Members</u>

HUI, LLC
1711 N Street, N.W.
Washington, D.C.  20036-4504
Fax No. (202)419-3113

CRA Urban Venture I LLC
1640 Rhode Island Avenue, N.W.
Suite 825
Washington, D.C.  20036
Fax No. (202)787-3010

A-1

**EXHIBIT B**

**INTERNAL RATE OF RETURN**

This Exhibit sets forth certain definitions used in calculating the parties' relative interests, incentive compensation and investment returns.

**1.01    Assumptions**.  For the purpose of performing the calculations described in this Exhibit:

(a)    Periods.  All calculations shall be based on actual days on a monthly basis, the first of which shall commence at Time 0.

(b)    Contributions.  All Contributions of the Investor shall be considered to have been made on the day actually credited as Available Funds by the designated Company depository or, if an escrow is used, on the day actually credited as Available Funds in such escrow.

(c)    Distributions.  All Distributions to the Investor shall be considered to have been made on the date actually credited as Available Funds in the Investor designated depository account.

(d)    Calculation Method.  In calculating both the net present value and the Investor's internal rate of return, the XNPV and the XIRR functions of Microsoft Excel shall be used.

~BALT2:4113320.v8  |11/29/04
1-6

**EXHIBIT C**

**[Intentionally Omitted]**

~BALT2:4113320.v8  |11/29/04
1-6

# EXHIBIT D

## REPORTS AND PLANS

(a)    <u>Project Business Plan</u>. The Project Business Plan for the Project shall include without limitation:  (i) a narrative description of the proposed objectives and goals for the acquisition of the Project and financing and development of the Project; (ii) a cash-flow projection setting forth the historical and future estimated revenues, expenses (including debt service) and net operating income (or loss) expected to be incurred during the initial acquisition of the Project and financing and development of the Project; (iii) the plans and specifications for any construction to be undertaken as part of the Project, to the extent then available; (iv) the Project Schedule for the Project; (v) the terms and provisions of any financing that the Manager proposes to obtain for the Project; (vi) a detailed description of such other information, contracts, agreements and other matters reasonably necessary to inform the Investor of all matters relevant to the initial acquisition of the Project and financing and development of the Project; and (vii) such other items as are requested by the Investor or are reasonably necessary to inform the Investor as to the business and affairs of the Company relating to the Project.

(b)    <u>Pre-Development Budget and Project Budget</u>. The Pre-Development Budget and  the Project Budget for the Project shall set forth on a detailed itemized basis:  (i) all receipts and all costs and expenses, by category, for the Company projected for the acquisition of the Project, the financing and development of the Project and the sale of the condominium units comprising the Project; (ii) the anticipated operating reserves and working capital projected to be required for such period; and (iii) a schedule setting forth the timing and amount of any Capital Contributions projected to be required of the Members.

(c)    <u>Monthly Report</u>. The Manager shall submit to the Investor, from time to time as requested by the Investor or as deemed necessary or appropriate by the Manager, but in any event at least monthly, a review and comparison of the Project's actual and projected results and operations in relation to the Project Business Plan, Pre-Development Budget and the Project Budget. Each such report shall include, without limitation (i) with respect to the just-concluded month (1) a budgetary report comparing the actual results for the Project for such month (and period from the initial acquisition of the Project and financing and development of the Project to date) to the Pre-Development Budget and  the Project Budget; and (2) a narrative report comparing the actual business activities of the Company relating to the Project for such month (and period from the initial acquisition of the Project and financing and development of the Project to date) to the Project Business Plan; (ii) with respect to the balance of such fiscal year (and the remainder of the period of the Project Business Plan) (1) a budgetary report comparing the projected results for the Project to the Pre-Development Budget and  the Project Budget and the Project Business Plan; and (2) a narrative report comparing the projected business activities of the Project to the Pre-Development Budget and  the Project Budget and the Project Business Plan; and (iii) a detailed explanation for any actual or projected deviations from the Pre-Development Budget and  the Project Budget and the Project Business Plan. In particular, Manager shall call the Investor's attention to any actual or projected cost and/or net income which deviates from the Pre-Development Budget or the Project Budget or the Project Business Plan by more than ten percent (10%).

**EXHIBIT E**

**TARGET AREA**

**[See attached]**

## TARGET AREA



**EXHIBIT F**

**PROJECT BUSINESS PLAN**

**[See attached]**

PROJECT BUSINESS PLAN

**Project Objectives & Goals**

The Project will consist of a three component residential development with underground parking. The existing Gage School will be completely restored on the exterior and will look much like it did when it was originally constructed in 1904. On the interior, the Gage School will have new structure, stairwells, an elevator and all new finishes to allow for residential use. A new condominium building will be constructed at the corner of 2nd and V Streets. This new building will be held away from the Gage School creating a respectful separation between old and new. The main entrance to this building is anticipated to be off of V Street. Along Flagler Street, east of Gage School, infill condominiums will be constructed to fill the gap between the existing townhouses to the north and south.

The Project is projected to consist of a total of approximately ninety three (93) residential units contained in approximately 89,000 gross square feet. Currently, there are projected to be thirty one (31) units in the original school building, forty four (44) units in the new building at 2nd and V Streets, and sixteen (16) units in the new building on Flagler Street. The project will have two (2) levels of underground parking for approximately seventy two (72) automobiles contained under the 2nd and V Streets building, accessed from V Street. Planned Project amenities include: a landscaped courtyard between Gage School and the 2nd and V Streets building that will provide a sheltered outdoor space for common use by the residents, a fitness room, and for-sale storage units contained in the underground parking levels.

The main objectives of the Project are as follows:

- Acquire the Property at a competitive price relative to the current market value.
- Assemble a team of professionals with significant experience and superior reputations to help maximize the Project return.
- Enter into an acquisition loan and then a construction loan, each of which will be structured to maximize the loan-to-value ratio and reduce the blended cost of capital without comprising certain non-economic considerations of the Members of the Company.
- Design an aesthetically pleasing and economically efficient Project.
- Generate significant interest in the Project by coordinating a thoughtful and comprehensive marketing campaign.
- Construct and redevelop (as applicable) a quality built residential project on-time and on-budget.
- Maximize sales proceeds from all revenue generating sources – residential units, parking units and storage units.
- Deliver the required return to the Investor as quickly as possible.
- Provide for a smooth Project turnover to the residents such that the developer experiences no lawsuits.

The proposed Project acquisition date is November 30, 2004. The Manager has negotiated first trust financing from a local commercial bank, Columbia Bank

("Lender"), for 100% of the purchase price, or $2,250,000. The Property has been appraised by Joseph J. Blake & Associates at $3,800,000. At Project acquisition, the Company will, using Company capital contributions and Lender loan proceeds, pay for the purchase of the Property, pay its team of consultants for services rendered to date, and thereafter have available approximately $1,080,000 to fund design and other soft costs necessary to submit plans to the District for a building permit. The Manager plans to expedite the design and permitting process in order to begin the sales and marketing of the condominium units while the Washington, DC real estate market is experiencing such significant growth. The pre-development period is expected to last 6 – 9 months, during which the Manager will, amongst other activities: cause the construction documents to be completed, commence sales and marketing of the units, and arrange for a construction loan from a viable commercial lender.

Upon issuance of a building permit, the Company will enter into a construction loan with a commercial lender. It is the intent of the Manager to arrange non-recourse construction financing for the Project. The actual construction of the Project is expected to take 14 – 18 months and will be staged in an effort to maximize the return on overhead and minimize cost redundancies. The Company will settle units upon Project completion, over an estimated 2 – 6 month period, using a pre-selected settlement agency. The conceptual project schedule shows units delivering beginning in July 2006.

**Cash Flow Projection**
Below is a semi-annual sources and uses projection for the life of the Project based upon the current conceptual development plan. As the project design is solidified, thie cash flow projection will be modified to reflect the updated Project design and schedule.

| Uses | 2nd Half 2004 | 1st Half 2005 | 2nd Half 2005 | 1st Half 2006 | 2nd Half 2006 | TOTAL |
|---|---|---|---|---|---|---|
| Land | 2,375,300 | 0 | 0 | 0 | 0 | 2,375,300 |
| Construction | 0 | 1,692,368 | 8,461,838 | 5,923,287 | 846,184 | 16,923,676 |
| Soft | 733,825 | 1,614,415 | 880,590 | 440,295 | 0 | 3,669,125 |
| Interest | 0 | 17,763 | 190,438 | 489,992 | 324,668 | 1,022,863 |
| **Subtotal** | **3,109,125** | **3,324,546** | **9,532,867** | **6,853,574** | **1,170,852** | **23,990,964** |
| | | | | | | |
| Sources | 2nd Half 2004 | 1st Half 2005 | 2nd Half 2005 | 1st Half 2006 | 2nd Half 2006 | TOTAL |
| Debt | 1,584,125 | 1,349,546 | 9,532,867 | 6,853,574 | 1,170,852 | 1,584,125 |
| Equity | 1,525,000 | 1,975,000 | 0 | 0 | 0 | 1,525,000 |
| Net Sales | 0 | 0 | 0 | 0 | 29,912,498 | 0 |
| **Subtotal** | **3,109,125** | **3,324,546** | **9,532,867** | **6,853,574** | **31,083,350** | **3,109,125** |
| | | | | | | |
| Cash Flow | 0 | 0 | 0 | 0 | 14,473,790 | 29,912,498 |
| Debt Payoff | 0 | 0 | 0 | 0 | (14,473,790) | 20,490,964 |
| Equity Payoff | 0 | 0 | 0 | 0 | 0 | 3,500,000 |
| | | | | | | |
| **Net Cash Flow** | | | | | | **5,921,535** |

**Plans & Specifications**

Plans and specifications are not available at this time. The Manager expects schematic design plans and outline specifications to be issued in late December 2004. Said plans and specifications will be made available to the Investor and incorporated into this Exhibit F. Thereafter, from time to time, the Manager will cause the Architect to update the plans and specifications, and any updates will made available to the Investor and incorporated herewith.

**Project Schedule**

A preliminary Project schedule has been prepared and is attached hereto (please see Exhibit F-1). The schedule will be updated by the Manager from time to time to reflect more complete information.

**Project Financing**

The Project will be financed in two stages. As discussed above, the Company has entered into a nine (9) month loan with Columbia Bank for acquisition and pre-development funding. This loan for $2,250,000 coupled with the approximately $1,525,000 invested by the Company at Project acquisition will provide sufficient funds to acquire the Property and complete Project design. The Company has the right to extend the loan for an additional three (3) months should the need arise. The pricing of this loan is one point over the bank prime rate.

Upon issuance of a building permit by the District government, the Company will enter into a construction loan with a commercial lender for 80% - 90% of development costs (will attempt to maximize loan-to-value), or approximately $21,000,000. The remaining Project costs, which are anticipated to be approximately $3,200,000, will be funded by the Company (includes initial investment of approximately $1,525,000). The total Project cost is estimated to be $24,200,000. It is anticipated that the construction loan will have a 30 – 36 month term and will be priced at a floating rate, 300 to 600 basis points over LIBOR.

**Summary**

The primary goal of the Project is simple – develop a quality residential project within a specified timeframe for a budgeted cost and therefore maximize return to the Company. The Manager has selected a team of professionals that have vast experience in developing urban residential projects. The Manager has arranged for superior debt financing and has a strong Investor partner. The Property is being purchased at a significant discount to the market value. The conceptual design has been well received by the community. The Project is well located and well timed to maximize profitability for the Company.

~WASH1:4628242.v1

EXHIBIT F-1

PROJECT SCHEDULE



**EXHIBIT G**

**PROJECT BUDGET**

**[See attached]**

~BALT2:4113320.v8 |11/29/04
1-6

**GAGE SCHOOL CONDOMINIUMS - 2035 2ND STREET, NW**
**CONCEPTUAL PREDEVELOPMENT BUDGET**

## SOURCES

|  | *$ Amount* | Land Closing | Pre-Develop |
|---|---|---|---|
| Columbia Bank | $2,250,000 | $1,166,732 | $1,083,268 |
| CRA Urban Venture I LLC | 225,000 | 225,000 | 0 |
| Hue LLC | 1,300,000 | 1,300,000 | 0 |
| SOURCES, TOTAL | $3,775,000 | $2,691,732 | $1,083,268 |

## USES

**LAND COSTS**

|  |  |  |  |
|---|---|---|---|
| Contract Purchase Price | 2,250,000 | 2,250,000 | 0 |
| Consulting Fee | 75,000 | 75,000 | 0 |
| Transfer & Recordation Taxes | 50,300 | 50,300 | 0 |
| LAND COSTS, TOTAL | 2,375,300 | 2,375,300 | 0 |

**SOFT COSTS**

|  |  |  |  |
|---|---|---|---|
| Architect & Engineer | 550,000 | 113,555 | 436,445 |
| Building Permit, Construction Bond, Etc. | 25,000 | 0 | 25,000 |
| Third Party Reports | 75,000 | 21,330 | 53,671 |
| Real Estate Taxes (2005) | 36,000 | 0 | 36,000 |
| Insurance - General Liability & Property | 20,000 | 10,000 | 10,000 |
| Other Closing Costs | 30,000 | 30,000 | 0 |
| Legal, Condo Docs & Accounting | 100,000 | 24,925 | 75,075 |
| Columbia Bank Commitment Fee | 22,500 | 22,500 | 0 |
| Columbia Bank Legal | 3,000 | 3,000 | 0 |
| Hue LLC Legal | 15,000 | 15,000 | 0 |
| C&W Placement Fee | 35,500 | 35,500 | 0 |
| Marketing Expenses | 150,000 | 0 | 150,000 |
| Development Fee ($ / mos) | 120,000 | 30,000 | 90,000 |
| Contingency - Soft Costs | 100,700 | 10,622 | 90,078 |
| SOFT COSTS. TOTAL | 1,282,700 | 316,432 | 966,268 |
| Interest Reserve - Columbia | 117,000 | 0 | 117,000 |
| USES, TOTAL | $3,775,000 | $2,691,732 | $1,083,268 |

## GAGE SCHOOL CONDOMINIUMS - 2035 2ND STREET, NW
### CONCEPTUAL DEVELOPMENT BUDGET

### SUMMARY DATA

| | | | | |
|---|---|---|---|---|
| Site Area | | 42,118 | Total Residential SF ("SSF") | 68,085 |
| Legal FAR | 75,812 | 1.8 | Parking Ratio | 0.81 |
| Below Grade Gross SF | | | Parking Spaces | 75 |
| GSF | | 89,227 | Residential Units | 93 |
| Core Factor | | 24% | Average Unit Size | 732 |

### DEVELOPMENT BUDGET

| | $ Amount | Per SSF | Per GSF | Per Unit | % Cost |
|---|---|---|---|---|---|
| **LAND COSTS** | | | | | |
| Purchase Price | $2,250,000 | $33.05 | $25.22 | $24,194 | 9.1% |
| Consulting Services - Acquisition & Predevelopment | 75,000 | 1.10 | 0.84 | 806 | 0.3% |
| Closing Costs | 50,300 | 0.74 | 0.56 | 541 | 0.2% |
| Land Appreciation | 500,000 | 7.34 | 5.60 | 5,376 | 2.0% |
| **LAND COSTS, TOTAL (per legal FAR)** | **$37.93** 2,875,300 | 42.23 | 32.22 | 30,917 | 11.6% |
| | | | | | |
| **HARD COSTS** | | | | | |
| Gage School | 4,376,141 | 64.27 | 49.05 | 47,055 | 17.7% |
| V Street Condos | 6,637,721 | 97.49 | 74.39 | 71,373 | 26.8% |
| Flagler Condos | 2,356,438 | 34.61 | 26.41 | 25,338 | 9.5% |
| Landscaping/Sitework | 413,430 | 6.07 | 4.63 | 4,445 | 1.7% |
| General Conditions, Overhead, Fees | 1,956,278 | 28.73 | 21.92 | 21,035 | 7.9% |
| Subtotal | 15,740,008 | 231.18 | 176.40 | 169,247 | 63.6% |
| Contingency - Renovation Hard Costs | 12.0% 525,137 | 7.71 | 5.89 | 5,647 | 2.1% |
| Contingency - New Construction Hard Costs | 7.0% 658,531 | 9.67 | 7.38 | 7,081 | 2.7% |
| **HARD COSTS, TOTAL** | **16,923,676** | **248.57** | **189.67** | **181,975** | **68.4%** |
| | | | | | |
| **SOFT COSTS** | | | | | |
| Architect & Engineer | 950,000 | 13.95 | 10.65 | 10,215 | 3.8% |
| Building Permit, Construction Bond, Etc. | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Inspections, Survey, Testing & Other Third Party Reports | 150,000 | 2.20 | 1.68 | 1,613 | 0.6% |
| Real Estate Taxes | 100,000 | 1.47 | 1.12 | 1,075 | 0.4% |
| Insurance - Builder's Risk & Commercial Liability | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Transfer & Recordation Taxes | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Legal, Condo Docs & Accounting | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Lender Fee | 202,500 | 2.97 | 2.27 | 2,177 | 0.8% |
| C&W Placement Fee | 230,000 | 3.38 | 2.58 | 2,473 | 0.9% |
| Marketing Expenses | 300,000 | 4.41 | 3.36 | 3,226 | 1.2% |
| Development Management Fee (% / costs) | 4.0% 800,000 | 11.75 | 8.97 | 8,602 | 3.2% |
| Development Management Reimbursables | 5.0% 40,000 | 0.59 | 0.45 | 430 | 0.2% |
| Contingency - Soft Costs | 5.0% 136,625 | 2.01 | 1.53 | 1,469 | 0.6% |
| **SOFT COSTS, TOTAL** | **3,709,125** | **54.48** | **41.57** | **39,883** | **15.0%** |
| | | | | | |
| **LAND, HARD & SOFT COSTS** | **23,508,101** | **345.28** | **263.46** | **252,775** | **95.0%** |
| | | | | | |
| **CONSTRUCTION INTEREST** | 1,243,257 | 18.26 | 13.93 | 13,368 | 5.0% |
| | | | | | |
| **TOTAL PROJECT COST** | **$24,751,358** | **$363.54** | **$277.40** | **$266,144** | **100.0%** |

### PRO FORMA SALE PROCEEDS

| RESIDENTIAL SALES REVENUE | Area | Units | $ Amount | Per SSF | | Per Unit | % of Mix |
|---|---|---|---|---|---|---|---|
| Gage School Condos | 27,230 | 33 | $11,164,300 | $410.00 | | $338,312 | 40.0% |
| V Street Condos | 29,895 | 44 | 12,256,950 | 410.00 | | 278,567 | 43.9% |
| Flagler Place Condos | 10,960 | 16 | 4,493,600 | 410.00 | | 280,850 | 16.1% |
| Subtotal | 68,085 | 93 | 27,914,850 | 410.00 | | 300,160 | 100.0% |
| 5% Increase after 50% Sales | | | 697,871 | 10.25 | | 7,504 | 2.2% |
| Storage Spaces | | 30 | 150,000 | N/A | | 5,000 | 0.5% |
| Parking Spaces | | 75 | 2,625,000 | N/A | | 35,000 | 8.4% |
| Totals | 68,085 | 93 | 31,387,721 | 461.01 | | 337,502 | |
| | | | | | | | |
| SALES COSTS | | | $ Amount | Per SSF | | Per Unit | % of Sales |
| In-House Broker Commissions | 100% | 2.00% | (627,754) | (9.22) | | (6,750) | -2.0% |
| Outside Broker Commissions | 40% | 3.00% | (376,653) | (5.53) | | (4,050) | -1.2% |
| Transfer & Recordation Taxes, Misc. Closing Costs | 1.50% | | (470,816) | (6.92) | | (5,063) | -1.5% |
| **SALES COSTS, TOTALS** | | | **(1,475,223)** | **(21.67)** | | **(15,863)** | **-4.7%** |
| | | | | | | | |
| **NET RESIDENTIAL SALE PROCEEDS** | | | **$29,912,498** | **$439.34** | | **$321,640** | **95.3%** |
| | | | | | | | |
| **PROFIT** | | | **$5,161,140** | **$75.80** | | **$55,496** | **20.9%** |

# EXHIBIT H

# MILESTONES

**[See attached]**

## PROJECT MILESTONES

| Event | Not Later Than |
|---|---|
| Land Closing | December 31, 2004 |
| Schematic Design Completion | January 31, 2005 |
| Permit Set (65% Construction Documents) | May 1, 2005 |
| Preliminary Unit Pricing Schedule | June 1, 2005 |
| Anticipated Project Registration with DC | June 1, 2005 |
| Howard University Exclusive Sales Period Commencement* | July 1, 2005 |
| Complete Construction Documents | August 1, 2005 |
| Construction Commencement & Construction Loan Commencement | December 1, 2005 |
| Substantial Completion | May 1, 2007 |
| Final Settlement of Units** | October 31, 2007 |

*Statute provides that the City has up to 60 days to review the registration application. Units may not be sold or offered for sale until the Declarant receives a registration letter from the City for the Project.

**All units under contract prior to substantial completion will be settled prior to the outside date for Final Settlement of Units

## EXHIBIT I

## SALES GUIDELINES

**[To be attached]**

~BALT2:4113320.v8  |11/29/04
1-6

## EXHIBIT J

## DEVELOPMENT SERVICES AGREEMENT

**[See attached]**

~BALT2:4113320.v8  |11/29/04
1-6

## DEVELOPMENT SERVICES AGREEMENT

THIS DEVELOPMENT SERVICES AGREEMENT (the "Agreement") is made and entered into as of November __, 2004 ("Effective Date"), by and between **GAGE SCHOOL HOLDINGS, LLC**, a Delaware limited liability company (the "Owner"), and **CRA URBAN LLC**, a District of Columbia limited liability company ("Developer").

### RECITALS:

WHEREAS, the Owner intends to purchase, develop, construct, redevelop, sell, subdivide, own, trade in, hold, lease, manage, impose a condominium regime upon, and otherwise deal in and with respect to the real property and improvements located at 2035 Second Street, NW, Washington, DC (the "Property"), and to do any and all things necessary, convenient, or incidental to that purpose, including the borrowing of funds and granting of collateral security for borrowing in any and all property required by the ownership and development of the Project and to construct a residential development consisting of approximately ninety (90) residential condominium units and structured underground parking consisting of approximately seventy (70) parking spaces (the "Project"); and

WHEREAS, the Owner desires to retain the Developer to provide development management services in connection with the acquisition, development, construction, marketing and sale of the Project, and the Developer wishes to provide such services to the Owner, in accordance with the terms and conditions of this Agreement; and

WHEREAS, any reference herein to plans and specifications, Project Budget or Project Schedule shall mean such item as the same may have been updated from time to time in accordance with the provisions of the Operating Agreement, as such term is defined herein.

NOW, THEREFORE, in consideration of the foregoing Recitals, the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

1.    Recitals.  The Recitals set forth above are hereby incorporated herein and, by this reference, made substantive part hereof.

2.    Engagement.  The Owner hereby appoints and engages the Developer to provide the development management services for the Project more particularly hereinafter described in Paragraph 4, with the authority to act on behalf of the Owner and to bind the Owner, subject to the specific limitations set forth in this Agreement and the GAGE SCHOOL HOLDINGS, LLC Limited Liability Company Agreement (the "Operating Agreement").  Capitalized terms used but not defined herein have the meaning given to them in the Operating Agreement.

3.    Acceptance of Engagement.   Subject only to any specific limitations of the Developer's authority provided herein and subject to Owner's funding of all Project costs on a timely basis, the Developer hereby agrees to provide the development management services set forth in Paragraph 4 below.

4.    <u>Development Management Services</u>.

(a)    The Developer shall provide, coordinate, oversee and cause to be done, through subcontracts or otherwise, the following services during the term of this Agreement:

(i)    monitor, supervise and coordinate the development and construction of the Project, in the performance of which Developer shall utilize Due Care (as defined in the Operating Agreement) and shall do the following, provided, however, notwithstanding anything herein to the contrary, the Developer shall not be responsible for the design of the Project or the means, methods and techniques of construction of the Project, other than to the extent that any problems in any of such areas are the result of the Developer's gross negligence, willful misconduct or other intentional harmful action or inaction in the performance of the customary developer duties to coordinate, oversee and supervise the contractor and architect of the Project:

(1)    Negotiate, enter into on behalf of the Owner, and supervise the performance of contracts with architects, engineers, planners, designers, contractors, subcontractors, vendors and other suppliers and services, other than sales agents, utilized in the demolition, development and construction of the Project;

(2)    Employ, supervise the performance of and compensate all full or part time on-site employees required to perform Developer's obligations hereunder, which shall be paid by Developer without expense to Owner;

(3)    Prepare and submit to Owner (for subsequent submission to the construction lender) all ordinary draw requests under the construction loan (and prior thereto in accordance with the Operating Agreement), disburse all funds to subcontractors, vendors and others as specified in the draw requests, and prepare and submit to Owner (for subsequent submission to the construction lender) requests for application of contingency amounts to Project Budget line items and/or requests for re-allocation of cost-savings from one line item to another;

(4)    Make application for and use reasonable efforts to obtain all necessary governmental approvals and permits and perform such acts, within its authority, as shall be necessary to effect compliance by the Owner with all laws, rules, ordinances, statutes, permits and regulations of any governmental authority applicable to the demolition, development and construction and sale of the Project, including, but not limited to, obtaining utility bonds or similar performance bonds (and any indemnities associated therewith, which shall be provided by Owner at its sole cost and expense) in favor of local municipalities;

2

(5)    Arrange for the purchase of all necessary supplies and materials required for the demolition, development, construction and management of the Project;

(6)    Coordinate the preparation of all applications for, or otherwise arrange for, and cause Owner to pay all charges imposed necessary to obtain commitments for, water, sewer, electric, gas, telephone and other utility services necessary for the construction and operation of the Project (all such applications shall be executed by the Owner); and

(7)    solicit, bid and negotiate the construction contract on behalf of the Owner with a general contractor approved by the Owner and within the constraints of the Project Budget and Project Schedule and upon such terms and conditions as approved by the Owner in accordance with the Operating Agreement;

(ii)    negotiate and enter into (and/or supervise the foregoing, as applicable) purchase agreements in the name of the Owner with respect to individual units on the standard form of purchase agreement, in a form to be approved by the Owner, in accordance with the approved Sales Guidelines or as otherwise agreed to by the Owner, and use reasonable efforts to close the sale of such units in accordance with such purchase agreements;

(iii)    supervise and manage the general contractor using reasonable efforts to cause the general contractor to construct and deliver individual units in accordance with the specifications in each unit purchase agreement and the plans and specifications of the Project.

(iv)    use reasonable efforts to manage and operate the Project in an efficient manner and in accordance with the Project Budget, Project Schedule and the plans and specifications of the Project,

(v)    promptly cause the payment of all amounts due to the general contractor, subcontractors and suppliers for work performed by them at the direction of the Developer on the Project (provided the Developer is proceeding in accordance with the Project Budget), subject to review and approval of draw requests therefor by Owner and construction lender in accordance herewith and subject further to the availability of funds from the Owner;

(vi)    subject further to the availability of funds from the Owner, cause the completion of the development and construction of the Project free and clear of any and all mechanic's liens or claims; and

(vii)    without limitation to the foregoing, but subject in all events to the specific limitations herein and in the Operating Agreement, the Developer shall otherwise plan, oversee and coordinate, the design and implementation of the Project and provide the day-to-day coordination, administration, management and supervision of the Project,

3

including all aspects of (A) acquisition of the Property, (B) approval of the Project and all aspects thereof for development and construction, (C) the development of the Property and the construction of improvements on the Project, (D) the oversight of the marketing of the Units in the Project, (E) the sale of the units and receipt and management of sales proceeds in connection therewith, (F) all customer service and warranty work related to the units, (G) contracting for all services required in the acquisition, development, construction, marketing and sale of the units, (H) budgeting and accounting for costs of and revenues from the Project and related finance and loan administration, (I) formation of a condominium regime and homeowners' association for the Project (with related documentation and regulatory filings necessary thereto), (J) interacting with federal, state and local governmental authorities with respect to gaining the approvals for, implementation of the conditions requisite to, and complying with the permits for construction of the Project and (K) the management and oversight of construction of the Project and all Project-related activities relating thereto. The Developer shall provide, through the appointment of one or more of its employees, construction management services with respect to all work necessary to construct the Project and overall project management. The fee for such services shall be included within (and not in addition to) the Development Fee.

(b)     Subject to the limitations set forth herein and in the Operating Agreement, Developer shall coordinate with all contractors and otherwise take reasonable efforts to ensure that all work on the Project performed pursuant to this Agreement shall be performed in substantial conformance with the plans and specifications for the Project and the requirements, terms and conditions of the individual purchase agreements for the sale of Units.

(c)     The Developer shall for all purposes act as the representative of the Owner with regard to all aspects of the day-to-day coordination, administration, management and supervision of the Project.

(d)     All contracts for the performance of work on the Project, including, but not necessarily limited to land development and construction contracts, shall be negotiated by the Developer on behalf of and in the name of the Owner. All such contracts shall be approved by the Owner before they are executed and become valid and binding contracts and agreements; provided, however, that if Manager shall have the authority to enter into any such contracts without the approval of the other Member of Owner pursuant to the terms of the Operating Agreement, then no Owner approval shall be required with respect thereto hereunder.

(e)     The Developer shall be responsible for supervising and directing the activities of all agents and employees of the Developer engaged in or working upon the Project or any activities relating to the Project, including specifically, but not necessarily limited to, all on-site sales and supervisory personnel employed by or under contract to the Owner or the Developer.

(f)     A preliminary budget and a preliminary development schedule for the Project have been prepared. This budget shall constitute the operating budget for the Project (as amended from time to time in accordance with the provisions of the Operating Agreement, the "'Project Budget") a copy of which is attached hereto as Exhibit B and made a part hereof by reference, and this schedule shall constitute the development schedule for the Project (the "Project Schedule"), a copy of which is attached hereto as Exhibit C and made a part hereof by reference. The Developer

4

shall use reasonable efforts to oversee, coordinate and administer the Project in all respects in such a manner as is consistent with completion of the Project in accordance with the Project Budget and the Project Schedule. All deviations from the Project Budget and Project Schedule shall be reviewed by and are subject to the prior written approval of the Owner, except for those deviations specifically permitted under this Agreement or which Manager is permitted to carry out without the consent of the other Member pursuant to the terms of the Operating Agreement.

(g)     The Developer shall prepare written status reports not less frequently than monthly detailing the progress of development, construction, marketing and sales activities, and noting actual or anticipated problems related thereto, including any deviations from the Project Schedule or Project Budget, such deviations from the Project Budget which shall be presented, explained and noted on a line-by-line basis.

(h)     The Developer shall prepare on the date of completion of the sales of the units, a statement for the Project detailing the revenues and expenses of the Project and the sales and marketing activities relating thereto.

(i)     The Developer shall update on a semi-annual basis, or more frequently as the Owner specifically requires, the Project Budget and Project Schedule to reflect changes thereto pursuant to the direction of the Owner.

5.     Compensation.

(a)     Pre-Development Fee and Development Fee:  In consideration for the performance of the foregoing services by the Developer, the Owner shall pay to the Developer a pre-development fee and a development fee. The pre-development fee payable hereunder shall be equal to fifteen thousand dollars ($15,000) per month (the "Pre-Development Fee"), payable on the first day of each month, beginning on October 1, 2004, and ending in the month during which the Owner gives notice to proceed to the general contractor. The Pre-Development Fee payable on October 1, 2004 and November 1, 2004 in accordance with the foregoing shall be paid upon the execution of this Agreement. The development fee payable hereunder (the "Development Fee") shall be equal to four percent (4%) of total hard costs and soft costs (excluding loan interest) set forth in the Project Budget approved prior to commencement of construction, less the amount of the Pre-Development Fee. The Development Fee shall be paid in equal monthly installments, beginning on the first day of the month following the month in which notice to proceed is given by the Owner to the general contractor, over the projected construction period, as set forth in the approved Project Budget referred to above. The amount and timing of the payment of each of such fees shall be subject to modification to the extent required by the construction lender, and as so modified shall be reflected in the final, approved Pre-Development Budget and Project Budget adopted prior to the commencement of construction.

(b)     Reimbursement of Project Costs and Expenses:  In addition to the Pre-Development Fee and the Development Fee, the Developer shall be fully and entirely reimbursed by the Owner for any and all direct, out-of-pocket, third-party costs and expenses incurred by the Developer in connection with the performance of its development services activities called for by this Agreement, including but not limited to items such as printing, phone, travel, and the like (collectively the "Project Costs and Expenses"); provided however, that with respect to any such

5

reimbursement, the Developer shall present the Owner invoices, in such detail and with such receipts as are necessary to substantiate such direct, out-of-pocket, third-party costs and expenses and provided further, that the costs and expenses for which reimbursement is sought pursuant to this paragraph shall be in accordance with the Project Budget or otherwise be permitted to be incurred by Manager under the Operating Agreement hereunder.

6.     Progress of Work.

(a)     Upon notification by the Owner to the Developer that the Owner has acquired ownership of the Property and the financing is in place for the development and construction of the Project, the Developer shall proceed with managing the work of development and construction, and shall coordinate the Project's consultants and contractors in the performance of the work and furnishing all of the materials shown on the plans and specifications in accordance with the Project Budget and Project Schedule. In each instance, the work to be performed shall be commenced as quickly as possible, and, when commenced, shall be carried through expeditiously and continuously to completion as rapidly as the proper doing of the work, the employment of available subcontractors, the prompt placing of orders by the Developer, and the availability of materials will permit, it being intended that the work shall proceed in accordance with the Project Budget and the Project Schedule.

(b)     Changes in the plans and specifications for the Project, the Project Budget and the Project Schedule shall be evidenced by change orders prepared by Developer for submission to Owner for its prior written approval ("Change Orders"). Notwithstanding the foregoing, Owner's approval shall not be required for Change Orders which Manager is otherwise authorized to carry out under the Operating Agreement without the consent of the other Member of the Owner.

(c)     Nothing contained herein shall require the Developer to employ overtime labor.

(d)     In no event shall the Developer be deemed liable to the Owner for any delay in the final completion of the work caused by force majeure. The time for performance of any obligation hereunder shall be excused for the period of delay or prevention resulting from an event of force majeure and extended for a period equal to the period of such delay or prevention.

7.     Quality of Work. Subject to the limitations set forth herein and in the Operating Agreement, Developer shall coordinate with all contractors and otherwise take reasonable efforts to ensure that all work under this Agreement is performed in all respects in compliance with applicable building laws, ordinances and regulations and the plans and specifications; and all such work shall be done in a good and workmanlike manner and shall be of a quality to be specified by the Owner.

8.     Independent Contractor Relationship

(a)     The parties intend that the Developer's legal status with respect to the Owner shall be that of an independent contractor, and they expressly disclaim any right to create an agency relationship between the Owner and the Developer. Accordingly, the Developer shall be an independent contractor with respect to its rights, duties and obligations hereunder and shall perform

6

such duties and obligations in such manner as it, in its sole discretion, but subject to the limitations contained in this Agreement, shall deem proper.

(b)     All employees retained to perform Developer's services hereunder shall be employees of the Developer, or employees of a subcontractor engaged by the Developer, and the Developer shall maintain adequate insurance, at the sole cost and expense of the Developer, to protect the Developer and the Owner from and against criminal acts including, but not limited to, theft or embezzlement of or by any such employees of the Developer.  Furthermore, the Developer, at its sole cost and expense, shall make all necessary payroll deductions for disability and unemployment insurance, social security, withholding taxes and other applicable taxes for its employees, and prepare, maintain and file all necessary reports with respect to such taxes or deductions, and all other necessary statements and reports pertaining to its employees.

9.     Termination.

(a)     This Agreement may be terminated by the Owner as of the end of any calendar month, only for just cause.  "Just cause" is hereby defined to mean:

(i)     The material failure of the Developer to observe or perform any of its duties or obligations hereunder and the continued failure of the Developer to observe or perform the same for a period of thirty (30) days from the date of its receipt of written notice from the Owner specifying the act or acts of the Developer deemed by the Owner to be in violation of or contrary to the provisions of this Agreement; provided that such thirty (30) day period shall be extended for such time as is reasonably necessary to cure such default (but not to exceed ninety (90) additional days), if the Developer has commenced the curing of such default within said thirty (30) day period and is diligently pursuing the completion of such cure, and provided further that such cure right shall not apply with respect to any breach or default attributable to Developer's willful misconduct or intentionally harmful action or inaction; or

(ii)     the removal of CRA Urban Venture I LLC as Manager of the Owner pursuant to Section 2.04 of the Operating Agreement.

No liability shall attach to either party by reason of such termination; provided, however, that, to the extent that either party has liabilities or obligations existing as of the date of such termination, such liabilities or obligations shall not be forgiven, but must be met and satisfied notwithstanding such termination.

(b)     In the event that a petition in bankruptcy is filed by or against the Owner or the Developer, or in the event that either makes an assignment for the benefit of creditors or takes advantage of any insolvency act, the other party may terminate this Agreement immediately upon written notice to the other party; provided, however, that to the extent that either party has liabilities or obligations existing as of the date of such termination, such liabilities or obligations shall not be forgiven, but must be met and satisfied notwithstanding such termination.

(c)     Upon termination of this Agreement for any reason, payment of the Pre-Development Fee and Development Fee, and Developer's rights to such fee that would accrue thereafter, shall cease as of the effective date of the termination, provided that Owner shall pay

7

promptly Developer its Pre-Development Fee and Development Fee that may have accrued and that remains unpaid as of the effective date of such termination, without set-off.

10.    Severability.  Each provision of this Agreement is intended to be severable.  If any term or provision hereof shall be determined by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever, such provision shall be severed from this Agreement and shall not affect the validity of the remainder of this Agreement.

11.    Attorney's Fees.  In the event either of the parties hereto shall institute any action or proceeding against the other party relating to this Agreement, the unsuccessful party in such action or proceeding shall reimburse the successful party for its disbursements incurred in connection therewith and for its reasonable attorney's fees as fixed by the court.

12.    Waiver; Consents.  No consent or waiver, express or implied, by either party hereto or for any breach or default by the other party in the performance of the other of its obligations hereunder shall be valid unless in writing, and no such consent or waiver shall be deemed or construed to be a consent or waiver to or for any other breach or default in the performance by such other party of the same or any other obligations of such party hereunder.  Failure on the part of either party to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.  The granting of any consent or approval in any one instance by or on behalf of the Owner shall not be construed to waive or limit the need for such consent in any other subsequent instance.

13.    Indemnifications.

(a)    The Developer hereby absolutely, unconditionally and irrevocably covenants and agrees to indemnify and hold harmless the Owner (and its members and its and their respective members, partners, shareholders, officers, directors, employees and agents) from and against any and all claims, demands, liabilities, losses, costs or expenses arising out of or in any way connected with any acts, omissions to act or forbearances of the Developer (and its members and its and their respective members, partners, shareholders, officers, directors, employees and agents) which (i) are in knowing violation of the terms set forth in this Agreement, and/or (ii) which constitute or are otherwise attributable to Developer's gross negligence, willful misconduct or intentionally harmful action or inaction.

(b)    The Owner hereby absolutely, unconditionally and irrevocably covenants and agrees to indemnify and hold harmless the Developer (and its members and its and their respective members, partners, shareholders, officers, directors, employees and agents) from and against any and all claims, demands, liabilities, losses, costs or expenses arising out of or in any way connected with any acts, omissions to act or forbearances of the Developer including with respect to Developer's performance under this Agreement, to the extent that such actions or inactions are not (i) attributable to Developer's gross negligence, willful misconduct or intentionally harmful action or inaction, or (ii) not otherwise in knowing violation of the terms of this Agreement.

14.    Binding Effect; Assignment.  This Agreement shall be binding on the parties hereto and each of their respective successors and assigns; provided, however, that the Developer may not

8

(voluntarily, involuntarily or by operation of law) assign its rights or obligations hereunder without the prior written consent of the Owner (which may be granted or denied in Owner's sole discretion).

15.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference to choice of law principles which might indicate that the law of some other jurisdiction should apply.

16.     <u>Entire Agreement</u>.     This Agreement represents the entire understanding and agreement between the parties hereto with respect to (and only with respect to) the development, construction, marketing and sale of the Project, and, to the extent inconsistent therewith, supersedes all other prior agreements, representations and covenants, oral or written, and this Agreement may not be modified other than by written instrument executed by both parties hereto.

9

IN WITNESS WHEREOF, the parties hereto have affixed their signatures and seals to this Development Services Agreement as of the day and year first hereinabove set forth.

**WITNESS**:

**OWNER**:

**GAGE SCHOOL HOLDINGS, LLC**

By:     CRA URBAN VENTURE I LLC,
        Operator

By: _____(SEAL)
        William Herman,
        Managing Member

By:     HUI LLC

        By:     Ka Po'e Hana, LLC,
                its Manager

        By: _____(SEAL)
        Name: John H. Agee
        Title: President & CEO

**DEVELOPER**:

CRA URBAN LLC

By: _____(SEAL)
        Name:   William Herman
        Title:    Managing Member

10

EXHIBIT A

PRELIMINARY PLANS AND SPECIFICATIONS


[To Be Attached]

EXHIBIT B

PRELIMINARY PROJECT BUDGET


[See Attached]

**GAGE SCHOOL CONDOMINIUMS - 2035 2ND STREET, NW**
**CONCEPTUAL PREDEVELOPMENT BUDGET**

### SOURCES

|  | $ Amount | Land Closing | Pre-Develop |
|---|---|---|---|
| Columbia Bank | $2,250,000 | $1,166,732 | $1,083,268 |
| CRA Urban Venture I LLC | 225,000 | 225,000 | 0 |
| Hue LLC | 1,300,000 | 1,300,000 | 0 |
| **SOURCES, TOTAL** | **$3,775,000** | **$2,691,732** | **$1,083,268** |

### USES

**LAND COSTS**

|  |  |  |  |
|---|---|---|---|
| Contract Purchase Price | 2,250,000 | 2,250,000 | 0 |
| Consulting Fee | 75,000 | 75,000 | 0 |
| Transfer & Recordation Taxes | 50,300 | 50,300 | 0 |
| **LAND COSTS, TOTAL** | **2,375,300** | **2,375,300** | **0** |

**SOFT COSTS**

|  |  |  |  |
|---|---|---|---|
| Architect & Engineer | 550,000 | 113,555 | 436,445 |
| Building Permit, Construction Bond, Etc. | 25,000 | 0 | 25,000 |
| Third Party Reports | 75,000 | 21,330 | 53,671 |
| Real Estate Taxes (2005) | 36,000 | 0 | 36,000 |
| Insurance - General Liability & Property | 20,000 | 10,000 | 10,000 |
| Other Closing Costs | 30,000 | 30,000 | 0 |
| Legal, Condo Docs & Accounting | 100,000 | 24,925 | 75,075 |
| Columbia Bank Commitment Fee | 22,500 | 22,500 | 0 |
| Columbia Bank Legal | 3,000 | 3,000 | 0 |
| Hue LLC Legal | 15,000 | 15,000 | 0 |
| C&W Placement Fee | 35,500 | 35,500 | 0 |
| Marketing Expenses | 150,000 | 0 | 150,000 |
| Development Fee ($ / mos) | 120,000 | 30,000 | 90,000 |
| Contingency - Soft Costs | 100,700 | 10,622 | 90,078 |
| **SOFT COSTS. TOTAL** | **1,282,700** | **316,432** | **966,268** |
| Interest Reserve - Columbia | **117,000** | **0** | **117,000** |
| **USES, TOTAL** | **$3,775,000** | **$2,691,732** | **$1,083,268** |

## GAGE SCHOOL CONDOMINIUMS - 2035 2ND STREET, NW
## CONCEPTUAL DEVELOPMENT BUDGET

### SUMMARY DATA

| | | | | |
|---|---|---|---|---|
| Site Area | | 42,118 | Total Residential SF ("SSF") | 68,085 |
| Legal FAR | 75,812 | 1.8 | Parking Ratio | 0.81 |
| Below Grade Gross SF | | | Parking Spaces | 75 |
| GSF | | 89,227 | Residential Units | 93 |
| Core Factor | | 24% | Average Unit Size | 732 |

### DEVELOPMENT BUDGET

| | | $ Amount | Per SSF | Per GSF | Per Unit | % Cost |
|---|---|---|---|---|---|---|
| **LAND COSTS** | | | | | | |
| Purchase Price | | $2,250,000 | $33.05 | $25.22 | $24,194 | 9.1% |
| Consulting Services - Acquisition & Predevelopment | | 75,000 | 1.10 | 0.84 | 806 | 0.3% |
| Closing Costs | | 50,300 | 0.74 | 0.56 | 541 | 0.2% |
| Land Appreciation | | 500,000 | 7.34 | 5.60 | 5,376 | 2.0% |
| **LAND COSTS, TOTAL (per legal FAR)** | **$37.93** | **2,875,300** | **42.23** | **32.22** | **30,917** | **11.6%** |
| **HARD COSTS** | | | | | | |
| Gage School | | 4,376,141 | 64.27 | 49.05 | 47,055 | 17.7% |
| V Street Condos | | 6,637,721 | 97.49 | 74.39 | 71,373 | 26.8% |
| Flagler Condos | | 2,356,438 | 34.61 | 26.41 | 25,338 | 9.5% |
| Landscaping/Sitework | | 413,430 | 6.07 | 4.63 | 4,445 | 1.7% |
| General Conditions, Overhead, Fees | | 1,956,278 | 28.73 | 21.92 | 21,035 | 7.9% |
| **Subtotal** | | **15,740,008** | **231.18** | **176.40** | **169,247** | **63.6%** |
| Contingency - Renovation Hard Costs | 12.0% | 525,137 | 7.71 | 5.89 | 5,647 | 2.1% |
| Contingency - New Construction Hard Costs | 7.0% | 658,531 | 9.67 | 7.38 | 7,081 | 2.7% |
| **HARD COSTS, TOTAL** | | **16,923,676** | **248.57** | **189.67** | **181,975** | **68.4%** |
| **SOFT COSTS** | | | | | | |
| Architect & Engineer | | 950,000 | 13.95 | 10.65 | 10,215 | 3.8% |
| Building Permit, Construction Bond, Etc. | | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Inspections, Survey, Testing & Other Third Party Reports | | 150,000 | 2.20 | 1.68 | 1,613 | 0.6% |
| Real Estate Taxes | | 100,000 | 1.47 | 1.12 | 1,075 | 0.4% |
| Insurance - Builder's Risk & Commercial Liability | | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Transfer & Recordation Taxes | | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Legal, Condo Docs & Accounting | | 200,000 | 2.94 | 2.24 | 2,151 | 0.8% |
| Lender Fee | | 202,500 | 2.97 | 2.27 | 2,177 | 0.8% |
| C&W Placement Fee | | 230,000 | 3.38 | 2.58 | 2,473 | 0.9% |
| Marketing Expenses | | 300,000 | 4.41 | 3.36 | 3,226 | 1.2% |
| Development Management Fee (% / costs) | 4.0% | 800,000 | 11.75 | 8.97 | 8,602 | 3.2% |
| Development Management Reimbursables | 5.0% | 40,000 | 0.59 | 0.45 | 430 | 0.2% |
| Contingency - Soft Costs | 5.0% | 136,625 | 2.01 | 1.53 | 1,469 | 0.6% |
| **SOFT COSTS, TOTAL** | | **3,709,125** | **54.48** | **41.57** | **39,883** | **15.0%** |
| **LAND, HARD & SOFT COSTS** | | **23,508,101** | **345.28** | **263.46** | **252,775** | **95.0%** |
| **CONSTRUCTION INTEREST** | | 1,243,257 | 18.26 | 13.93 | 13,368 | 5.0% |
| **TOTAL PROJECT COST** | | **$24,751,358** | **$363.54** | **$277.40** | **$266,144** | **100.0%** |

### PRO FORMA SALE PROCEEDS

| RESIDENTIAL SALES REVENUE | Area | Units | $ Amount | Per SSF | | Per Unit | % of Mix |
|---|---|---|---|---|---|---|---|
| Gage School Condos | 27,230 | 33 | $11,164,300 | $410.00 | | $338,312 | 40.0% |
| V Street Condos | 29,895 | 44 | 12,256,950 | 410.00 | | 278,567 | 43.9% |
| Flagler Place Condos | 10,960 | 16 | 4,493,600 | 410.00 | | 280,850 | 16.1% |
| **Subtotal** | **68,085** | **93** | **27,914,850** | **410.00** | | **300,160** | **100.0%** |
| 5% Increase after 50% Sales | | | 697,871 | 10.25 | | 7,504 | 2.2% |
| Storage Spaces | | 30 | 150,000 | N/A | | 5,000 | 0.5% |
| Parking Spaces | | 75 | 2,625,000 | N/A | | 35,000 | 8.4% |
| **Totals** | **68,085** | **93** | **31,387,721** | **461.01** | | **337,502** | |

| SALES COSTS | | | $ Amount | Per SSF | | Per Unit | % of Sales |
|---|---|---|---|---|---|---|---|
| In-House Broker Commissions | 100% | 2.00% | (627,754) | (9.22) | | (6,750) | -2.0% |
| Outside Broker Commissions | 40% | 3.00% | (376,653) | (5.53) | | (4,050) | -1.2% |
| Transfer & Recordation Taxes, Misc. Closing Costs | 1.50% | | (470,816) | (6.92) | | (5,063) | -1.5% |
| **SALES COSTS, TOTALS** | | | **(1,475,223)** | **(21.67)** | | **(15,863)** | **-4.7%** |
| **NET RESIDENTIAL SALE PROCEEDS** | | | **$29,912,498** | **$439.34** | | **$321,640** | **95.3%** |
| **PROFIT** | | | **$5,161,140** | **$75.80** | | **$55,496** | **20.9%** |

EXHIBIT C

PRELIMINARY PROJECT SCHEDULE


[See Attached]

# PROJECT SCHEDULE



| | GAGE SCHOOL<br>CONCEPTUAL PROJECT SCHEDULE | | | | |
|---|---|---|---|---|---|
| ID | Task Name | Duration | Start | Finish | |
| 1 | Property Acquisition | 1 day | Tue 11/30/04 | Tue 11/30/04 | |
| 2 | Schematic Design | 45 days | Fri 10/29/04 | Thu 12/30/04 | |
| 3 | Schematic Budget Update | 7 days | Fri 12/31/04 | Mon 1/10/05 | |
| 4 | Condominium Documentation | 30 days | Fri 12/31/04 | Thu 2/10/05 | |
| 5 | Howard Univ Sales Period | 87 days | Fri 2/11/05 | Mon 6/13/05 | |
| 6 | Building Permit Set of Drawings | 85 days | Fri 12/31/04 | Thu 4/28/05 | |
| 7 | Sheeting & Shoring Permit | 70 days | Tue 1/11/05 | Mon 4/18/05 | |
| 8 | Historic Repair Permit | 80 days | Tue 1/11/05 | Mon 5/2/05 | |
| 9 | Building Permit | 120 days | Tue 5/3/05 | Mon 10/17/05 | |
| 10 | Public Sales Period | 120 days | Tue 6/14/05 | Mon 11/28/05 | |
| 11 | Progress Set Budget Update | 10 days | Fri 3/4/05 | Thu 3/17/05 | |
| 12 | Construction Mobilization | 10 days | Tue 5/3/05 | Mon 5/16/05 | |
| 13 | Gage School Building Renovation | 150 days | Fri 4/29/05 | Thu 11/24/05 | |
| 14 | New Building Construction | 175 days | Fri 4/29/05 | Thu 12/29/05 | |
| 15 | Interior Finishes | 120 days | Fri 10/7/05 | Thu 3/23/06 | |
| 16 | Building Common Areas | 130 days | Fri 12/30/05 | Thu 6/29/06 | |
| 17 | Final Inspections | 10 days | Fri 6/30/06 | Thu 7/13/06 | |
| 18 | Project Completion | 5 days | Fri 7/14/06 | Thu 7/20/06 | |
| 19 | Settlements | 90 days | Fri 7/21/06 | Thu 11/23/06 | |
| | CRA URBAN LLC | | | | |

~WASH1:4628242.v1

## **EXHIBIT K-1**

### **Loan Documents**

Loan Commitment

Loan Agreement

Deed of Trust Note

Deed of Trust and Security Agreement

Guaranty Agreement

Assignment of Permits; Contracts; Plans; and Leases

Hazardous Wastes and Toxic Substances Certificate and Indemnification

Limited Liability Company Certification and Borrowing Authorization

Financing Statement – UCC-1

~BALT2:4113320.v8  |11/29/04
1-6

## EXHIBIT K-2

## Acquisition Documents

Agreement of Purchase and Sale, as amended

Deed

Development Covenant and Agreement

~BALT2:4113320.v8  |11/29/04
1-6